UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| SUNCOAST WATERKEEPER, OUR CHILDREN'S EARTH FOUNDATION, and ECOLOGICAL RIGHTS FOUNDATION,<br><br>     Plaintiffs,<br><br>     v.<br><br>CITY OF ST. PETERSBURG,<br><br>     Defendant. | Case No: 8:16-cv-03319-JDW-AEP |

**PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS UNDER SECTION 505(d) OF THE CLEAN WATER ACT AND MEMORANDUM IN SUPPORT**

Pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and the Court's December 17, 2018 Stipulated Order of Partial Dismissal and Court's Retention of Jurisdiction ¶ 5 (Dkt 187), Plaintiffs Suncoast Waterkeeper, Our Children's Earth Foundation and Ecological Rights Foundation ("Citizens"), as the prevailing parties in this case, hereby move the Court to award attorneys' fees and costs. Attached to this Motion are the declarations of all counsel claiming attorney time: Christopher Sproul, Fredric Evenson, Justin Bloom, Molly Coyne, Kathryn Schmidt, Michael Goodstein and Benjamin Pierce.

**MEMORANDUM IN SUPPORT**

Through the application of considerable effort, expertise and skill, the Citizens achieved excellent results in resolving this Clean Water Act ("CWA") action through a Court-ordered settlement requiring the Defendant City of St. Petersburg's ("City") compliance with expansive injunctive relief and a $200,000 payment to the Tampa Bay Estuaries Program ("TBEP"), in lieu

1

of civil penalties, to fund environmental projects in the St. Petersburg area. *See* December 17, 2018 Stipulated Order of Partial Dismissal and Court's Retention of Jurisdiction and its two attachments: Attachment A: Consent Order OGC No. 16-1280 (effective July 26, 2017) ("Consent Order") and Attachment B: First Amendment to Consent Order (effective October 12, 2018) ("First Amendment to Consent Order") (Dkt 187, 182-1, 182-2) (collectively referred to as "Stipulated Order"). Through the Stipulated Order, the Citizens fully met this citizen suit's public interest objectives: (1) court-supervised injunctive relief mandating firm deadlines for fixes to the City's failing sewage infrastructure and (2) deterrent civil penalties for the City's sanitary sewer overflows ("SSOs") that violated the CWA. *See* Second Amended Complaint (Dkt 87).

As prevailing parties, the Citizens here seek $1,331,814 in attorneys' fees and $167,095 in costs through February 25, 2019 under CWA Section 505(d) and the Stipulated Order ¶ 5. While the Citizens are mindful that this is a substantial amount, the fees and costs reached this magnitude because the City chose to assert a vigorous defense until a trial date was looming. Absent any prospect of settlement, the Citizens worked diligently to carry their burden of proof as the case moved toward trial. To assist the Court in its review of the appropriate fee award, the Citizens have diligently reviewed the hours recorded and exercised billing judgment to reduce the fees claimed where appropriate. For the Court's reference, Exhibit 1 to the Schmidt Declaration contains spreadsheet summaries of the Citizens' hours and the lodestar, and Exhibit 2 contains a master spreadsheet of all attorney time combined, separated into six phases of the case. Schmidt Decl. ¶¶ 10-16, 77, Ex. 1 and Ex. 2.

## BACKGROUND

### I. Objectives of the Citizen-Suit

The Citizens initiated this CWA action in response to the City's unprecedented discharges of over 100 million gallons of raw and partially treated sewage into Tampa Bay in June, August and September of 2016. At that point, the City had an unfortunate history of large, public health threatening and environmentally damaging SSOs, having unlawfully spilled millions of gallons of sewage into Tampa Bay in August 2015. The Citizens, who had already been investigating Gulf Coast cities for sewage problems since December 2015, moved quickly in response to the City's astonishingly large SSOs and issued a CWA Section 505 Notice of Intent to Sue Letter within two weeks of the discharges, on September 28, 2016. 33 U.S.C. § 1365; Sproul. Dec1. ¶¶ 17-19; Bloom Decl. ¶ 7.

At the time of their Notice Letter, the Citizens were aware of a *draft* Florida Department of Environmental Protection ("FDEP") consent order dated a week earlier (September 19, 2016). However, that draft consent order was inadequate for several reasons. First, it was only in draft form, to be negotiated by the City and FDEP for an unknown time (the consent order was not finalized until nine months later, on July 27, 2017) and to the exclusion of the Citizens. Sproul Decl. ¶ 19; Consent Order (Stipulated Order Att. A (Dkt 182-1)).  Second, it allowed the City full discretion to decide what measures to take, and when, to remedy its SSOs' primary cause: too much groundwater and stormwater entering its 900 miles of neglected sewer pipes. Consent Order (Att. A, Dkt 187, 182-1); Excerpts from 5/18/18 Expert Disclosure of Thomas Christ ("Christ Report") Opinions 9-19 (Schmidt Decl. Ex. 8); Sproul Decl. ¶ 19. Third, history demonstrated the lack of efficacy of FDEP consent orders generally: the City was under a prior FDEP consent order from 2000-2010 that demonstrably failed to remedy the City's sewage

3

infrastructure failings. Sproul Decl. ¶ 19; Schmidt Decl. Ex. 10 (FDEP Consent Order OGC 97-0134 (effective Feb. 4, 2000)). That failure is obvious from the City's SSOs during wet weather events in 2012, 2015 and 2016, which also was confirmed by City staff. *See* Christ Report, Opinions 6-9 (Schmidt Decl. Ex. 8).  Fourth, the Citizens' research of FDEP consent orders with area municipalities found them to be ineffective in reducing SSOs. Sproul Decl. ¶ 19; Coyne Decl. ¶ 4. Fifth, the City's management appeared to be in turmoil at that time.[1]  In sum, the City's collection system was in desperate need of repair, and the Citizens reasonably determined another FDEP consent order would again be ineffective at securing the City actions needed to protect the environment and public health. Accordingly, in the absence of "diligent prosecution" by the United States Environmental Protection Agency ("EPA") or Florida under a state statute comparable to the CWA,[2] the Citizens sought a federal court order to ensure that the City would indeed fix its neglected infrastructure. Bloom Decl. ¶ 6.

The Citizens made four settlement overtures throughout the litigation. The Citizens' first settlement offer was in November 2016, after their Notice Letter but before filing the case. The City failed to seriously entertain this offer. Bloom Decl. ¶ 13; Sproul Decl. ¶ 20. The City further rebuffed the Citizens' additional settlement overtures in September 2017 (during Court-required mediation) and in April 2018 (following the Court's denial of the City's Motion for Summary Judgment and significant discovery). Bloom Decl. ¶¶ 13-14. These rejections mandated that the Citizens diligently work to carry their burden of proof, including extensive case development,

---

[1] In the Fall of 2016, there were widespread public reports of the failure of the City to fully inform the public in 2015 and 2016 of the sewage spills, allegations that City staff concealed important information and an internal audit commissioned by City Council to investigate that concealment, consultants hired by the City Council to evaluate and make recommendations concerning the City's Wastewater Division; turnover in management; and a whistleblower on City staff making allegations of the City's mismanagement and concealment. Sproul Decl. ¶ 19.

[2] This Court confirmed that the Florida state law is not "comparable" to the CWA when it denied the City's Motion for Summary Judgment on this issue (Dkt. 132).

discovery, motions practice, expert disclosures and preparation for trial. The work was effective, because after receiving the Citizens' expert disclosures in May of 2018, the City finally agreed to seriously discuss settlement. Schmidt Decl. ¶¶ 51-54.

## II.    The Citizens' Successful Resolution of the Case

From before the lawsuit was filed, the Citizens have always demanded Court-enforced obligations and deadlines from the City that were absent from the Consent Order but required to reduce and ultimately eliminate SSOs. Sproul Decl. ¶¶ 19-20; Bloom Decl. ¶ 6, 13-15. Those additional essential commitments are now contained in the settlement entered by the Court on December 17, 2018. Stipulated Order (Dkt 187, 182-1, 182-2).

## A.  Injunctive Relief

In the Stipulated Order, the Citizens obtained the injunctive relief they sought in initiating this action: Court-ordered work by the City to assess and repair its failed sewage infrastructure within specified timeframes. In addition, the settlement creates rights of oversight and judicial enforcement for the Citizens that previously did not exist, such that (1) the Citizens can seek the Court's enforcement if the City does not adhere to its commitments and (2) the City cannot modify its work commitments without the Citizens' agreement and Court approval. Having obtained a stipulated Court Order mandating the City's specific essential work commitments coupled with the Court's retention of jurisdiction for six years, the Citizens have ensured redress for a significant environmental problem. The Stipulated Order secures these additional actions:

1.    Development of a Sanitary Sewer Asset Management Program ("SSAMP") as part of the City's Integrated Wastewater Resources Master Plan required under the Consent Order (Att. A), including numerous detailed provisions relating to all aspects of the wastewater collection system maintenance and operation. Att. B ¶ 6.g.

2.    Development of a Rain Derived Inflow and Infiltration ("RDII") Evaluation and Reduction Plan. Att. B ¶ 6.i.

3. Assessment and repair, replacement or rehabilitation of the components of the wastewater collection and transport system by specified deadlines: gravity sewer lines, manholes, pump stations and identified critical force-main lines. Att. B at ¶¶ 6.h, 6.n and 6.r. An additional $2 million increase in the City's annual commitment for pipe lining/replacement and manhole rehabilitation for a total commitment of $16 million per year. Att. B ¶ 6.l.

4. Routine sewer cleaning program for fats, oil and grease ("FOG"), roots or debris, FOG public education, and coordination between the City's Water Resources Department and its food service establishment inspectors regarding FOG. Att. B ¶ 6.f.

5. Installation of additional meters/monitors throughout the collection system and at pump stations for monitoring the system's response to wet weather events. Att. B ¶ 6.s.

6. Construction of a new lift station to balance flows between wastewater treatment plants as necessary during wet weather events. Att. B ¶ 6.e.

7. A system for notification and tracking of properties with defective private lateral sewer lines and an accelerated deadline for passing an ordinance for homeowner replacement of private lateral sewer lines (now June 30, 2020). Att. B ¶ 6.m.

8. Microbial testing in identified water bodies throughout the City, and if necessary, further microbial source tracking to determine the source of high measurements of fecal bacteria contamination. Att. B ¶ 6.o.[3]

9. Issuance of public advisories/notifications when water quality monitoring flags unsafe levels in area waters, and communication of such water quality test results to the Pinnellas County Health Department. Att. B ¶ 8.

10. Semi-annual "Implementation Reporting" to the Citizens, in addition to FDEP, describing the City's status and work as to each requirement of the First Amended Consent Order. Stipulated Order ¶ 3 and Attachment B ¶ 6.q.

The settlement keeps the City on-track with objective metrics and timelines for repairing its defective wastewater collection system. The difference between the original Consent Order and the First Amendment to Consent Order negotiated with the Citizens can easily be seen by reviewing the proposed settlement recommended to City Council for approval. Bloom Decl. Ex. 5 (Agenda Packet for August 9, 2018 meeting (yellow highlights of additional obligations)) and

---

[3] The microbial source tracking work, which would not exist as legally required but for the citizen suit, has been well-received as beneficial to the public. *See* Transcript of January 17, 2019 City Council Meeting, Bloom Decl. Ex. 7.

Ex. 6 (Transcript of August 9, 2018 meeting). In addition, the unamended requirements of the original Consent Order are Court enforceable, and the City will pay up to $15,000 annually for the Citizens' compliance monitoring costs. Stipulated Order ¶¶ 1, 4.[4]

### B.  Payments Toward Environmental Restoration Projects in Lieu of Civil Penalties

The settlement requires the City to pay $200,000 to TBEP for environmental projects to benefit local watersheds, in lieu of CWA civil penalties. Stipulated Order ¶ 2; November 16, 2018 TBEP Letter to the U.S. Department of Justice ("DOJ") (Dkt 175-1).

### C.  Settlement Format

The Stipulated Order is the result of creative work by the attorneys and engineers for both Parties to negotiate a settlement acceptable to all in substance and in form. Schmidt Decl. ¶¶ 55-57.  The negotiated work commitments were placed into the First Amendment to Consent Order, which is now attached to the Stipulated Order along with the original Consent Order. (Dkt 187, 182-1, 182-2).  The Court retains jurisdiction to enforce the work commitments for a six year term. Stipulated Order ¶ 10. The Citizens now have oversight and enforcement rights to ensure the City's compliance with the work commitments they negotiated, and these commitments cannot be modified without the Citizens' agreement and the Court's approval. Stipulated Order ¶¶ 9-10.  In Stipulated Order, the Citizens have achieved Court-ordered injunctive relief.

### ARGUMENT

### I.    The Citizens Are the Prevailing Parties under the Clean Water Act

Under the CWA, a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court

---

[4] The remaining unamended provisions of the Consent Order include completion of an Integrated Water Resources Master Plan, recommendations whether to reopen of the Albert Whitted wastewater treatment plant; reporting of unpermitted discharges; and stipulated penalties for noncompliance. Att. A at ¶¶ 6.e-g, 7 and 12-13 (Dkt 182-2).

determines such award is appropriate." 33 U.S.C. § 1365(d). "The award of fees is within the discretion of the district court; however, the sound exercise of that discretion will not allow the court to deny fees and costs <u>absent good cause</u>." *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1143 (11th Cir. 2002) (emphasis added). Courts generally must award attorneys' fees to prevailing environmental citizen suit plaintiffs to encourage statutory goals, because fee-shifting is typically required for public interest groups to secure representation:

> [I]t is important to distinguish between traditional civil cases and environmental litigation . . . . The legislative history of the fee shifting provisions indicates that they were enacted to encourage litigation to ensure proper administrative implementation of the environmental statutes. . . . Unlike Citizens in traditional civil actions, Citizens in environmental suits do not seek to vindicate personal rights and they obtain no financial benefit if they win.

*Sierra Club v. Hankinson*, 351 F.3d 1358, 1362-63 (11th Cir. 2003) (*quoting National Wildlife Federation v. Hanson,* 859 F.2d 313, 316-17 (4th Cir. 1988).[5]

### A. **The Stipulated Order Establishes the Citizens as the Prevailing Parties**

The Citizens unquestionably are the prevailing parties in this action having secured the Stipulated Order:

> [E]ven where there has been no formal entry of a consent decree following a settlement agreement, a district court may still award attorney's fees to the prevailing party as long as: (1) it has incorporated the terms of the settlement into the final order of dismissal or (2) it has explicitly retained jurisdiction to enforce the terms of the settlement.

---

[5] "The fee-shifting provisions in public interest statutes are designed to attract competent counsel to represent public interest plaintiffs by ensuring that if they prevail, counsel will receive fees commensurate with what they could obtain in other litigation. *City of Burlington v. Dague*, 505 U.S. 557, 568-69, (1992) (Blackmun, J., dissenting). The CWA's fee-shifting provisions are similar to such provisions in civil rights statutes (*e.g.*, 42 U.S. C. § 1988), the enforcement of which depends largely on the efforts of private citizens," and unless reasonable attorney's fees could be awarded for bringing these actions, Congress found that many legitimate claims would not be redressed. H. R. Rep. No. 94-1558, p. 1 (1976). *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560 (1986). The case law construing what is a "reasonable" fee applies uniformly to all of them. *Flight Attendants v. Zipes*, 491 U.S. 754, 758, n.2, (1989). *City of Burlington v. Dague,* 505 U.S. 557, 561-62 (1992).

*Smalbein v. City of Daytona Beach*, 353 F.3d 901, 904-05 (11th Cir. 2003) (citing *American Disability Ass'n.,* 289 F.3d 1315, 1320 (11th Cir. 2002) and applying *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 604 (2001); see also Rowe v. Jones,* 483 F.3d. 791, 798 (11th Cir. 2007) (a "final order" retaining court's jurisdiction should be "treated as a consent decree"); *Aaron-Brush v. Attorney General State of Alabama,* 678 Fed.Appx. 792 (11th Cir. 2017).

The Stipulated Order materially alters the legal relationship between the Parties with Court oversight for a six-year term, requires the Citizen' agreement and Court approval for material modifications, and ensures that the City's commitments survive the decisions of the City's future staff, elected officials or budget priorities.  But for this citizen suit, the First Amendment to Consent Order (Stipulated Order Att. B (Dkt 187, 182-2) would not exist, the City would not be under federal Court order to keep the commitments it negotiated with the Citizens, and the City would not be paying $200,000 to TBEP or $15,000 annually for the Citizens' compliance oversight costs.  Stipulated Order ¶ 2.  The Stipulated Order plainly conveys "prevailing party" status to the Citizens.

## B.  The Citizens Have Advanced the Objectives of the CWA

While the Stipulated Order grants Citizens prevailing party status by altering the legal relationship between the Parties, the Citizens also are prevailing parties because the settlement advances the goals of the CWA. As the 11th Circuit observed, "[t]he definition of that term [prevailing party] is one who "'prevailed in what the lawsuit originally sought to accomplish,'" or more generally "'advanced the goals of the [Clean Water] Act.'" *Black Warrior Riverkeeper, Inc. v. Metro Recycling*, Inc. 613 Fed.Appx 877 (11th Cir. 2015), *quoting Friends of the Everglades v. S. Fla. Water Mgmt. Dist.,* 678 F.3d 1199, 1201–02 (11th Cir.2012); *Tyson Foods*,

9

897 F.2d at 1143 ("[plaintiffs] have served the public interest by insisting that the Clean Water Act be adequately enforced." *quoting Stoddard v. Stoddard, 784 F.2d 1200,1209 (4th Cir 1986)); Chemical Mfrs. Ass'n v. United States Envtl. Prot. Agency*, 885 F.2d 1276, 1279 (5th Cir.1989); *see also Loggerhead Turtle v. The County Council of Volusia County, Florida*, 307 F.3d 1318, 1325 (11th Cir. 2002).

The settlement accomplishes the objectives of the CWA: Court-ordered, detailed and comprehensive injunctive relief and payment of funds for the City's past violations. The $200,000 payment to TBEP alone advances the CWA because it is a "Supplemental Environmental Project" or "SEP" payment in lieu of civil penalties for the City's past violations. Stipulated Order ¶ 2. SEP payments in settlements have long been recognized as advancing the goals of the CWA:

> There is also evidence, however, that <u>Congress encourages settlements that put money directly to use in protecting the environment</u>. . . . In fact, Congress "encourages" settlements of this type "which preserve the punitive nature of enforcement actions while putting the funds collected to use on behalf of environmental protection."

*Sierra Club, Inc. v. Electronic Controls Design, Inc*., 909 F.2d 1350, 1355 (9th Cir. 1990) (emphasis added), citing H.R. Conf.Rep. No. 1004, 99th Cong., 2d Sess. 139 (1986), *reprinted at* 13 Cong.Rec. Hl0,571 (daily ed. Oct. 15, 1986). CWA civil penalties are important for deterrence and retribution, hence Plaintiffs' securing the equivalent of a penalty from the City also advances CWA goals. *See Friends of the Earth, Inc., et al. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 185 (2000).

### C. <u>No Good Cause Exists to Deny the Citizens' Claim for Fees and Costs</u>

In the 11th Circuit, "if a district court denies 'fees and costs,' the district court must establish 'good cause' by "'articulat[ing] the decisions it made [and] giv[ing] principled reasons for those decisions.'" *Friends of Warm Mineral Springs, Inc., et al. v. McCarthy,* 2015 WL

4571281 (M.D. Fla 2015) citing *Tysons Foods*, 897 F.2d at 1143. The Citizens' diligent pursuit of this complex matter led to substantial negotiated injunctive relief under Court Order and a SEP payment in lieu of civil penalties. No good cause could possibly exist for denying the Citizens an award of fees and costs incurred to achieve that result.  Any argument by the City that it was already planning to do the work now embodied in the settlement is immaterial because the settlement places legal requirements on the City that are the sole result of the Citizens' lawsuit.

II.      **The Citizens Are Entitled to Full Recovery of Their Lodestar**

  *Norman v. Hous. Auth. of City of Montgomery, et al.,* 836 F.2d 1292 (11th Cir.1988) governs the analysis for CWA fees and costs awards:

> "[T]he court's order on attorneys' fees must allow meaningful review – the district court must articulate the decision it made, give principled reasons for those decisions, and show its calculation. If the court disallows hours, it must explain which hours are disallowed and show why an award of these hours would be improper."

*Tyson Foods*, 897 F.2d at 1143, quoting *Norman,* 836 F.2d at 1304. "The Supreme Court has explained that the 'the starting point for determining . . . a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" *Reyes v. Aqua Life Corp.*, 632 F. App'x 552, 556 (11th Cir. 2015) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). There is a "strong presumption" that this approach will result in a reasonable fee award. *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008). In opposing the Citizens' claimed hours, the City carries the burden of raising "specific objections" that are "reasonably precise." *Tampa Bay Water v. HDR Engineering, Inc.,* 2012 WL 5387830 at *9 (M.D. Fla Nov. 2, 2012), citing *American Civil Liberties Union of Ga, v. Barnes,* 168 F.3d

423,428-29 (11th Cir. 1999).[6]  Despite having the Plaintiffs' fees and costs package for nearly five months, the City has not provided any meaningful specific objections.[7]  Schmidt Decl. ¶ 64.

### A. <u>The Hours Expended by the Citizens are Reasonable</u>

#### 1. <u>The Citizen's Legal Team</u>

The Court should review the Citizens' hours claimed in light of the experience of the environmental attorneys representing the Citizens and mindful of the incentive for Citizens to keep down the costs of litigation:

> It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, . . . By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker.

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

The three senior-most attorneys – Mr. Sproul, Ms. Schmidt and Mr. Goodstein – are former federal environmental enforcement attorneys with decades of experience representing the United States in enforcement cases under the CWA and other federal statutes, and they managed this case with the same litigation strategy and expertise used when working on behalf of the United States. Sproul Decl. ¶¶ 2-13; Schmidt Decl. ¶¶ 2-8, and Goodstein Decl. ¶¶ 2-7.  Mr. Bloom and Mr. Evenson likewise have extensive environmental litigation experience. Bloom

---

[6] The City does not carry its burden of proof by pointing to its own hours and rates to defend the case. *Tampa Bay Water at *6 ("*the hours spent by [the opponent's] attorneys [cannot] be fairly compared in determining what was reasonable and necessary for [the moving party's] attorneys." citing *Johnson v. Univ. College of the Univ. of Ala. in Birmingham*, 706 F.2d 1205, 1208 (11th Cir.1983); *Brooks v. Georgia State Board of Elections*, 997 F.2d 857, 869-70 (11th Cir. 1993) (citing *Norman,* 836 F.2d at 1300 to reject the application of a municipality rate applicable to the opponent).

[7] Any expert opinion offered by the City regarding Plaintiffs' hours, rates or costs at this point should not be considered.  Fed. R. Civ. P. 37(c)(1). Under the Court's Order (Dkt 194) the City was to produce an expert disclosure that "shall present the expert's opinion regarding the Plaintiffs' entitlement to recovery of attorney's fees, the reasonableness of Plaintiffs' attorney hours and attorney rates, and the reasons for the expert's conclusions."  The expert disclosure addressed a single issue at great length -- that a fee award was not "appropriate" in this case -- and did not include any disclosure as to Plaintiffs' hours, rates or costs.

Decl. ¶¶ 3-5; Evenson Decl. ¶¶ 2-8. There was no learning curve for the legal team here.

The senior attorneys directed the legal team's work to ensure timely and efficient production of winning arguments and evidence, assigning distinct tasks to co-counsel to avoid duplication of effort, and frequently and appropriately delegating tasks to junior attorneys and paralegals, billing at lower rates. Sproul Decl. ¶¶ 14-15, 43-44; Schmidt Decl. ¶¶ 24-44. It is well-recognized that effective representation in complex litigation requires a team of attorneys.[8] The hours include paralegal support as well as numerous hours by attorneys billed at paralegal rates for paralegal tasks, which is compensable at prevailing market rates.[9]

### 2. Litigation Tasks

Litigating this complex and technical CWA case required a substantial investment of time. The Citizens had to learn an old and complex sewage system that was not their own, unravel the history surrounding the City's neglect of its sewage infrastructure, and, relying on their expert sewage consultant, come to understand the detailed requirements necessary for the City to assess and repair its failing sewage collection system. The Citizens did their work without access to resources freely available to defense counsel, *i.e.*, the City's entire Public Works and Water Resources Department, the City's consultants, and the City Attorney's office.[10]

---

[8] *Heard v. District of Columbia*, 2006 WL 2568013at **49-51, (D.C.D.C. Sept. 5, 2006) ("having a senior associate and a partner work in collaboration on a brief during the week prior to its filing is not presumptively excessive… having two attorneys attend a deposition is standard practice"). *Norman,* 836 F.2d at 1302 (time for multiple attorneys recoverable if not redundant and reflect distinct contributions of each lawyer); *Tampa Bay Water* (reduction of time for multiple attorneys warranted "only if the attorneys are unreasonably doing the same work."), *quoting Barnes*; *Wishtoyo Foundation et al. v. United Water Conservation District,* 2019 WL 1109684 at *5-8 (C.D. Cal. March 5, 2019) (finding lodestar reasonable after billing judgment applied).

[9] *Jean v. Nelson*, 863 F.2d 759, 778 (11th Cir. 1988), aff'd sub nom. *Comm'r, I.N.S. v. Jean*, 496 U.S. 154 (1990); *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas Cty.*, 278 F. Supp. 2d 1301, 1310 (M.D. Fla. 2003) (citing *Missouri v. Jenkins*, 491 U.S. at 286-88).

[10] For example, in its initial disclosure of 13 expert witnesses, 9 experts were already consultants or employees paid for by the City independent of the litigation Schmidt Decl. ¶ 42.

13

Consistent with the Federal Rules of Civil Procedure and the Local Rules, the Citizens routinely attempted to work with opposing counsel to attempt to narrow the issues, avoid litigation to the extent possible, and to achieve settlement. These efforts included devoting many hours propounding requests for admission, seeking stipulations to narrow issues, working cooperatively with counsel for the defense on discovery scheduling and joint filings for case management purposes, settlement attempts, and preparing draft settlement documents throughout the litigation. The declarations of Citizens' counsel detail the major litigation tasks performed in the case. Sproul Decl. ¶¶ 14-49; Schmidt Decl. ¶¶ 24-64; Bloom Decl. ¶¶ 6-15; Evenson Decl. ¶¶ 9-16; Coyne Decl. ¶¶ 4,7; Goodstein Decl. ¶ 7; Pierce Decl. ¶ 4.

In evaluating the reasonableness of the Citizens' time, the Court should consider that the Citizens' hours correlate to the City's vigorous defense of the lawsuit, thus multiplying the litigation and driving attorney time and costs considerably upward. A party's choice of aggressive litigation tactics comes with a price. *See City of Riverside, et al. v. Rivera et al.*, 477 U.S. 561, 580 n.11 (1986) ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response."); *Tampa Bay Water v. HDR Engineering, Inc., et al.*, 2012 WL 5387830 (November 2, 2012) (Whittemore, J.) (a party whose choice of litigation tactics serves to increase the amount of fees generated by the other side bears some responsibility for those fees). The City's vigorous defense is seen throughout the history of the case. First, the City went on the offense early by filing eight of the twelve non-procedural motions filed in 2017, requiring substantial work on the part of the Citizens. Sproul Decl. ¶¶ 24-38. Second, the City did not consider settlement until trial was looming, even though it had received a significantly adverse ruling on its Motion for Summary Judgment and Motion to Stay Proceedings in January of 2018 (Dkt 132 and 135). Sproul Decl. ¶ 15. Third, the City

14

maintained the positions asserted in its Motion for Partial Summary Judgment (Dkt 114), for eight months while awaiting a ruling, despite facts discovered to the contrary. For example, when a City manager testified in direct contradiction to his declaration filed in support of the City's argument that certain spills entered surface waters that were not "Waters of the United States" the Citizens requested the City either withdraw the motion or stipulate to facts to narrow the Court's review. Evenson Decl. ¶ 13. Similarly, as the City continued to have SSOs during the litigation, the City's pending argument that the case was moot was undermined and at a minimum genuinely disputed. Fed. R. Civ. P. 56. The Citizens supplemented the Court's record with this evidence (Dkt 140, 141, 142, 147, 151 152). In the face of an overly aggressive defense by the City, the Citizens expended significant resources opposing the City and carrying their burden of proof.

The Citizens expended a total of 5257.3 hours on this case from July 23, 2016 through February 25, 2019 total, excluding the time to prepare this motion and its reply. Schmidt Decl. ¶¶ 10-23. To assist the Court, the Citizens have applied billing judgment to self-impose a total reduction of 1338.7 hours (representing a 25.46% reduction of hours across the team and a 23.52% reduction to the lodestar in the amount of $408,550.36). *Id.* ¶ 11, 22 and Ex. 3. The Schmidt Declaration details billing judgment guidelines used to eliminate any hours that could be considered duplicative, redundant or inefficient. *Id.* ¶¶ 19-23. The 3918.6 hours remaining after billing judgment reductions represent work reasonable and necessary to move this complex case forward to its final resolution. *Id.* ¶ 23 and Ex. 1 (Lodestar Summary Sheets).

Consistent with the guidelines established in *Norman,* 836 F.2d at 1303, the Citizens have grouped the tasks into six Phases: Phase I (Initiation); Phase II (Motions and Early Discovery);

15

Phase III (Peak Discovery and Expert Reports); Phase IV (Dual Track Litigation/Settlement); Phase V (Settlement); and Phase VI (Post-Settlement). Schmidt Decl. ¶ 12, Ex. 1 and 2.

### Phase I:  Case Development and Initiation

In Phase I, the Citizens investigated and initiated this citizen suit action between July 23, 2016 and January 20, 2017 (first case management report filed, Dkt 32), on the heels of unprecedented sewage spills by the City in August-September of 2016.[11]  With Mr. Sproul as lead counsel, the team conducted legal and factual research; obtained documents under public records requests; developed legal theories; reached consensus with clients on litigation goals and strategy; worked with standing witnesses; drafted the statutorily-required citizen suit notice letter; attempted to engage the City in early settlement discussions, to no avail; attempted to coordinate enforcement with FDEP and the United States Environmental Protection Agency; and drafted a proposed consent decree, the complaint and case management documents. Sproul Decl. ¶¶ 17-23. This pre-filing work took substantial time given the complexity of the issues and the tight timeframe imposed on the Citizens. *Ibid*. The Citizens' pre-filing work is recoverable. *See Webb v. County Bd. of Educ.*, 471 U.S. 234, 243 (1985) (time for drafting pleadings and developing the theory of the case is recoverable); *Barnes*, 168 F.3d at 429-30 (awarding reasonable attorneys' fees for pre-filing activity); *Sierra Club v. EPA*, 625 F. Supp. 2d 863, 871 (N.D. Cal. 2007) (pre-litigation background research and investigation, drafting notice letter, and other activities recoverable); *Golden Gate Audubon Soc., Inc. v. U.S. Army Corps of Engineers*, 732 F. Supp. 1014, 1018 (N.D. Cal. 1989) (pre-litigation telephone calls and meetings recoverable).

---

[11] The Citizens' investigation dates back to December of 2015, but none of that time is included here because the investigation covered multiple cities in the region. Sproul, Decl. ¶ 17; Evenson Decl. ¶ 10.

All Phase I work was reasonable and necessary – the Citizens appropriately were not going to initiate a federal lawsuit of this magnitude without adequate research and preparation. Sproul Decl. ¶ 23.  The Citizens claim 351.6 hours for the work of four attorneys during Phase I, after self-reductions for billing judgment. Sproul Decl. ¶¶ 17-23; Schmidt Decl. Ex. 1.

### Phase II:  Motions Practice and Early Discovery

Phase II covers the work of four attorneys over a one-year period between the initial case management report (January 20, 2017) (Dkt 32) and the Court's denial of the City's Motion for Summary Judgment (January 19, 2018) (Dkt 132). Sproul Decl. ¶¶ 24-46.

As can be seen from the Docket Sheet, the City filed eight of the twelve non-procedural motions filed during Phase II.  Schmidt Decl. Ex. 7 (courtesy copy of Docket Sheet); *see also* Sproul Decl. ¶¶ 24-38. The City lost two key motions: a motion for summary judgment and a motion for a stay (Dkt 132, 135). The City's two motions to dismiss for lack of standing (Dkt 7 and 38) resulted in nothing. The first motion was denied as moot (Dkt 36) when Plaintiffs filed the Second Amended Complaint (Dkt 87) and numerous affidavits (Dkt 16-28), and the City stipulated to withdraw its second motion (Dkt 38) after Plaintiffs' filed their brief in opposition (Dkt 53, 83).[12]  The Plaintiffs filed two motions:  (1) Plaintiffs' Motion for Partial Summary Judgment (Dkt 101), which never received a ruling from the Court, and (2) Plaintiffs' Motion to Strike Answer to Amended Complaint (Dkt 90), which the Court granted in part and denied in part, thus narrowing the issues for the Parties (Dkt 134). Plaintiffs further successfully defeated or resolved two Motions to Quash Subpoena filed by third-parties. The City placed a significant workload upon the Citizens with its eight motions in 2017, causing hours of work to complete

---

[12] The Court never ruled on three of the City's 12 motions (two motions to take judicial notice and a second Motion for Partial Summary Judgment (Dkt. 62, 79, 114). The Court granted only one of the City's 12 motions: motion requesting retroactive leave to file a second motion for summary judgment (Dkt 131).

17

factual and legal research necessary to respond, in addition to Plaintiffs' work preparing their two motions and responses to third-party discovery motions.  Sproul Decl. ¶¶ 25-38.

Discovery in Phase II was substantial. As the City and its consultants possessed the information regarding its sewage infrastructure, the Citizens propounded necessary discovery (three sets of Requests for Production of Documents, 37 Interrogatories and 117 Requests for Admission).  Sproul Decl. ¶¶ 39-48. Plaintiffs received five document productions from the City and requested stipulations from the City concerning the documents in order to narrow issues for discovery and trial.  Sproul Decl. ¶ 40.  Plaintiffs issued two subpoenas to third-parties and collected documents from state agencies through public records requests. *Ibid*; Coyne Decl. ¶ 4. The Citizens also continued working with fact and expert witnesses and took two depositions of City staff, including a wastewater treatment plant operator who had filed a whistleblower complaint against the City in connection with the 2016 sewage spills. Evenson Decl. ¶ 13.

Phase II concluded with an important and precedential ruling by the Court on January 19, 2018, when it denied the City's Motion for Summary Judgment (Dkt 132). The Court then denied the City's Motion for a Stay on January 22, 2018 (Dkt 135), thus keeping the case on track for a Fall trial. Despite these adverse rulings, the City did not convey any interest in settlement at that critical moment. Sproul Decl. ¶ 15; Bloom Decl. ¶¶ 13-15. The Citizens claim 856.86 hours for the work of four attorneys during Phase II, after self-reductions for billing judgment.  Sproul Decl. ¶ 42; Schmidt Decl. Ex. 1.

### Phase III:  Peak Discovery and Experts

Phase III covers the time between the Court's January 19, 2018 ruling (Dkt 132) and June 13, 2018 (when the Citizens made their fourth and final written settlement offer to the City). Schmidt Decl. ¶¶ 28-45.  During Phase III, the Citizens engaged trial counsel to prepare the case

18

for a September 2018 trial date. *Id.* at ¶¶ 9, 24-44. Discovery, expert witness preparation and trial preparation was at its peak: The Citizens conducted 10 depositions (two of them extending beyond one day);[13] defended two depositions taken by the City; assisted four expert witnesses in preparation of their disclosures and rebuttal reports; reviewed and analyzed the City's 13 expert disclosures; conducted ongoing document review of productions from the City and third-parties; performed witness interviews; supplemented the Citizens' initial disclosures; issued four subpoenas to third-parties (Reiss Engineering, Kerkering Barbario, CH2M Hill and Brown and Caldwell); managed production details and discovery disputes with third-parties and the defense; continued to gather documents directly from state agencies through public records requests; researched and responded to the City's 9 Interrogatories and 26 Requests for Production of Documents; supplemented its opposition to the Defendant's pending second Motion for Partial Summary Judgment with contrary evidence developed in depositions of City staff (Dkt 147, 151, 152); identified and investigated exfiltration issues in the City's collection system; and prepared a motion for preliminary injunction concerning the City's failure to adequately notify the public of poor water quality. Sproul Decl. ¶¶ 47-48; Schmidt Decl. ¶¶ 24-45; Evenson Decl. ¶ 15; Bloom Decl. ¶ 9; Coyne Decl. ¶ 4; Pierce Decl. ¶ 4; Goodstein Decl. ¶ 7.

The work performed by the full litigation team during Phase III was substantial and effective, culminating in the City's willingness to engage in meaningful settlement negotiations. After self-reductions for billing judgment (including substantial hours of "ramp up" time during transition between lead counsel), Phase III includes 2020.3 hours of sustained, intense effort by Plaintiffs to comply with the Court's schedule and prepare the case for trial. Schmidt Decl. ¶¶ 28-45 and Ex. 1.

---

[13] In Phase III, Mr. Sproul prepared for and conducted three depositions of FDEP staff; Mr. Evenson prepared for and conducted three depositions of City staff; Ms. Schmidt prepared for and conducted two depositions of City staff. Sproul Decl. ¶ 48; Evenson Decl. ¶ 13; Schmidt Decl. ¶¶ 29-32.

19

### Phase IV:  Dual Track (Settlement and Litigation)

Phase IV covers the time between June 14 and July 3, 2018, when the Parties engaged in settlement discussions while the Citizens simultaneously moved the case forward to meet discovery deadlines. When the Parties reached an agreement in principle on July 3, 2018, they ceased the litigation and devoted substantial resources to settlement.

Phase IV work included continued assistance to four experts to analyze the City's expert reports and finalize Plaintiffs' expert rebuttal reports; two depositions of City staff; a status conference with the Court; case management and status updates to the Court; two day-long negotiation meetings with the City's attorneys and staff; multiple settlement calls with defense counsel, clients and expert witnesses; document review of continuing productions from the City; managing discovery disputes with the City; and communications with the City regarding the Citizens' intended motion for preliminary injunction developed in Phase III and the City's agreement to timely notify the public regarding water quality risks.  Sproul Decl. ¶ 49; Schmidt Decl. ¶¶ 46-54; Goodstein Decl. ¶ 7; Coyne Decl. ¶ 4; Pierce Decl. ¶ 4.

The workload during this "dual track" timeframe was extensive because Plaintiffs were facing a discovery cutoff date.  The Citizens claim 361.1 hours for Phase IV, after self-reductions for billing judgment. Schmidt Decl. ¶¶ 46-50 and Ex. 1.

### Phase V:  Settlement

Phase V covers the timeframe when the Parties negotiated the settlement documents between July 4 and August 9, 2018.  Phase V time includes negotiations and exchanges of draft settlement documents; consultation with the Citizens' expert consultants, clients and co-counsel; and drafting and discussing case management filings, including a motion to reopen and other case management filings.  Phase V work was performed almost entirely by Ms. Schmidt and Mr.

Bloom, with some assistance from the rest of the litigation team when needed.  Schmidt Decl. ¶¶ 55-57; Bloom Decl. ¶ 15.  The Citizens claim 163.4 hours for Phase V, after self-reductions for billing judgment. Schmidt Decl. ¶ 55-58 and Ex. 1.

### Phase VI: Post-Settlement

Phase VI covers the time between the City's approval of the settlement on August 10, 2018 and February 25, 2019, when the Citizens last supplemented their claim for fees and costs to the defense.  During Phase VI, the Citizens' work included discussions with defense counsel on entry and implementation of the settlement and the fee and cost claims; work with DOJ and TBEP concerning the $200,000 SEP payment; initial legal research and attorney review of timeslips for billing judgment; preparation and delivery of a complete fee package on November 2, 2018 and two supplements on January 21 and February 25, 2019 to the City; an unsuccessful meet and confer process with the City and its expert witness on the fee petition; case management filings with the Court (Dkt 172-191); preparation of a motion to enter the settlement (Dkt 177-182); attendance at Court hearings on the settlement and the upcoming fee motion; and revisions to the settlement per the instructions of Judge Whittemore (Dkt 181).  Schmidt Decl. ¶¶ 59-64; Bloom Decl. ¶ 15; Goodstein Decl. ¶ 7; Coyne Decl. ¶ 4.

Phase VI work has been performed primarily by three attorneys (Ms. Schmidt, Mr. Bloom and Ms. Coyne) as detailed in their declarations. Phase VI does not include time spent preparing this brief, supporting declarations or the reply brief. In their reply brief, the Citizens will claim and document the reasonable hours to prepare this motion and their reply.  Such time is recoverable. *Thompson v. Pharmacy Corp. of Am. Inc.*, 334 F.3d 1242, 1245 (11th Cir. 2003) (disallowing fees on fees litigation would frustrate Congress's intent to compensate public

21

interest attorneys).   Phase VI reflects a total of 165.4 hours, after self-reductions for billing judgment. Schmidt Decl. ¶ 59-64 and Ex. 1.

### B. Plaintiffs' Proposed Rates Are Consonant with Prevailing Tampa Market Rates

Counsel is entitled to the hourly rates "prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Norman,* 836 F.2d at 1299. The relevant legal market is generally where the case is filed.  *See Cullens v. Ga. Dep't of Transp.*, 29 F.3d 1489, 1494 (11th Cir. 1994)*; Norman,* 836 F.2d at 1299. Where there is a lack of direct comparison, the party moving for fees is encouraged to look at comparable cases. *Norman,* 836 F.2d at 1300. Further, counsel should be awarded 2018 rates to compensate for delay in payment. *Id.* at 1302; *see also Missouri v. Jenkins*, 491 U.S. 274, 283 (1989). Plaintiffs' survey of case-law in the Middle District of Florida supports the following area rates for complex litigation related to years of practice:

| Counsel and years out of law school | Rate |
|---|---|
| Goodstein (34 years) and Sproul (32 years) | $490 |
| Schmidt (27 years) | $440 |
| Evenson (20 years) and Bloom (22 years) | $385 |
| Coyne (2 years) | $295 |
| Pierce (1 year) | $225 |
| Paralegals, Attorneys performing paralegal tasks, Coyne's work prior to bar admission | $150 |

Schmidt Decl. ¶¶ 67-76; Coyne Decl. ¶ 7 and Ex. 2.[14]  The declarations filed with this motion detail counsel's professional experience supporting the rates claimed. Sproul Decl. ¶¶ 2-13, 52 and Ex. 3; Schmidt Decl. ¶¶ 2-8, 71; Evenson Decl. ¶¶ 2-8, 18; Bloom Decl. ¶¶ 3-5, 16; Pierce Decl. ¶¶ 2-3, 7; Goodstein Decl. ¶¶ 2-6, 9; Coyne Decl. ¶¶ 2-3, 8.

---

[14] The Citizens' survey includes some cases that do not arise from complex litigation because they awarded rates commensurate with the rates claimed here, despite being less complex.  Schmidt Decl. ¶ 68.  Also, for the Court's reference, Exhibit 2 of Ms. Coyne's declaration contains excerpts of court filings related to the case-law survey.  Coyne Decl. ¶ 7 and Ex. 2.

22

The factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) apply to the Court's analysis of appropriate rates for the lodestar. *Norman,* 836 F.2d at 1299.[15] Plaintiffs' rates claimed here are appropriate under the *Johnson* factors. A CWA action for sewage spills is a complex and technical body of litigation, requiring years of specialized experience. The Citizens' counsel possessed that experience and demonstrated considerable skill in developing the evidence through dogged pursuit of discovery and presenting complex issues of fact and law. The substantial investment in time spent litigating this case limited the availability of the Citizens' attorneys to work on other cases. Sproul Decl. ¶ 13; Schmidt Decl. ¶ 9. In addition, counsel took this case with some hesitation, recognizing that due to complexity and the reasonable likelihood that the City would resist settlement, the case would require long hours over years without compensation from the clients--who could only afford legal representation from its counsel on a fee-shifting basis. Sproul Decl. ¶ 13; Evenson Decl. ¶ 11.

As to the amount involved and results obtained, because the Citizens achieved the relief sought, the hours they reasonably expended is a satisfactory basis for awarding the requested amount of fees. *Norman,* 836 F.2d at 1302 (focus should be on the significance of overall results as a function of total reasonable hours; vindication of class-wide rights generally more significant than relief granted for an isolated violation); *see also Hensley* (the Courts must consider the extent of a plaintiff's success in obtaining what was sought in litigation in determining attorneys' fees awards). The claim for $1.3 million in fees to secure a judicially-enforceable agreement for six years is a small fraction (.42%) of the millions of dollars the City

---

[15] The *Johnson* factors are:  (1) time and labor required; (2) novelty and difficulty of the questions; (3) skill requisite to perform the legal service properly; (4) preclusion of employment by the attorney due to acceptance of the case; (5) customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and the results obtained; (9) experience, reputation, and ability of the attorneys; (10) "undesirability" of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717–719.

has and will spend on its infrastructure under the settlement, and the attorney fees requested are nominal (7.5%) when compared to the nearly $18 million of economic benefit to the City from years of delayed and avoided expenditures to comply with the CWA.  Schmidt Decl. ¶ 78; Excerpts of 5/18/18 Expert Disclosure of Jonathan Shefftz (Schmidt Decl. ¶ 38 and Ex. 9).[16]

III.    **The Citizens Are Entitled to Recover Reasonable Costs of Litigation**

The Citizens incurred $167,095 in costs for court filing fees, court courtesy copies, postage and other document delivery charges, deposition transcripts, mediator compensation, attorney travel, electronic legal research, litigation support, and expert witness costs.  Schmidt Decl. ¶¶ 79-82; Sproul Decl. ¶ 51; Evenson Decl. ¶ 17; Bloom Decl. ¶ 12. Such costs are recoverable. *Evans v. Books-A-Million*, 762 F.3d 1288, 1299 (11th Cir. 2014) ("reasonable out-of-pocket expenses . . . normally charged to a fee-paying client, in the course of providing legal services.") quoting *Associated Builders & Contractors of La., Inc. v. The Orleans Parish Sch. Bd.*, 919 F.2d 374, 380 (5th Cir.1990); *Evans v. Books-A-Million*, 762 F.3d 1288, 1299 (11th Cir. 2014) (costs properly include travel, mediation, legal research and postage). Plaintiffs' costs reflect savings due to non-profit pricing from court reporters and experts, the use of video-tape depositions to reduce travel costs, and counsel lodging with friends or family. Bloom Decl. ¶ 9; Evenson Decl. ¶¶ 9, 13; Schmidt Decl. ¶80; Coyne Decl. ¶ 4.

The CWA expressly authorizes recovery of expert witness costs. 33 U.S.C. § 1365(d). the Citizens retained four experts at a total cost of $120,367. Schmidt Decl. ¶¶ 36-41 and Ex. 4. The sewage engineer evaluated the City's sewage system and guided the Citizens' negotiations

---

[16] As to the *Johnson* factor of "awards in similar cases," the Citizens have found no similar cases in the Tampa area. A 2001 award of fees to prevailing plaintiffs under the Endangered Species Act is of marginal use to the Court regarding the rates. *Loggerhead Turtle,* 307 F.3d 1318, 1319 (11th Cir. 2002) (affirming district court (Middle District of Florida, Orlando Division) award in 2001 of $269,745 for 1572 attorney hours and noting defense did not object to rates). However, *Loggerhead Turtle* establishes precedent in this Circuit regarding "prevailing party" status under federal environmental statutes. *Id.* at 1322-27; *see also* page 10, *supra*.

24

of specific work commitments and timelines. Schmidt Decl. ¶ 37 and Ex. 8 (Christ Report); Sproul Decl. ¶ 21. The economist opined about (1) the "economic impact" of a sizeable civil penalty and the demanded injunctive relief and (2) the "economic benefit" enjoyed by the City in its delayed and avoided costs of compliance. 33 U.S.C. § 1319(d); Schmidt Decl. ¶ 38 and Ex. 9 (Shefftz Report).  Two toxicologists opined about the harm to the environment and humans caused by the City's pollution, in support of the "seriousness of violations" civil penalty factor. 33 U.S.C. § 1319(d); Schmidt Decl. ¶¶ 40-41; Goodstein Decl. ¶ 7.  Plaintiffs' experts were essential for trial preparation, as well as settlement of the case, as evinced the City's change in settlement stance after Plaintiffs' expert disclosures on May 18, 2018.  Schmidt Decl. ¶¶ 36-41.

## CONCLUSION

The Citizens respectfully request that the Court award $1,331,814 in attorneys' fees and $167,095 in costs. The Citizens are prevailing parties under the CWA, the fees and costs reflect work reasonably and necessarily performed to obtain the relief requested in the case, and no good cause exists for denying the requested award. The City had the means to hire its own outside counsel and expert witnesses to pursue its defense and cannot now evade the law's plain requirement that it reimburse the prevailing Citizens for their attorneys' fees and other litigation costs. The Parties conferred under Local Rule 3.01(g), and the City opposes the motion.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of April, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record for Defendant; via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Kathryn Schmidt*

25