UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SUNCOAST WATERKEEPER, OUR
CHILDREN'S EARTH FOUNDATION, and
ECOLOGICAL RIGHTS FOUNDATION,

          Plaintiffs,

    v.

CITY OF ST. PETERSBURG,

          Defendant.

Case No: 8:16-cv-03319-JDW-AEP

## DECLARATION OF JUSTIN BLOOM IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS

I, JUSTIN BLOOM, hereby declare under penalty of law that the following facts are true and correct:

2.    I am an attorney licensed to practice law in the State of Florida and am local counsel on this case. I make this declaration based upon my personal knowledge, unless otherwise stated, and I am competent to testify to the matters set forth herein. I make this Declaration in support of Plaintiffs' Motion for Attorneys' Fees and Costs.

**Justin Bloom Biographical Information**

3.    I have been a practicing environmental attorney specializing in prosecuting pollution cases and representing communities for over 22 years. I am currently in solo private practice, based in Florida, and serve as the unpaid Executive Director of Suncoast Waterkeeper, the lead plaintiff in this case. My experience includes investigation, enforcement and litigation of Clean Water Act ("CWA") violations, Toxic

Tort cases, land use and pharmaceutical class actions.  I have successfully represented

many plaintiffs affected by the BP Deepwater Horizon oil spill and other oil spills in the

US.  I have significant experience in pharmaceutical class action litigation, representing

the State of Louisiana and other municipalities and organizations in defective drug cases.

Earlier in my career I represented Monroe County, Florida as special land use and

environmental enforcement counsel.  Prior to returning to the Florida Suncoast, I worked

in New York City as Waterkeeper Alliance's Eastern Regional Director.

4.      I hold a J.D. from Tulane School of Law with a Certificate in

Environmental Law (1994) and a B.A. in Environmental Studies from New College

(1991).  At Tulane, I began my career in public interest environmental law as a student

attorney in the Environmental Clinic, and I also completed significant study at the MA

level in conservation and ecology studies at the University of Florida.  I am a member of

the following bars:  Florida State Bar, U.S. District Court for the Middle District of

Florida, U.S. District Court for the Southern District of Florida, U.S. District Court for

the Northern District of Florida, U.S. Court of Appeals for the 11th Circuit, New York

State Bar, U.S. District Court for the Eastern District of New York, U.S. District Court

for the Southern District of New York.

5.      I am local counsel on this case and on a similar CWA sewage case filed in

this Court:  *Suncoast Waterkeeper v. City of Gulfport*, No. 8:17-00035 (M.D. Fla.), and I

am local counsel for a third CWA sewage case against the County of Sarasota, which

may be filed in this Court at the end of the statutorily required 60-day notice period.  33

U.S.C. 33 U.S.C. §1365.

**Tasks Performed and Hours Incurred in this Case**

6.      Since 2016, Suncoast Waterkeeper's Sick of Sewage Campaign has been an important mission area for our organization.  We believe the damage caused by sewage spills in the Suncoast Region are harmful to the human health and the environment, contribute to Red Tide, and are of great concern to all citizens who use Suncoast waters for recreational, economic, or spiritual purposes.  I was aware of and concerned about the Saint Petersburg sewage spills in August 2015, June 2016, and August-September of 2016, and those of its "satellite" cities who send their sewage to Saint Petersburg for treatment.  In the absence of adequate state enforcement regarding the City's sewage spills, and with no enforcement by EPA, citizen suit enforcement against the City was essential, consistent with Suncoast Waterkeeper's "Sick of Sewage" mission area.  In September of 2016, Suncoast Waterkeeper joined with Our Children's Earth ("OCE") and Ecological Rights Foundation ("ERF") to initiate the citizen suit against the City of Saint Peteresburg.  We also initiated a citizen suit against Gulfport, Florida. *Suncoast Waterkeeper v. City of Gulfport*, No. 8:17-00035 (M.D. Fla.).

7.      I serve as local counsel on both cases, issued the Notice of Intent letter to the City of Saint Petersburg on September 28, 2016 and communicated with the City, FDEP, and EPA following the Notice Letter.   I have been local counsel for this case from inception and during all Phases.  The true and correct copy of my letter is attached to my declaration as Exhibit 2.  I further communicated with FDEP and EPA to encourage a coordinated enforcement effort, to no avail.  A true and correct copy of my letter to FDEP and EPA is attached to my declaration as Exhibit 3.

8.      As Executive Director of Suncoast Waterkeeper, I have been satisfied and confident in the representation received in this case from highly qualified environmental enforcement lawyers: Mr. Sproul, Mr. Evenson, Ms. Schmidt, and Mr. Goodstein.  In some preliminary discussions I had with local area attorneys at the inception of this case, I did not encounter any counsel as qualified as the legal team ultimately retained for this highly publicized, contentious and complex Clean Water Act case.

9.      My work on this case includes initial groundwork necessary to initiate the case; public record requests and subpoenas; communications with local citizens, fact witnesses, expert witnesses, and City representatives; conducting factual investigations; assisting in depositions, sometimes by video tape to reduce travel costs; obtaining non-profit pricing for court reporters and experts; attending court hearings and mediation; all involvement in settlement discussions with the defense and Ms. Schmidt; case management and administration; discussions with the legal team as to litigation and settlement strategies throughout the case; and review and filing of documents with the Court.

10.      I have lead oversight and monitoring responsibility of the City's compliance with the settlement terms we negotiated with the City, as embodied in the Stipulated Order and its attachments (Dkt 187).

11.      My work is described in detail in my time records attached to this declaration as Exhibit 1.  I billed a total of 514.03 hours to this case, and those hours to not include time spent on an administrative challenge to the FDEP consent order, time engaging with the press, or time spent in my capacity as Executive Director of Suncoast Waterkeeper.   My time has been cut by 130.19 hours in an exercise of billing judgment.

4

The 383.84 hours remaining after the reduction for billing judgment include 335.17 attorney hours and 48.67 paralegal hours, as described in Exhibit 1, which is a true and correct copy of time records that I personally and contemporaneously have kept using computerized billing software documenting the hours I have worked on this case for which I am seeking to recover an attorney's fee award.

12.     Attached as Exhibit 8 are true and correct copies of my receipts for costs incurred in relation to this case.  I hereby declare that I drove approximately 1073.04 miles in my role as local counsel on this case, for attendance at court appearances, depositions, settlement negotiations, and meetings with experts and witnesses.  Applying a mileage rate of $0.54 per mile, my mileage costs are $579.44.

**Settlement Efforts**

13.     I arranged for the first settlement conference with the City following issuance of the Notice Letter.  The conference was attended by myself, Mr. Sproul, our sewage engineer, Mr. Tom Christ, and representatives of the City.  We provided a proposed consent decree to guide the discussions concerning the remedy for the City. The discussion was unsuccessful.  There was no further discussion of settlement between the Parties until September 27, 2017 when the Parties met for Court-ordered mediation. On September 27, 2017, I attended the Court-ordered mediation and the Parties remained at an impasse.

14.     On April 4, 2018, the Citizen groups sent a letter to the City Council prior to a meeting set for April 5, 2018, to be considered with an agenda item to approve increasing the retainer to their litigation counsel, and requested in a public forum that the City stop the litigation and sit down with the Citizens to work out a settlement.  Attached

to the letter were the proposed consent decree offered in November 2016 and the Court's recent orders denying the City's motion for summary judgment.  The letter is attached to my Declaration as Exhibit 4 and is not settlement confidential, having been released into the public record.  At the April 5, 2018 meeting, the Citizens were accused by a councilmember of engaging in a "terrorist lawsuit," and I later rose during public comment to respond to that accusation.   On April 10, 2018, I delivered another settlement letter in response to the April 5 meeting, again outlining our settlement terms and requesting settlement negotiations.  That letter is not attached to this declaration because it is settlement confidential.

15.     The City expressed a willingness to engage in meaningful settlement discussions in June of 2018, following disclosure of Plaintiffs' expert reports and communications to the City and its trial counsel from Ms. Schmidt.  Thereafter Ms. Schmidt and I attended settlement negotiations, with Mr. Christ assisting us on June 21, 2018 and Mr. Goodstein attending on June 27, 2018.   These negotiations resulted in the settlement embodied in the Stipulated Order and its Attachments (Dkt 187, 182-1, 182-2). I further consulted with Ms. Schmidt as she negotiated the language of the Stipulated Order and the amendment to the consent order with outside counsel for the City.

**My Hourly Rate for Attorney Work**

16.     In consultation with Ms. Schmidt, I have set my rate at $385 per hour as an appropriate 2018 rate to claim in the Middle District of Florida.  This rate is commensurate with rates found reasonable in Middle District of Florida attorneys' fee award decisions for attorneys with my level of experience working on cases involving complex civil litigation.  In setting my hourly rate, Ms. Schmidt and I have reviewed

recent attorney awards in cases involving complex litigation in the U.S. District Court for the Middle District of Florida, which are described in detail in the concurrently filed Declaration of Kathryn Schmidt in Support of Motion for Attorneys' Fees and Costs.  My $385 per hour rate is within the range of rates awarded to several lawyers with comparable experience in recent cases.  Accordingly, in my and Ms. Schmidt's opinion, this is a reasonable market-based rate for my work in this case.

**Exhibits**

17.     Attached as Exhibit 5 is the Agenda Packet pertaining to approval of settlement by Defendant's City Council on August 9, 2018, which is publicly available online.

18.     Attached as Exhibit 6 is a Transcript of the August 9, 2018 City Council Meeting.

19.     Attached as Exhibit 7 is a Transcript of the July 17, 19 City Council Meeting.


I declare, under penalty of perjury, that the foregoing is true and correct. Executed on March 29, 2019 in Sarasota, Florida.

By: _____
                Justin Bloom

Exhibit 1

to the

Declaration of Justin Bloom

In Support of

Plaintiffs' Motion for Attorneys'
Fees and Costs


Suncoast Waterkeeper et al. v. City of St.
Petersburg Case No. 8:16-cv-03319-JDW-AEP

Exhibit 1 - Page 1

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
|  |  |  | 383.84 | 335.17 |  | 48.67 |  | $ 136,341.59 |
| 09/27/16 | Bloom, Justin | Meeting with Chris Sproul and Fred Evenson to discuss case investigation and claim development, and organizational standing requirements. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 09/28/16 | Bloom, Justin | Call with Fred Evenson and Chris Sproul to discuss issuing citizen suit notice letter (8 min.) and public outreach strategy (8 min.) to build support for citizen suit, inform members of potential citizen suit, assist with settlement negotiation strategy. | 0.27 | 0.27 | $ 385 | 0.00 | $ 150 | $ 103.95 |
| 09/28/16 | Bloom, Justin | Call with Justin Bloom to discuss issuance of citizen suit notice letter against St. Petersburg. | 0.22 | 0.22 | $ 385 | 0.00 | $ 150 | $ 84.70 |
| 10/04/16 | Bloom, Justin | Call with Fred Evenson and Chris Sproul  to discuss development of settlement position for potential settlement negotiation with St. Petersburg, preparation for initial call with city attorney. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 127.05 |
| 10/06/16 | Bloom, Justin | looking for consultant and discussing with team | 0.34 | 0.34 | $ 385 | 0.00 | $ 150 | $ 130.90 |
| 10/06/16 | Bloom, Justin | Communications with Fred Aschauer (DEP General Counsel) re: Notice letter to FDEP and EPA | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 10/06/16 | Bloom, Justin | Conf call w/ City of St. Pete (.24) re: Notice letter w/ Chris Sproul, and subsequent and follow-up call w/ Chris Sproul. | 0.58 | 0.58 | $ 385 | 0.00 | $ 150 | $ 223.30 |
| 10/12/16 | Bloom, Justin | Call with Fred Evenson re: expert, call with DEP attorney, corp. rep for SCWK | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 10/13/16 | Bloom, Justin | Review of evidence preservation memo and response | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 10/13/16 | Bloom, Justin | Call with Fred Aschauer at Florida DEP and Chris Sproul to discuss proposed citizen suit against St. Petersburg. | 0.45 | 0.45 | $ 385 | 0.00 | $ 150 | $ 173.25 |
| 10/13/16 | Bloom, Justin | Call with Sproul and Fred Evenson to discuss potential retention of sewage engineering expert and preparation for call with Florida DEP. | 0.28 | 0.28 | $ 385 | 0.00 | $ 150 | $ 109.08 |
| 10/14/16 | Bloom, Justin | Draft response to city re: mediators | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 10/19/16 | Bloom, Justin | Call with Chris Sproul to discuss preparation for call with expert consultant, attorneys fee recovery issue, continuing investigation of role of satellites in sewage discharge problem for St. Pete. | 0.20 | 0.20 | $ 385 | 0.00 | $ 150 | $ 77.00 |
| 10/19/16 | Bloom, Justin | Finalize and send email to St. Pete re: mediation | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 10/19/16 | Bloom, Justin | Review and edit Pinellas Co records request | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 10/20/16 | Bloom, Justin | Call with Chris Sproul and Fred Evanson to discuss retention of Thomas Christ as consulting expert for evaluation of sewage spill compliance issue. | 0.47 | 0.47 | $ 385 | 0.00 | $ 150 | $ 179.67 |
| 10/20/16 | Bloom, Justin | follow-up email communications regarding retension of expert Christ | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 10/21/16 | Bloom, Justin | Finalize and send Pinellas Co records request | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 10/21/16 | Bloom, Justin | Research St. Pete council actions and email update with press clips to team | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 10/25/16 | Bloom, Justin | Draft response to Pinellas County email requesting timeframes for multiple items within our records request. Communicate those timeframes to Molly Coyne for incorporation into all related requests | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 10/26/16 | Bloom, Justin | follow-up with City Atty office re: mediation, emails between city, communications with Sproul and Evenson | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 10/26/16 | Bloom, Justin | Meeting with Tom Christ about record requests and strategy | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 10/27/16 | Bloom, Justin | Email to Chris Sproul and Fred Evenson re: EPA call | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 10/27/16 | Bloom, Justin | Emails with Chris Sproul, Molly Coyne and T. Christ re: records requests | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 10/27/16 | Bloom, Justin | Phone call with William Bush EPA region 4 - initial informational discussion | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 10/28/16 | Bloom, Justin | Review and respond to team emails about mediation and questions about City's Wet Weather Overflow Mitigation Program | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 10/31/16 | Bloom, Justin | Emails with Sproul and clients re mediator choice and strategy | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/01/16 | Bloom, Justin | Call with Bill Bush EPA re: conference Call scheduling and follow-up email with Chris Sproul and Fred Evenson | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/01/16 | Bloom, Justin | Call with Chris Sproul and ( for part of call) Thomas Christ to discuss revisions to proposed consent decree and settlement strategy/communication to St. Petersburg about mediation and request for additional information about St. Petersburg sewer system needed for mediation. | 1.73 | 1.73 | $ 385 | 0.00 | $ 150 | $ 667.33 |
| 11/01/16 | Bloom, Justin | Email to City of St. Pete re: mediation, consent order, and questions about Wet Weather Overflow Mitigation Plan | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 11/03/16 | Bloom, Justin | Phone and email with Pinellas County re: public records request, set up dropbox and manage responsive records | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 11/08/16 | Bloom, Justin | Phone call with Bill Bush EPA, followed by Chris Sproul re: scheduling call | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 11/09/16 | Bloom, Justin | Research Sunshine Law, Email Fred Evenson and Chris Sproul re; St. Pete records request, failure to respond | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/10/16 | Bloom, Justin | Follow-up email to St. Pete re: records request | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 11/14/16 | Bloom, Justin | Call with Fred Evenson and Chris Sproul to discuss further settlement strategy, including coordination with EPA as part of settlement and potential litigation strategy, further communication with City attorney on settlement mediation potential. | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/14/16 | Bloom, Justin | Receipt and review of St. Pete records pursuant to records request, discuss with Cris Sproul and respond to request for clarification | 0.58 | 0.58 | $ 385 | 0.00 | $ 150 | $ 224.58 |
| 11/15/16 | Bloom, Justin | Email to St. Pete re: potential mediation and discussions with Chris Sproul, Fred Evanson and NGOs re: strategy and response | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |

Exhibit 1 - Page 2

Exhibit 1 - Page 3

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 11/15/16 | Bloom, Justin | Phone calls to EPA, Bill Bush re: conference call and email to Chris Sproul and Fred Evanson to re-schedule | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 11/15/16 | Bloom, Justin | Review records and calculate filing date, communicate with Fred Evanson and Chris Sproul | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 11/16/16 | Bloom, Justin | Emails with co-counsel and clients re: St. Pete mediation, email to St. Pete attorney's office re: mediation | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 11/17/16 | Bloom, Justin | Conf call with EPA and DEP, Sproul and Evanson | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 11/18/16 | Bloom, Justin | Review and discuss email from Patner, City Atty about potential in-person negotiations | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 11/20/16 | Bloom, Justin | Email correspondence with team re: mediation strategy and draft consent decree | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/20/16 | Bloom, Justin | Review and edit Draft Consent Decree | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 11/21/16 | Bloom, Justin | Email Tom Christ and Sproul re: upcoming negotiation and housekeeping | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 11/21/16 | Bloom, Justin | Review and edit draft complaint, research MDFL rules | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 11/21/16 | Bloom, Justin | Review email from Chris Sproul and incorporate final edits into draft Consent Decree, send to City in email communication | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/23/16 | Bloom, Justin | Review and respond to St. Pete email re: clarification of records request | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 11/28/16 | Bloom, Justin | Email Joe Patner re: upcoming negotiation meeting | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 11/28/16 | Bloom, Justin | Email team re: access for Tom Christ to records and upcoming negotiation meeting | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 11/28/16 | Bloom, Justin | Email Tom Christ re: documents | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 11/28/16 | Bloom, Justin | Email with EcoRights client Rosner re: negotiation mtg | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 11/28/16 | Bloom, Justin | meeting with Tom Christ | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 11/28/16 | Bloom, Justin | Review and edit draft complaint | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 12/01/16 | Bloom, Justin | Call with Chris Sproul to discuss filing complaint | 0.13 | 0.00 | $ 385 | 0.13 | $ 150 | $ 20.00 |
| 12/01/16 | Bloom, Justin | Emails with Sproul and Evanson, and Patner re: confidentiality agreement - negotiations | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 12/02/16 | Bloom, Justin | Finalize complaint, summons, cover sheet, travel to and hand-submit at MDFL tampa. | 4.50 | 0.00 | $ 385 | 4.50 | $ 150 | $ 675.00 |
| 12/02/16 | Bloom, Justin | Email Sproul and Evanson re: filed complaint, cover, summons, research court information re: judge and magistrate | 0.25 | 0.00 | $ 385 | 0.25 | $ 150 | $ 37.50 |
| 12/02/16 | Bloom, Justin | Research notice requirements, and timing of notice, issue of exception to administrative orders vs. state or fed. court enforcement preclusion | 2.00 | 2.00 | $ 385 | 0.00 | $ 150 | $ 770.00 |
| 12/05/16 | Bloom, Justin | Review email from Sproul, email pleadings and orders to team | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 12/05/16 | Bloom, Justin | Call with Chris Sproul to discuss drafting amended complaint. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 65.45 |
| 12/05/16 | Bloom, Justin | Review and compare DEP consent order w/ Draft Consent Decreee | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |

Exhibit 1 - Page 4

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 12/05/16 | Bloom, Justin | Review Order striking complaint, call with Sproul to discuss Order, Proposed DEP order and Press strategy. | 0.42 | 0.42 | $ 385 | 0.00 | $ 150 | $ 160.42 |
| 12/06/16 | Bloom, Justin | Email communications with Joe Patner (City) re: waiver of service | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 12/06/16 | Bloom, Justin | Emails with Evanson and Sproul, final edits to amended complaint | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 12/06/16 | Bloom, Justin | Review amended complaint and edit | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 12/06/16 | Bloom, Justin | Review Tom Christ notes and comments on proposed DEP Consent Order | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 12/07/16 | Bloom, Justin | service of complaint | 0.33 | 0.00 | $ 385 | 0.33 | $ 150 | $ 50.00 |
| 12/07/16 | Bloom, Justin | Call with Clerk's office re: amended complaint | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 12/07/16 | Bloom, Justin | file amended complaint, courtesy copy to def. | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 12/09/16 | Bloom, Justin | Conference call re: settlement meeting | 1.35 | 1.35 | $ 385 | 0.00 | $ 150 | $ 519.75 |
| 12/09/16 | Bloom, Justin | Email to Joe Patner re: agenda for mediation. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 12/09/16 | Bloom, Justin | Emails with Joe Patner re: meeting | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 12/09/16 | Bloom, Justin | Review and share notice of appearance | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 12/12/16 | Bloom, Justin | travel to, attend conference w/ Def attorneys, mtg with Tom Christ, return | 4.50 | 2.20 | $ 385 | 2.30 | $ 150 | $ 1,192.00 |
| 12/12/16 | Bloom, Justin | Conference call set-up info to Sproul, Evanson, Beamon, directions to Christ, confirmations | 0.25 | 0.00 | $ 385 | 0.25 | $ 150 | $ 37.50 |
| 12/12/16 | Bloom, Justin | Review Christ email and document comparison of DEP and PL draft consent orders | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 12/13/16 | Bloom, Justin | Call with Sproul re: 12/12 conference follow-up, local rules and practice, discovery | 0.32 | 0.00 | $ 385 | 0.32 | $ 150 | $ 47.50 |
| 12/13/16 | Bloom, Justin | Email to St. Pete re: records request | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 12/13/16 | Bloom, Justin | Review email / notes from Tom Christ re: 12/12 conference | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 12/14/16 | Bloom, Justin | Review of City Counsel agenda, items, resolutions re: Independent CPA firm review of the "buried report" and Re-commissioning the Albert Whitted, email with T. Christ about attending and thoughts | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 12/19/16 | Bloom, Justin | Call with Fred Evenson and Chris Sproul to discuss how best to obtain documents from St. Petersburg needed for further evaluation of extensive sewage spill problems and necessary remedies, Sunshine law request and/or request for production of documents in discovery. | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 12/19/16 | Bloom, Justin | Emails with Evanson, Sproul, clients re: re-opening Whitted | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 12/19/16 | Bloom, Justin | Review discovery email, calculate timing for disovery | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 12/20/16 | Bloom, Justin | Email St. Petersburg request for consent to add Gulfport to amended complaint, research rules | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 12/21/16 | Bloom, Justin | Emails with Chris Sproul and PennFuture to obtain and review model Consent Decree from PA litigation | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |

Exhibit 1 - Page 5

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
|  |  |  | 383.84 | 335.17 |  | 48.67 |  | $ 136,341.59 |
| 12/21/16 | Bloom, Justin | Research Albert Whitted documents and options, emails with T. Christ and team. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 12/22/16 | Bloom, Justin | Emails to Barbara Peterson, First Amendment Foundation re: sunshine violation and review responses | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 12/23/16 | Bloom, Justin | serve defendant Notice of Designation and initiate rule 3.05 case management scheduling | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 12/28/16 | Bloom, Justin | Review Motion to Dismiss and send to Fred Evenson, Chris Sproul | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 12/29/16 | Bloom, Justin | Call with Chris Sproul to discuss Motion to Dismiss, standing declarants, 11th Circuit law | 0.12 | 0.12 | $ 385 | 0.00 | $ 150 | $ 44.92 |
| 12/29/16 | Bloom, Justin | Communications with plaintiff members re: standing and Communications with legal team re: standing declarations | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 12/29/16 | Bloom, Justin | Emails with C. Sproul and Molly Coyne re: Motion to Amend and failure of St. Pete to respond to Email requesting stipulation | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 12/29/16 | Bloom, Justin | Emails with defendants to schedule case mgmt conference | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 12/29/16 | Bloom, Justin | Emails with legal team re: response to Motion to Dismiss, procedure and caselaw. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 12/29/16 | Bloom, Justin | Research 11th Circuit law on standing, injury | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 12/29/16 | Bloom, Justin | Research and communications with plaintiff members regarding standing | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 12/30/16 | Bloom, Justin | Emails with Sean Sullivan re: standing and Molly Coyne re: complaint | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/01/17 | Bloom, Justin | Review email from Chris Sproul re: standing and opposition to motion to dismiss, including 11th Circuit research | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 01/02/17 | Bloom, Justin | Call with Chris Sproul and Fred Evenson to discuss further development of standing evidence for amended complaint and opposition to motion to dismiss, motion for summary judgment on standing. | 0.27 | 0.27 | $ 385 | 0.00 | $ 150 | $ 102.67 |
| 01/02/17 | Bloom, Justin | Communications with Defense re: scheduling conference | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 01/02/17 | Bloom, Justin | Emails with standing declarant Andy Hayslip | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/03/17 | Bloom, Justin | Emails trying to coordinate case mgmt conference | 0.33 | 0.00 | $ 385 | 0.33 | $ 150 | $ 50.00 |
| 01/04/17 | Bloom, Justin | travel to Tampa MDFL, file complaint, summons, civil cover sheet. | 2.50 | 0.00 | $ 385 | 2.50 | $ 150 | $ 375.00 |
| 01/04/17 | Bloom, Justin | Edit draft case management report | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 01/04/17 | Bloom, Justin | Email Chris Sproul re: case mgmt, local rule, judge's recommendation, scheduling | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/04/17 | Bloom, Justin | Emails with Chris Sproul and defense to coordinate case mgmt conference. | 0.20 | 0.00 | $ 385 | 0.20 | $ 150 | $ 30.00 |
| 01/05/17 | Bloom, Justin | Edit draft case management report | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/05/17 | Bloom, Justin | Emails with defense re: protocol for communications | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 01/05/17 | Bloom, Justin | Finalize case management conference arrangements | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |

Exhibit 1 - Page 6

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 01/09/17 | Bloom, Justin | Research court rules re: filing proposed order,and email to Chris Sproul, Molly Coyne, Fred Evenson | 0.13 | 0.00 | $ 385 | 0.13 | $ 150 | $ 20.00 |
| 01/09/17 | Bloom, Justin | Research on transferring related cases and email to Chris Sproul, Molly Coyne, Fred Evenson | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 01/09/17 | Bloom, Justin | Call with Joseph McClash and edit declaration for same | 0.83 | 0.83 | $ 385 | 0.00 | $ 150 | $ 320.83 |
| 01/09/17 | Bloom, Justin | meet with Andrew Hayslip about declaration | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 01/09/17 | Bloom, Justin | Review and email Chris Sproul, Molly and Fred Evenson re: draft of response to Motion to Dismiss. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 01/09/17 | Bloom, Justin | Review emails re: Motion to Dismiss, including Review of declarations and begin drafting declarations, communicating with potential declarants | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 01/10/17 | Bloom, Justin | Call with John Rice about declaration, draft and edit declaration | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 01/10/17 | Bloom, Justin | Call with Joseph McClash and edit declaration for reply to motion to dismiss for witness review. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/10/17 | Bloom, Justin | Draft and edit Andy Hayslip declaration for witness review. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 01/10/17 | Bloom, Justin | Edit 2nd am complaint | 1.50 | 1.50 | $ 385 | 0.00 | $ 150 | $ 577.50 |
| 01/10/17 | Bloom, Justin | phone call with Jill Wenner to discuss declaration, edit declaration and emails with her. | 0.83 | 0.83 | $ 385 | 0.00 | $ 150 | $ 320.83 |
| 01/10/17 | Bloom, Justin | phone call with Sandra Ripberger to discuss declaration, edit declaration and emails with her. | 0.92 | 0.92 | $ 385 | 0.00 | $ 150 | $ 352.92 |
| 01/10/17 | Bloom, Justin | phone call with Sean McClash to discuss declaration, edit declaration and emails with her. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/10/17 | Bloom, Justin | phone call with Sean Sullivan to discuss declaration, edit declaration and emails with her. | 0.83 | 0.83 | $ 385 | 0.00 | $ 150 | $ 320.83 |
| 01/11/17 | Bloom, Justin | Additional edits to declarations | 0.83 | 0.83 | $ 385 | 0.00 | $ 150 | $ 320.83 |
| 01/11/17 | Bloom, Justin | complete and file 1)leave to file amended complaint, 2)amended complaint, 3) response to motion to dismiss and declarations. | 1.67 | 1.67 | $ 385 | 0.00 | $ 150 | $ 641.67 |
| 01/11/17 | Bloom, Justin | Draft case management report for discussion, send to defendant | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 01/11/17 | Bloom, Justin | Edit 2nd amended complaint and motion for leave to file | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 01/11/17 | Bloom, Justin | Edit response to motion to dismiss | 1.67 | 1.67 | $ 385 | 0.00 | $ 150 | $ 641.67 |
| 01/11/17 | Bloom, Justin | Email to defense for no objection to 2nd amended complaint, discuss prior request with Chris Sproul and Local Rule 3.01g | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/11/17 | Bloom, Justin | Finalize declaration of Wenner | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 01/11/17 | Bloom, Justin | Finalize declarations of McClash, Ripberger, Wenner, Hayslip, Sullivan, Alfieri. | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 01/11/17 | Bloom, Justin | phone call with Chris Sproul re: filings | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/12/17 | Bloom, Justin | Edit and send Plaintiff's first request for production, emails with Molly Coyne and Chris Sproul | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |

Exhibit 1 - Page 7

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 01/12/17 | Bloom, Justin | Emails from Def. counsel and communications with Evenson and Sproul re: protocol for communications with Def. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/13/17 | Bloom, Justin | Call with Chris Sproul to discuss case management matters in light of Rule 26(f) call with opposing counsel, motion to transfer Gulfport and Treasure Island cases to Judge Whittemore for case consolidation. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 65.45 |
| 01/13/17 | Bloom, Justin | ~~Case Management Conference~~ Call with St. Petersburg counsel, Justin Bloom to discuss Rule 26(f) matters, case management report. | 0.83 | 0.83 | $ 385 | 0.00 | $ 150 | $ 319.55 |
| 01/13/17 | Bloom, Justin | Draft Motion to Transfer | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 01/13/17 | Bloom, Justin | Draft Notice of Pendency of Of Other Action and email Sproul and Evenson re: consolidation | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 01/13/17 | Bloom, Justin | Emails with Chris Sproul and Molly Coyne re: discovery, share Sunshine requests with Molly Coyne. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/13/17 | Bloom, Justin | follow-up call re: Case Management Conference with Chris Sproul | 0.18 | 0.18 | $ 385 | 0.00 | $ 150 | $ 70.58 |
| 01/16/17 | Bloom, Justin | Draft certificate of compliance and notice of appearance for Sproul and Evenson | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 01/16/17 | Bloom, Justin | Emails with Molly Coyne re: RFPs | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/17/17 | Bloom, Justin | Review emails between Molly Coyne and Chris Sproul and myself re: updated SSO reports | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/17/17 | Bloom, Justin | Review, edit and file interrogatories | 0.58 | 0.58 | $ 385 | 0.00 | $ 150 | $ 224.58 |
| 01/17/17 | Bloom, Justin | Review, edit and file requests for admissions | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 01/18/17 | Bloom, Justin | Finalize and file Notice of Related Case | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 01/18/17 | Bloom, Justin | Review and respond to strategy regarding satellites and 3rd party subpoenae | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 01/18/17 | Bloom, Justin | Review, edit Chris Sproul changes, send to Def. Case Management Report | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/20/17 | Bloom, Justin | Call with Chris Sproul and Fred Evenson re: case management report | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/20/17 | Bloom, Justin | Call with Fred Evenson re: case management report, final edits and email to Bovles | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/20/17 | Bloom, Justin | file Case Management Report | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 01/23/17 | Bloom, Justin | Call from MDFL Clerk re: case management report | 0.03 | 0.00 | $ 385 | 0.03 | $ 150 | $ 5.00 |
| 01/23/17 | Bloom, Justin | Email to def. re: signature block required on case management report | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 01/23/17 | Bloom, Justin | Emails with Def. (Cantrell) regarding start date of trial. | 0.05 | 0.00 | $ 385 | 0.05 | $ 150 | $ 7.50 |
| 01/23/17 | Bloom, Justin | receive signed copy from Def and re-file case management report | 0.12 | 0.00 | $ 385 | 0.12 | $ 150 | $ 17.50 |
| 01/24/17 | Bloom, Justin | Call with Chris Sproul re: agreed order - 2nd amended complaint | 0.10 | 0.10 | $ 385 | 0.00 | $ 150 | $ 38.50 |
| 01/24/17 | Bloom, Justin | Draft proposed order - 2nd amended complaint | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |

Exhibit 1 - Page 8

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 01/24/17 | Bloom, Justin | Emails with Debbi Cantwell re: scheduling | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 01/25/17 | Bloom, Justin | Call to law clerk re: form of order granting 2nd am complaint | 0.13 | 0.00 | $ 385 | 0.13 | $ 150 | $ 20.00 |
| 01/25/17 | Bloom, Justin | Email Chris Sproul and Fred Evenson re:unopposed motion and withdrawal of MTD | 0.03 | 0.03 | $ 385 | 0.00 | $ 150 | $ 12.83 |
| 01/25/17 | Bloom, Justin | Emails with Def. counsel re: notice of unopposed motion and withdrawal of MTD | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/26/17 | Bloom, Justin | Email from Chris Sproul re: subpoenas, record review processes, document management, respond to Email | 0.12 | 0.12 | $ 385 | 0.00 | $ 150 | $ 44.92 |
| 01/26/17 | Bloom, Justin | Emails with Fred Evenson, Molly Coyne and Chris Sproul re: subpoenas | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/26/17 | Bloom, Justin | Emails with plaintiff team re: denial of motion to dismiss and strategy for communications with Def. and Council | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/26/17 | Bloom, Justin | Review and send 2nd set of RFPs to Def. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/26/17 | Bloom, Justin | Review case management order, discuss with team | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 01/27/17 | Bloom, Justin | Email to Tom Christ re: review and opinion from produced public documents | 0.05 | 0.05 | $ 385 | 0.00 | $ 150 | $ 19.25 |
| 01/27/17 | Bloom, Justin | Review and edit subpoenas to satellites | 0.22 | 0.22 | $ 385 | 0.00 | $ 150 | $ 83.42 |
| 01/27/17 | Bloom, Justin | send notice of subpoenas to Defendant | 0.05 | 0.05 | $ 385 | 0.00 | $ 150 | $ 19.25 |
| 01/30/17 | Bloom, Justin | Finalize, edit and send subpoenas to satellites | 1.17 | 1.17 | $ 385 | 0.00 | $ 150 | $ 449.17 |
| 01/31/17 | Bloom, Justin | Communications with process server re: subpoena to Treasure Island | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/31/17 | Bloom, Justin | Review records provided by Molly Coyne re: 2015 spills and Gulfport v St. Pete issues | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 02/02/17 | Bloom, Justin | Email to Chris, Fred, Molly re: Subpoena and records request | 0.03 | 0.03 | $ 385 | 0.00 | $ 150 | $ 12.83 |
| 02/02/17 | Bloom, Justin | phone call and email with firm representing Treasure Isl re: subpoena | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/06/17 | Bloom, Justin | Call with Fred Evenson and Chris Sproul to discuss opposition to St. Petersburg's motion to dismiss | 0.27 | 0.27 | $ 385 | 0.00 | $ 150 | $ 102.67 |
| 02/06/17 | Bloom, Justin | Call with Fred Evenson and Chris Sproul to discuss opposition to St. Petersburg's motion to dismiss | 0.23 | 0.23 | $ 385 | 0.00 | $ 150 | $ 89.83 |
| 02/06/17 | Bloom, Justin | Email to Chris, Fred, Molly re: St. Pete Beach Subpoena | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/06/17 | Bloom, Justin | phone call with Clerk of St. Pete beach re: subpoena | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/10/17 | Bloom, Justin | respond via email to request for filed documents to Molly Coyne for Plaintiff's response to 2nd motion to dismiss | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/10/17 | Bloom, Justin | Review and respond to team email re: St. Pete hearing 2/16 | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/13/17 | Bloom, Justin | Email correspondence with Tierra Verde re: Subpoena | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/13/17 | Bloom, Justin | Email to Fred Evenson, Chris Sproul, Molly Coyne re: Treasure Island motion to quash | 0.07 | 0.07 | $ 385 | 0.00 | $ 150 | $ 25.67 |
| 02/13/17 | Bloom, Justin | Review response to Plaintiffs 1st Request for Production | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/13/17 | Bloom, Justin | Review Treasure Island Motion to Quash | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |

Exhibit 1 - Page 9

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 02/14/17 | Bloom, Justin | Review emails and research issue of expedited request re: motion to quash, call to clerk | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 02/14/17 | Bloom, Justin | Review Motion to Consolidate | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/15/17 | Bloom, Justin | Call with Joe Morrisey, Pinellas County Atty office re: subpoena | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/15/17 | Bloom, Justin | correspondence with Jason Klein re: motion to quash subpoena | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/15/17 | Bloom, Justin | Email Gulfport counsel re: Motion to Quash and negotiation of withdrawal | 0.12 | 0.12 | $ 385 | 0.00 | $ 150 | $ 44.92 |
| 02/15/17 | Bloom, Justin | Email with Chris Sproul re: Motion to QUash subpoena from Gulfport | 0.05 | 0.05 | $ 385 | 0.00 | $ 150 | $ 19.25 |
| 02/15/17 | Bloom, Justin | receive and review response to Subpoena by Tierra verde | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 02/16/17 | Bloom, Justin | Call with Chris Sproul and Fred Evenson to discuss opposition to Treasure Island motion to quash subpoena, motion to consolidate Gulfport and St. Pete cases. | 0.31 | 0.31 | $ 385 | 0.00 | $ 150 | $ 118.71 |
| 02/16/17 | Bloom, Justin | conf call with Def Gulfport. re: motion to quash and misc. discovery issues | 0.83 | 0.83 | $ 385 | 0.00 | $ 150 | $ 320.83 |
| 02/16/17 | Bloom, Justin | reply, assemble, organize, publish to team responsive docs from Pinellas County to our Subpoena | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 02/16/17 | Bloom, Justin | Review and research Judge's notice/order on Motion to Consolidate | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 02/17/17 | Bloom, Justin | Call with Chris Sproul re: scheduling and motion to appear by phone | 0.07 | 0.07 | $ 385 | 0.00 | $ 150 | $ 25.67 |
| 02/17/17 | Bloom, Justin | Call with City Attorney for S. Pasadena re: Subpoena | 0.07 | 0.07 | $ 385 | 0.00 | $ 150 | $ 25.67 |
| 02/17/17 | Bloom, Justin | contact with Gulfport and St. Pete council re unopposed motion | 0.12 | 0.12 | $ 385 | 0.00 | $ 150 | $ 44.92 |
| 02/17/17 | Bloom, Justin | Draft and file Notice of Designation of Lead | 0.40 | 0.40 | $ 385 | 0.00 | $ 150 | $ 154.00 |
| 02/17/17 | Bloom, Justin | Email to defendants Gulfport and St. Pete re: opposition to appearing via phone | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/17/17 | Bloom, Justin | Finalize and file unopposed motion to appear by phone | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/17/17 | Bloom, Justin | Research and email to Fred Evenson and Chris Sproul re: Designation of Lead | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 02/20/17 | Bloom, Justin | Review and edit response to Motion to Dismiss SAC | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 02/21/17 | Bloom, Justin | Edit and finalize response to 2nd MTD, file | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 02/21/17 | Bloom, Justin | Email to Treasure Island and St. Petersburg re: telephonic hearing for Motion to Quash | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 02/21/17 | Bloom, Justin | Review and disseminate objection to motion to consolidate | 0.05 | 0.05 | $ 385 | 0.00 | $ 150 | $ 19.25 |
| 02/21/17 | Bloom, Justin | Review and respond to email from Chris Sproul re: response to 2nd MTD | 0.07 | 0.07 | $ 385 | 0.00 | $ 150 | $ 25.67 |
| 02/22/17 | Bloom, Justin | travel to TPA for hearing (1:10) and return | 4.00 | 1.70 | $ 385 | 2.30 | $ 150 | $ 999.50 |
| 02/22/17 | Bloom, Justin | Call with Fred Evenson re: hearing | 0.18 | 0.18 | $ 385 | 0.00 | $ 150 | $ 70.58 |
| 02/22/17 | Bloom, Justin | Draft UNOPPOSED MOTION TO APPEAR BY TELEPHONE - Motion to Quash | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |

Exhibit 1 - Page 10

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 02/22/17 | Bloom, Justin | Research and prep for consolidation hearing, call with Chris Sproul | 2.00 | 2.00 | $ 385 | 0.00 | $ 150 | $ 770.00 |
| 02/23/17 | Bloom, Justin | Prepare and file motion to appear by phone - Treasure Isl subpoena | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 02/24/17 | Bloom, Justin | discuss arguments, strategy for opposition to motion for summary judgment | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 02/24/17 | Bloom, Justin | Review email from Chris Sproul re: discovery responses | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 02/24/17 | Bloom, Justin | Review responses to RFAs and Chris Sprouls notes and comments | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 03/01/17 | Bloom, Justin | Call with Chris Sproul to discuss meeting and conferring with Treasure Island counsel in light of court order denying motion to quash. | 0.12 | 0.12 | $ 385 | 0.00 | $ 150 | $ 46.20 |
| 03/01/17 | Bloom, Justin | Review correspondence and responses to Plaintiffs RFAs | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 03/01/17 | Bloom, Justin | Review correspondence and responses to Plaintiffs' 2nd RFP | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 03/01/17 | Bloom, Justin | Review of motion for summary judgment | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 03/06/17 | Bloom, Justin | Emails with Brian Bolves and Chris Sproul re: response to our opposition to motion to Dismiss | 0.13 | 0.13 | $ 385 | 0.00 | $ 150 | $ 51.33 |
| 03/06/17 | Bloom, Justin | Review RFAs sent by Chris Sproul via email with proposal for Case Management Report | 0.13 | 0.13 | $ 385 | 0.00 | $ 150 | $ 51.33 |
| 03/07/17 | Bloom, Justin | Conference call with Chris Sproul and Fred Evenson re: public meeting on 3/15, discuss review and potential response to St. Petersburg motion for leave to file reply brief, our response to reply arguments reflected in St. Petersburg motion for leave. | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 03/07/17 | Bloom, Justin | response and reply to Brian Bolves re: leave to allow extra response | 0.05 | 0.05 | $ 385 | 0.00 | $ 150 | $ 19.25 |
| 03/07/17 | Bloom, Justin | Review Def. Motion for leave to reply and share with co-counsel | 0.10 | 0.10 | $ 385 | 0.00 | $ 150 | $ 38.50 |
| 03/07/17 | Bloom, Justin | Review emails re: objection drafting and share Order granting leave to allow extra response | 0.18 | 0.18 | $ 385 | 0.00 | $ 150 | $ 70.58 |
| 03/08/17 | Bloom, Justin | Communications with Fred Evenson, Chris Sproul re: Opposition to MSJ, draft declaration of Sproul, file Opposition and Declaration | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 03/08/17 | Bloom, Justin | Review and upload responsive docs from 1/26 request, | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 03/09/17 | Bloom, Justin | Emails with Plaintiffs team re: errata, filing error and protocols | 0.20 | 0.20 | $ 385 | 0.00 | $ 150 | $ 77.00 |
| 03/13/17 | Bloom, Justin | Emails with Brian Bolves and Chris Sproul and Fred Evenson re: Def. response to PL opposition to MSJ | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 03/13/17 | Bloom, Justin | Research and draft joint motion for leave to reply | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 03/13/17 | Bloom, Justin | Review and edit opposition to request for judicial notice, file | 0.58 | 0.58 | $ 385 | 0.00 | $ 150 | $ 224.58 |
| 03/14/17 | Bloom, Justin | Email to court reporter re: invoice | 0.07 | 0.00 | $ 385 | 0.07 | $ 150 | $ 10.00 |
| 03/14/17 | Bloom, Justin | Review of discovery chart for potential deponents | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |

Exhibit 1 - Page 11

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 03/15/17 | Bloom, Justin | Communications with Tom Christ re: St. Pete meeting re: consent order | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 03/15/17 | Bloom, Justin | Edit and emails with Def. re: joint motion for leave to reply, file motion | 0.37 | 0.37 | $ 385 | 0.00 | $ 150 | $ 141.17 |
| 03/15/17 | Bloom, Justin | Review and communicate with team denial of Def. motion for leave to file reply | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 03/16/17 | Bloom, Justin | Review of order denying Def 2nd motion for reply brief,share with team | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 03/16/17 | Bloom, Justin | Review of order denying joint motion for reply briefs, emails to team reminder re 3.01(d) | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 03/16/17 | Bloom, Justin | Review, email team and respond to 2nd Motion for Leave to File Reply | 0.58 | 0.58 | $ 385 | 0.00 | $ 150 | $ 224.58 |
| 03/27/17 | Bloom, Justin | Review emails, edit and send letter to Bolves et al re: depositions | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 03/28/17 | Bloom, Justin | Email communications with Bolves re: production of discovery | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 03/28/17 | Bloom, Justin | Emails re: case management with team | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 03/28/17 | Bloom, Justin | Research court reporters | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 03/29/17 | Bloom, Justin | Review 2nd set of interrogatories by Plaintiff | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 03/30/17 | Bloom, Justin | Email communications re: planning depos | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 03/30/17 | Bloom, Justin | Emails with Molly Coyne and Chris Sproul re: initial disclosures and other discovery | 0.12 | 0.12 | $ 385 | 0.00 | $ 150 | $ 44.92 |
| 03/30/17 | Bloom, Justin | Research local rules and practice re: deposition scheduling conflict meet and confer obligation | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 03/30/17 | Bloom, Justin | Review emails and discuss case management order, calendar access, etc. | 0.12 | 0.12 | $ 385 | 0.00 | $ 150 | $ 44.92 |
| 03/30/17 | Bloom, Justin | Review Plaintiffs initial disclosures | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 03/31/17 | Bloom, Justin | Review correspondence to Bolves re: objections to discovery responses. Meet and confer letter. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 03/31/17 | Bloom, Justin | Review discovery correspondence with Bolves, Sproul, Review discovery documents provided by Def. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/02/17 | Bloom, Justin | Review deposition letter to Bolves re: scheduling | 0.05 | 0.05 | $ 385 | 0.00 | $ 150 | $ 19.25 |
| 04/04/17 | Bloom, Justin | Emails re: depositions with reporter firm | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 04/07/17 | Bloom, Justin | Review discovery dispute communications with Bolves | 0.07 | 0.07 | $ 385 | 0.00 | $ 150 | $ 25.67 |
| 04/12/17 | Bloom, Justin | Emails to team re: sewage enforcement records | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/12/17 | Bloom, Justin | Emails with Fred Evenson and Chris Sproul re: draft consent decree | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/12/17 | Bloom, Justin | Emails with Fred Evenson and Chris Sproul re: plaintiffs 2nd RFPs response and timing | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/13/17 | Bloom, Justin | Emails re: scheduling depos | 0.10 | 0.10 | $ 385 | 0.00 | $ 150 | $ 38.50 |
| 04/20/17 | Bloom, Justin | Review emails and drafts for motion to compel re: interrogs | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/21/17 | Bloom, Justin | Call with Fred Evenson re: Discovery meet and confer letters | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |

Exhibit 1 - Page 12

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 04/21/17 | Bloom, Justin | Draft and send letter re: and motion to compel | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 04/24/17 | Bloom, Justin | Draft and send meet and confer letter re: RFP inadequacies | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/24/17 | Bloom, Justin | Emails with Molly Coyne re; RFPs | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 04/24/17 | Bloom, Justin | telephone conference with Fred Evenson and Molly Coyne re: discovery, scheduling meet and confer, depositions, responses and objections to requests for production, drafting motion to compel, protocol for handling correspondence with opposing counsel and organization of materials received in discovery. | 1.08 | 1.08 | $ 385 | 0.00 | $ 150 | $ 417.08 |
| 04/25/17 | Bloom, Justin | schedule meet and confer conf. | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 04/26/17 | Bloom, Justin | conf. call with C. Sproul and F. Evenson re: St. Pete discovery, meet and confer, motion to compel. | 0.22 | 0.22 | $ 385 | 0.00 | $ 150 | $ 83.42 |
| 04/27/17 | Bloom, Justin | followup call with Fred Evenson from conference call - meet and confer | 0.18 | 0.18 | $ 385 | 0.00 | $ 150 | $ 70.58 |
| 04/27/17 | Bloom, Justin | Conference call - meet and confer with Brian Bolves, Molly Coyne and Fred Evenson - meet and confer call with opposing counsel to discuss document production and answers to RFAs and interrogatories, deposition scheduling. | 1.10 | 1.10 | $ 385 | 0.00 | $ 150 | $ 423.50 |
| 05/02/17 | Bloom, Justin | Research and Draft and file Notice of Supplemental Authority | 1.17 | 1.17 | $ 385 | 0.00 | $ 150 | $ 449.17 |
| 05/08/17 | Bloom, Justin | Review discovery propounded by defendant and correspondence internally with Plaintiffs team | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/08/17 | Bloom, Justin | Review of City of St. Petersbug's Notice of Service and Answers to Plaintiffs Second Interrogatories | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 05/08/17 | Bloom, Justin | Review production of 3rd set of documents from Def. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 05/15/17 | Bloom, Justin | Call with Fred Evenson re: Bolves withdrawal and RFAs/ | 0.12 | 0.12 | $ 385 | 0.00 | $ 150 | $ 44.92 |
| 05/15/17 | Bloom, Justin | Call with Tom Christ re: doc review | 0.12 | 0.12 | $ 385 | 0.00 | $ 150 | $ 44.92 |
| 05/15/17 | Bloom, Justin | Email to Brian Bolves re: withdrawal of motion to dismiss | 0.05 | 0.05 | $ 385 | 0.00 | $ 150 | $ 19.25 |
| 05/16/17 | Bloom, Justin | Call with Chris Sproul, Molly Coyne, and for part of call Fred Evenson to discuss assessment of sewage collection system condition assessment, capital improvement planning, causes of sewage spills, and remedies for wet weather and dry weather related spills. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 05/16/17 | Bloom, Justin | St. Petersburg: Call with Chris Sproul, Fred Evenson, Molly Coyne, Tom Christ to discuss plan for reviewing documents received in response to RFPs. | 1.10 | 1.10 | $ 385 | 0.00 | $ 150 | $ 423.50 |
| 05/16/17 | Bloom, Justin | Emails with Chris Sproul, Molly Coyne, Fred Evenson re: Bolvis response to discovery questions and potential stipulation | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 05/22/17 | Bloom, Justin | Review draft Stipulation to send to Brian Bolvis | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 05/26/17 | Bloom, Justin | Draft stipulation for mediator, communicate with Def., file | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |

Exhibit 1 - Page 13

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 05/26/17 | Bloom, Justin | Email to Grilli regarding mediation in Saint Pete litigation. | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 05/30/17 | Bloom, Justin | Call with Chris Sproul re: stipulation | 0.03 | 0.03 | $ 385 | 0.00 | $ 150 | $ 12.83 |
| 05/30/17 | Bloom, Justin | Call with Chris Sproul and Fred Evenson re: mediation stipulation, 30b6 subpoena to DEP, discovery stipulation | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 05/30/17 | Bloom, Justin | Call to Debbie Cantwell, Bolves assistant re: mediator stipulation | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 05/30/17 | Bloom, Justin | Communications with Def. re: mediation stipulation, emails to Chris Sproul and Fred Evenson | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 05/30/17 | Bloom, Justin | Draft unilateral notice of agreement on mediator | 0.20 | 0.20 | $ 385 | 0.00 | $ 150 | $ 77.00 |
| 05/30/17 | Bloom, Justin | Email to defense re: mediation stip and intent to file unilateral notice | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/30/17 | Bloom, Justin | file stipulation re: mediator | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 06/07/17 | Bloom, Justin | Email discussion re: error by Def. in failing to answer 2nd am complaint. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/07/17 | Bloom, Justin | receipt and review of production - 4th Production Set. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/09/17 | Bloom, Justin | Draft and send letter re: potential default - 2nd amended complaint | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/09/17 | Bloom, Justin | Emails with Brian Bolves re: motion for leave to file answer out of time | 0.07 | 0.07 | $ 385 | 0.00 | $ 150 | $ 25.67 |
| 06/12/17 | Bloom, Justin | Review PACER and communications with Plaintiffs team re: entry of 2nd amended complaint and Def. Motion for Extension | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/14/17 | Bloom, Justin | Draft Sunshine Request for to DEP re: consent order | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 06/15/17 | Bloom, Justin | Edit and send Sunshine Request for to DEP re: consent order | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 06/15/17 | Bloom, Justin | Email to Andy Hayslip, Beaman, Eckerd re: Ms4 sampling | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/15/17 | Bloom, Justin | Emails with Caldwell (Bolves' assistant) re: filing/docket 2nd amended complaint | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 06/22/17 | Bloom, Justin | correspondence re: stormwater sampling with Tampa Bay Waterkeeper and Annie Beaman, labs | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 06/26/17 | Bloom, Justin | correspondence re: delay of trial | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 06/28/17 | Bloom, Justin | dep correspondence re: sunshine request | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 06/29/17 | Bloom, Justin | correspondence re: stormwater sampling with Tampa Bay Waterkeeper and Annie Beaman | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 07/02/17 | Bloom, Justin | correspondence re: sampling MS4 | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 07/02/17 | Bloom, Justin | Review corresp btw Chris Sproul and Molly Coyne re: timelines for Motions to Strike and discussion of testifying expert/special master. | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 07/02/17 | Bloom, Justin | Review correspondence re: trial schedule | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 07/17/17 | Bloom, Justin | Review of media articles, correspondence, 3rd Set of RFPs - relating to 7/17 spill | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 07/20/17 | Bloom, Justin | Review of FDEP correspondence re: sunshine request - production | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |

Exhibit 1 - Page 14

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 07/21/17 | Bloom, Justin | Emails with Sproul, Coyne, Evenson re: requesting admin hearing on Consent Order | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 07/21/17 | Bloom, Justin | Review emails and draft of Consent Order and communications between DEP and City re: negotiating changes to Order | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 07/24/17 | Bloom, Justin | Email DEP and City for executed copy of Consent Order | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 07/26/17 | Bloom, Justin | Call with Chris Sproul and Fred Evenson to discuss review of St. Petersburg discovery responses, additional request for admission to St. Petersburg and potential request that St. Petersburg stipulate to facts concerning sewage spills reaching waters of the United States, development of motion for summary judgment, discovery schedule planning. | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 07/31/17 | Bloom, Justin | receive and share discovery files via FTP site | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 08/01/17 | Bloom, Justin | Emails with Plaintiffs team re expert reports/disclosures, stip to extend | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 08/08/17 | Bloom, Justin | Emails re: Plaintiffs MSJ | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 08/09/17 | Bloom, Justin | post-conference call with Fred Evenson - discuss trial schedule and mediation | 0.10 | 0.10 | $ 385 | 0.00 | $ 150 | $ 38.50 |
| 08/09/17 | Bloom, Justin | Email to Fred Evenson in advance of strategy call, incuding CMOs and CMRs to review. | 0.03 | 0.03 | $ 385 | 0.00 | $ 150 | $ 12.83 |
| 08/09/17 | Bloom, Justin | Review MSJ | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 08/09/17 | Bloom, Justin | St. Petersburg SSO: Call with Fred Evenson and Molly Coyne re edits to St. Petersburg MSJ on liability | 0.78 | 0.78 | $ 385 | 0.00 | $ 150 | $ 301.58 |
| 08/12/17 | Bloom, Justin | Emails with Fred Evenson and Brian Bolvis re: case management and MSJ | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 08/12/17 | Bloom, Justin | reivew and edit MSJ | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 08/14/17 | Bloom, Justin | Email correspondence with Brian Bolves re: phone conf this week. | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 08/14/17 | Bloom, Justin | Email to Plaintiff team re: MSJ, Local Rule requirements, respond to Evenson Email re: filing | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 08/14/17 | Bloom, Justin | Review and respond to Sproul email re: meet and confer & MSJ | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 08/15/17 | Bloom, Justin | Review and edit MSJ | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 08/15/17 | Bloom, Justin | schedule call with Brian Bolvis | 0.05 | 0.00 | $ 385 | 0.05 | $ 150 | $ 7.50 |
| 08/16/17 | Bloom, Justin | Call with Fred Evenson re: mediation, MSJ, Joint Motion. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 08/16/17 | Bloom, Justin | Conference Call with Fred Evenson re: mediation, case management and scheduling | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 08/16/17 | Bloom, Justin | Draft JOINT MOTION FOR ENTRY OF STIPULATED ORDER MODIFYING CASE MANAGEMENT AND SCHEDULING ORDER | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 08/16/17 | Bloom, Justin | Emails with Evenson and Coyne, edit and send proposed Joint Motion to Bolves | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 08/16/17 | Bloom, Justin | Follow-up call with Fred Evenson re: mediation | 0.58 | 0.58 | $ 385 | 0.00 | $ 150 | $ 224.58 |

Exhibit 1 - Page 15

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 08/16/17 | Bloom, Justin | Research alternate mediators, email mediators, Evenson, Bolves. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 08/17/17 | Bloom, Justin | Call with potential mediator Clark, Calls to other lawyers re: mediators | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 08/17/17 | Bloom, Justin | Email with Evenson and Coyne re: finality of Consent Order, for MSJ | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 08/17/17 | Bloom, Justin | Review and research "comfort letter" from EPA and consent order. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 08/18/17 | Bloom, Justin | Emails with Evenson, Sproul and Bolves re: mediation | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 08/19/17 | Bloom, Justin | Review mootness materials, reasearch msj | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 08/21/17 | Bloom, Justin | Edit and file Joint Motion to Modify CMO | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 08/21/17 | Bloom, Justin | Edit Joint Motion draft, email to Bolves. | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 08/21/17 | Bloom, Justin | Emails re: Joint Motion draft | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 08/22/17 | Bloom, Justin | Email Atty Bolves re: mediation | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 08/22/17 | Bloom, Justin | Research and draft Subpoenas for Deposition to DEP employees, email Atty Kirk White, DEP, | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 08/22/17 | Bloom, Justin | Research FL Consent Orders and email to Molly Coyne | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 08/22/17 | Bloom, Justin | Review Order re: Case Mgmt., email Plaintiffs | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 08/23/17 | Bloom, Justin | Email to Bolves re: mediation scheduling | 0.05 | 0.00 | $ 385 | 0.05 | $ 150 | $ 7.50 |
| 08/23/17 | Bloom, Justin | Emails to Pamela Hatley re: mediation | 0.03 | 0.00 | $ 385 | 0.03 | $ 150 | $ 5.00 |
| 08/24/17 | Bloom, Justin | correspondence with potential mediators, Evenson, Bolves. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 08/24/17 | Bloom, Justin | Email to Kirk White DEP re: depositions | 0.05 | 0.00 | $ 385 | 0.05 | $ 150 | $ 7.50 |
| 08/24/17 | Bloom, Justin | Emails with potential mediators, scheduling | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 08/25/17 | Bloom, Justin | Finalize mediation dates, emails btw all parties and mediators | 0.42 | 0.42 | $ 385 | 0.00 | $ 150 | $ 160.42 |
| 08/30/17 | Bloom, Justin | Emails with John Wilcox, Mediator about schedule | 0.07 | 0.00 | $ 385 | 0.07 | $ 150 | $ 10.00 |
| 09/05/17 | Bloom, Justin | Email correspondence with Brian Bolves re continuing MSJ hearing, discussion with plaintiffs team, response to Bolves | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 09/12/17 | Bloom, Justin | Draft Joint Motion for Continuance of Oral Argument on MSJ | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 09/12/17 | Bloom, Justin | Emails to Mediator Wilcox | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 09/12/17 | Bloom, Justin | File Joint Motion | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 09/19/17 | Bloom, Justin | meet with Fred Evenson, Jennifer Rubielo, Annie Beamon, Andy Hayslip re: St. Pete sewage | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 09/22/17 | Bloom, Justin | Call with Fred Evenson re: mediation | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 09/22/17 | Bloom, Justin | Emails with Mediator Wilcox | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 09/25/17 | Bloom, Justin | Emails to Annie Beamon re; contact with St. Pete | 0.12 | 0.12 | $ 385 | 0.00 | $ 150 | $ 44.92 |
| 09/25/17 | Bloom, Justin | Emails with Def. Counsel re: mediation | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 09/26/17 | Bloom, Justin | Prep for mediation, emails with Tom Christ, Andy Hayslip, Fred Evenson, Mediator | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |

Exhibit 1 - Page 16

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 09/29/17 | Bloom, Justin | Call with Chris Sproul re: reviewing and filing MSJ | 0.05 | 0.00 | $ 385 | 0.05 | $ 150 | $ 7.50 |
| 09/29/17 | Bloom, Justin | Call with Molly Coyne, Chris Sproul re filing MSJ, MSJ exhibits. | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 09/29/17 | Bloom, Justin | (2 separate calls) calls with Molly Coyne re filing MSJ, MSJ exhibits. | 0.18 | 0.00 | $ 385 | 0.18 | $ 150 | $ 27.50 |
| 09/29/17 | Bloom, Justin | Edit and file MSJ and Declaration of Coyne | 1.17 | 1.17 | $ 385 | 0.00 | $ 150 | $ 449.17 |
| 10/03/17 | Bloom, Justin | Call with Fred Evenson re; Motion to Dismiss, Motion to Stay | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 10/03/17 | Bloom, Justin | Review motion to stay and declaration/exhibits | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 10/04/17 | Bloom, Justin | Review mediation report and contract | 0.83 | 0.83 | $ 385 | 0.00 | $ 150 | $ 320.83 |
| 10/13/17 | Bloom, Justin | Email to def. requesting no oppostion to telephonic appearance | 0.05 | 0.00 | $ 385 | 0.05 | $ 150 | $ 7.50 |
| 10/13/17 | Bloom, Justin | Draft and file motion to appear telephonically | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 10/13/17 | Bloom, Justin | Review pacer/ecf to determine if necessary to file notice of opposition to transfer/consolidate, email to PL team | 0.33 | 0.00 | $ 385 | 0.33 | $ 150 | $ 50.00 |
| 10/18/17 | Bloom, Justin | set up telephonic appearance, calls to courtroom deputy, chambers, Sproul, Evenson | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 10/23/17 | Bloom, Justin | Email Def. re: depositions | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 10/25/17 | Bloom, Justin | Attend Mediation - 2 hrs travel, 6 hours mediation | 8.00 | 6.00 | $ 385 | 2.00 | $ 150 | $ 2,610.00 |
| 10/25/17 | Bloom, Justin | Review mediation bill and agreement, email Evenson and Sproul | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 10/26/17 | Bloom, Justin | Call with Fred Evenson re: injection well and other releases post notice letter, depositions. | 0.20 | 0.20 | $ 385 | 0.00 | $ 150 | $ 77.00 |
| 10/26/17 | Bloom, Justin | Email to Bolves re: deposition notices | 0.05 | 0.00 | $ 385 | 0.05 | $ 150 | $ 7.50 |
| 10/31/17 | Bloom, Justin | Review Def Motion for supp auth. | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/01/17 | Bloom, Justin | Review and file Motion for leave to include suppl auth | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 11/13/17 | Bloom, Justin | Edit and file motion to strike | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 11/13/17 | Bloom, Justin | Edit and file opposition to MSJ and declaration | 1.67 | 1.67 | $ 385 | 0.00 | $ 150 | $ 641.67 |
| 11/17/17 | Bloom, Justin | correspondence with Brian Bolves re: further briefing on St. Pete's MPSJ | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 11/20/17 | Bloom, Justin | Communications w/ Bolves and Plaintiffs re: amendment to CMO. | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/27/17 | Bloom, Justin | Email to Bolves et al re: depositions | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 11/27/17 | Bloom, Justin | Review and edit Opposition to St. Pete's Request to Amend Case Management Order | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 11/28/17 | Bloom, Justin | Call with Tom Christ re: expert report | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 11/30/17 | Bloom, Justin | Communications with expert re: draft report | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 12/04/17 | Bloom, Justin | schedule depositions and draft/send notice for Cravens and Askew. | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 12/12/17 | Bloom, Justin | Call with Fred Evenson re: depositions in preparation for depositions of Askew and Tankersley | 0.12 | 0.12 | $ 385 | 0.00 | $ 150 | $ 44.92 |
| 12/14/17 | Bloom, Justin | Prep for Tankersley Depo in support of deposing attorney. | 2.00 | 2.00 | $ 385 | 0.00 | $ 150 | $ 770.00 |

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 12/18/17 | Bloom, Justin | Assist in preparation and review non-expert witness disclosures | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 12/19/17 | Bloom, Justin | Call with court reporter Re: tankersley and askew and emails | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 12/19/17 | Bloom, Justin | Review Motion to Dismiss 2nd Am Complaint | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 12/27/17 | Bloom, Justin | Emails with Evenson re: depositions | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/08/18 | Bloom, Justin | Emails with Tom Christ, Evenson re: expert report | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 01/09/18 | Bloom, Justin | Review emails, research for expert report | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 01/10/18 | Bloom, Justin | conf. call re: expert report, Evenson, Coyne, Christ. | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 01/10/18 | Bloom, Justin | Review materials, share with expert, prep for call | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 01/10/18 | Bloom, Justin | Review orders re: MSJ | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/11/18 | Bloom, Justin | file Joint Motion and email to Bolves | 0.25 | 0.00 | $ 385 | 0.25 | $ 150 | $ 37.50 |
| 01/11/18 | Bloom, Justin | Emails with Bolves, Evenson re Stipulating to extend deadline in CMO for Expert Reports | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 01/15/18 | Bloom, Justin | Emails re: DEP investigations. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/16/18 | Bloom, Justin | Emails re: supplemental authority for MSJ | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 01/18/18 | Bloom, Justin | Review depositions of Tankersley and Askew, assist in preparing supplement | 2.50 | 2.50 | $ 385 | 0.00 | $ 150 | $ 962.50 |
| 01/19/18 | Bloom, Justin | Assist Fred Evenson in supplemental evidence | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 01/19/18 | Bloom, Justin | Edit motion for supplemental authority, calls with Sproul and Evenson | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 01/19/18 | Bloom, Justin | Review and analysis of order on MSJ, team communications | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 01/22/18 | Bloom, Justin | Call with Fred Evenson to discuss filing Request to Submit New Evidence | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 65.45 |
| 01/22/18 | Bloom, Justin | Edit and file motion for leave to supplement msj, call with Evenson | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 01/22/18 | Bloom, Justin | Communications with Frago, edit motion for supplemental evidence, emails to team re: article and admission of City. | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 01/23/18 | Bloom, Justin | discovery emails - depo scheduling | 0.33 | 0.00 | $ 385 | 0.33 | $ 150 | $ 50.00 |
| 01/24/18 | Bloom, Justin | re-submit public records requ | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 01/24/18 | Bloom, Justin | Draft and send letter to Bolves to schedule depos in Feb. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 01/25/18 | Bloom, Justin | Call with FWC re: investigation records | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 01/25/18 | Bloom, Justin | Review of Tankersely errata | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 01/26/18 | Bloom, Justin | receipt and review of FWC response to sunshine req. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/26/18 | Bloom, Justin | Review tankersley depo and request CH2M Hill reports etc from Def. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 01/29/18 | Bloom, Justin | Communications with PL team re: St. Pete Depos | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 01/30/18 | Bloom, Justin | Review emails re: depositions, call with Fred Evenson re: discovery - depos(6min), email Bolves re: depositions | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 01/31/18 | Bloom, Justin | Review and edit deposition letter to bolves | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 01/31/18 | Bloom, Justin | Emails w/ plaintiffs re Depositions and document discovery | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |

Exhibit 1 - Page 17

Exhibit 1 - Page 18

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
|  |  |  | 383.84 | 335.17 |  | 48.67 |  | $ 136,341.59 |
| 02/01/18 | Bloom, Justin | Calls with Molly Coyne re drafting subpoenas to consultants | 0.10 | 0.10 | $ 385 | 0.00 | $ 150 | $ 38.50 |
| 02/01/18 | Bloom, Justin | Review deposition correspondence w bolves | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 02/01/18 | Bloom, Justin | Edit and serve 4th RFPs | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 02/01/18 | Bloom, Justin | Edit and issue - send for svc subpoenas | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 02/02/18 | Bloom, Justin | Research subpoena service per diem issue, comunicate with process server | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 02/02/18 | Bloom, Justin | Finalize subpoenas for production and depo,send to server and notice Def. | 0.75 | 0.00 | $ 385 | 0.75 | $ 150 | $ 112.50 |
| 02/04/18 | Bloom, Justin | Edit and prepare Reiss Subpoena, communications with service agent | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 02/04/18 | Bloom, Justin | Edit and send draft Joint Motion to Bolves - for CMO | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 02/05/18 | Bloom, Justin | sunshine request to DEP Review with Molly | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 02/06/18 | Bloom, Justin | Finalize and file joint motion for modification of CMO | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 02/06/18 | Bloom, Justin | service of CH2M Hill - via Plantation. Re-send to 2nd service agent, admin etc. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 02/07/18 | Bloom, Justin | pay subpoenas, email to team re: calendar | 0.25 | 0.00 | $ 385 | 0.25 | $ 150 | $ 37.50 |
| 02/07/18 | Bloom, Justin | discussion and interview with USF documentary group | 3.00 | 3.00 | $ 385 | 0.00 | $ 150 | $ 1,155.00 |
| 02/08/18 | Bloom, Justin | Communications re additional subpoenas | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 02/13/18 | Bloom, Justin | Communications re sunshine request w/ DEP | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 02/13/18 | Bloom, Justin | Deposition scheduling corresp | 0.25 | 0.00 | $ 385 | 0.25 | $ 150 | $ 37.50 |
| 02/14/18 | Bloom, Justin | Emails with DEP re: deposition logistics | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 02/14/18 | Bloom, Justin | coordinate deposition service of subpoena | 0.25 | 0.00 | $ 385 | 0.25 | $ 150 | $ 37.50 |
| 02/14/18 | Bloom, Justin | Draft and send waiver of service to DEP, emails with Kirk White | 0.50 | 0.00 | $ 385 | 0.50 | $ 150 | $ 75.00 |
| 02/14/18 | Bloom, Justin | St. Petersburg: call with Kaki Schmidt, Molly Coyne, Fred Evenson, Tom Christ (for part of call) re documents still needed for expert report, preparation for upcoming depositions, potential mediation | 1.25 | 1.25 | $ 385 | 0.00 | $ 150 | $ 481.25 |
| 02/15/18 | Bloom, Justin | sunshine request correspondence with DEP | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 02/16/18 | Bloom, Justin | Draft declaration, edit highlights in transcripts. re: additional evidence to court | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 02/16/18 | Bloom, Justin | response to order on motion for leave to submit additional evidence msj | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 02/19/18 | Bloom, Justin | Final edits and file Declaration in support of opposition to 2nd msj | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 02/20/18 | Bloom, Justin | Communicate with court reporters | 0.50 | 0.00 | $ 385 | 0.50 | $ 150 | $ 75.00 |
| 02/20/18 | Bloom, Justin | Communications re; depositions and court reporters | 0.50 | 0.00 | $ 385 | 0.50 | $ 150 | $ 75.00 |
| 02/20/18 | Bloom, Justin | Deposition communications and correspondence w/ CH2MHill, Brown and Caldwell. | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 02/21/18 | Bloom, Justin | follow-up call with Kaki Schmidt post conf call w. defense | 0.22 | 0.22 | $ 385 | 0.00 | $ 150 | $ 83.42 |

Exhibit 1 - Page 19

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 02/21/18 | Bloom, Justin | respond to Fred email re: subpoena objections, review service history | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 02/21/18 | Bloom, Justin | Call with Schmidt pre Call to Bolves re: depos | 0.28 | 0.28 | $ 385 | 0.00 | $ 150 | $ 109.08 |
| 02/21/18 | Bloom, Justin | Communications with Duggan re: scheduling depo | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 02/21/18 | Bloom, Justin | Call with Bolves and Schmidt re: depositions | 0.47 | 0.47 | $ 385 | 0.00 | $ 150 | $ 179.67 |
| 02/21/18 | Bloom, Justin | Emails re: subpoenas and depositions, error with Brown and Caldwell service | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 02/21/18 | Bloom, Justin | Benchmarking request search and public records requests at request of sewage engineer expert. | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 02/22/18 | Bloom, Justin | CH2M Subpoena emails | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 02/22/18 | Bloom, Justin | obtain benchmark rept to provide to expert witness for review in preparation of expert report. | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 02/22/18 | Bloom, Justin | phone and email communications re Reiss Engineering Subpoena | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 02/22/18 | Bloom, Justin | Emails re: Brown & Caldwell Subpoena and Motion to COmpel - | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 02/23/18 | Bloom, Justin | Call with Kaki re: 3rd party discovery and staffing | 0.27 | 0.27 | $ 385 | 0.00 | $ 150 | $ 102.67 |
| 02/23/18 | Bloom, Justin | Call with Coyne and Reiss Eng. atty re production, pre and followup with Coyne | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 02/26/18 | Bloom, Justin | Review communications with Bolves re Discovery | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 02/26/18 | Bloom, Justin | Emails with Brown and Caldwell atty re: 3rd party subpoena, research | 0.42 | 0.42 | $ 385 | 0.00 | $ 150 | $ 160.42 |
| 02/26/18 | Bloom, Justin | case management emails | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 02/26/18 | Bloom, Justin | Prep for Yeargan depo, calls with Evenson to assist deposing lawyer in Preparation for deposition. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 02/26/18 | Bloom, Justin | coordinate depositions and subpoenas, confirm DEP depos and Duggan. admin re: bills for depos | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 02/26/18 | Bloom, Justin | Emails and calls with Atty for CH2M re: 3rd party subpoena | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 02/26/18 | Bloom, Justin | coordinate depos, emails with DEP, court reporters, clients for admin, | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 02/28/18 | Bloom, Justin | Research injection well issues | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 02/28/18 | Bloom, Justin | 3rd Party Subpoenas - Reiss and Ch2, emails and research re Compel | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 03/02/18 | Bloom, Justin | Deposition scheduling, correspondence with Reporter, Caldwell, Kaki on issue of Notice | 1.00 | 0.00 | $ 385 | 1.00 | $ 150 | $ 150.00 |
| 03/04/18 | Bloom, Justin | Research experts for Harm and exfiltration issues. | 0.80 | 0.80 | $ 385 | 0.00 | $ 150 | $ 308.00 |
| 03/13/18 | Bloom, Justin | Emails re: Brown & Caldwell Subpoena and docs | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 03/13/18 | Bloom, Justin | Call with Kaki Schmidt re: CH2M Hill | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 03/13/18 | Bloom, Justin | 3rd Party - Kerkering communications and review of production | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 03/13/18 | Bloom, Justin | 3rd Party - CH2MHill communications and review of production | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |

Exhibit 1 - Page 20

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 03/14/18 | Bloom, Justin | Call with evenson and filing Motion for leave to submit declaration | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 03/14/18 | Bloom, Justin | Research monitoring and sampling - contact firms and potential samplers | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 03/15/18 | Bloom, Justin | Emails re: deposing Mayor | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 03/15/18 | Bloom, Justin | Review interrogatories | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 03/15/18 | Bloom, Justin | Call with Axys Analytical, Andy Hayslip, Evanson re: monitoring/testing | 2.00 | 2.00 | $ 385 | 0.00 | $ 150 | $ 770.00 |
| 03/16/18 | Bloom, Justin | Emails re: case mgmt | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 03/19/18 | Bloom, Justin | Communications re: Bolves meeting/call on Wed. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 03/19/18 | Bloom, Justin | Call with annie beamon, look for experts | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 03/19/18 | Bloom, Justin | Emails w/ bolves and Kaki Schmidt, Fred evenson re: documents to be provided and stipulation | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 03/19/18 | Bloom, Justin | Review and communications re: response to interrogs | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 03/20/18 | Bloom, Justin | Email re: kerkering3rd party production deficiency | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 03/20/18 | Bloom, Justin | Research and review information on sludge and biosolids | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 03/21/18 | Bloom, Justin | conf call - case management with Def. and PL - stipulations, discovery, | 1.08 | 1.08 | $ 385 | 0.00 | $ 150 | $ 417.08 |
| 03/22/18 | Bloom, Justin | Call with Fred Evenson re: order on filing additional info, GIS files, case management | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 03/22/18 | Bloom, Justin | Call with Kaki and Annie Beamon re: harm witnesses | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 03/22/18 | Bloom, Justin | Communications with Hayslip re: research GIS files, locate experts, investigate NE Plant | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 03/22/18 | Bloom, Justin | Review and investigate fact and expert witnesses on harm | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 03/23/18 | Bloom, Justin | Draft sunshine request to City | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 03/26/18 | Bloom, Justin | Communication and corresp review re: 3rd Party production | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 03/26/18 | Bloom, Justin | communciations re 3rd party producion and depos | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 03/26/18 | Bloom, Justin | Draft MS4 sunshine request | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 03/26/18 | Bloom, Justin | Review emails for production to def | 2.00 | 2.00 | $ 385 | 0.00 | $ 150 | $ 770.00 |
| 04/03/18 | Bloom, Justin | 3rd Party - CH2MHill communications | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 04/03/18 | Bloom, Justin | Final edit and file Joint Motion re: CMO | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/03/18 | Bloom, Justin | Research samplers - outreach, Curt Dixon, Pam Fetterman | 0.58 | 0.58 | $ 385 | 0.00 | $ 150 | $ 224.58 |
| 04/04/18 | Bloom, Justin | Call with Fred Evenson re: investigation, comment at council mtg, sampling | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/04/18 | Bloom, Justin | investigation - set up drone and volunteers | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 04/08/18 | Bloom, Justin | Review and edit April 9 letter to City following from Council meeting | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 04/09/18 | Bloom, Justin | investigation of NE Plant with evenson and videographer, travel 1/2 time | 4.50 | 2.50 | $ 385 | 2.00 | $ 150 | $ 1,262.50 |
| 04/09/18 | Bloom, Justin | plan investigation of NE Plant | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 04/09/18 | Bloom, Justin | Edit and create attachment for letter to City to discuss settlement. | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 04/10/18 | Bloom, Justin | Settlement emails w def counsel | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 04/10/18 | Bloom, Justin | Call with Schmidt re: discovery, settlement, fact witnesses, funding | 0.40 | 0.40 | $ 385 | 0.00 | $ 150 | $ 154.00 |
| 04/10/18 | Bloom, Justin | Discovery communications | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 04/10/18 | Bloom, Justin | Call with Sproul and Schmidt re: concerning email response of St. Petersburg to Plaintiffs‰Ûª settlement letter, requesting attorney fee figures, and Florida rules concerning acceptability of contacting elected officials. | 0.62 | 0.62 | $ 385 | 0.00 | $ 150 | $ 237.42 |
| 04/10/18 | Bloom, Justin | Final edits and transmission of settlement letter to City | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 04/11/18 | Bloom, Justin | Call with Tom Christ update | 0.30 | 0.30 | $ 385 | 0.00 | $ 150 | $ 115.50 |
| 04/11/18 | Bloom, Justin | Work on assembling attorney fees info for purposes of potential settlement discussions. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/11/18 | Bloom, Justin | production to Def. | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 04/13/18 | Bloom, Justin | Assist with investigation, Google Earth and stormwater/sewage overlay file research | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 04/13/18 | Bloom, Justin | Review Plaintiffs production with client and transmit to Kaki Schmidt | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 04/14/18 | Bloom, Justin | correct filing of supplement to MPSJ - email counsel explaining correction | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 04/16/18 | Bloom, Justin | Call with Ed Sherwood, Tampa Bay Estuary Program re: SEP projects | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/16/18 | Bloom, Justin | Call with Chris Sproul and Kaki Schmidt re: settlement and case management | 0.27 | 0.27 | $ 385 | 0.00 | $ 150 | $ 102.67 |
| 04/16/18 | Bloom, Justin | Communications re: settlement, fees/costs/SEP | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/16/18 | Bloom, Justin | Emails re: 3rd party motion to compel | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/16/18 | Bloom, Justin | outreach to Mike Deeson, reporter for fact witnesses and evidence | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/17/18 | Bloom, Justin | expert witness communications re: economic expert retension | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 04/17/18 | Bloom, Justin | create spreadsheet for lodestar - emails with all attorneys | 0.50 | 0.00 | $ 385 | 0.50 | $ 150 | $ 75.00 |
| 04/17/18 | Bloom, Justin | Review materials and GIS, send to Tom Christ expert | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 04/17/18 | Bloom, Justin | Communications with K. Schmidt re: settlement position | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 04/17/18 | Bloom, Justin | Call with Deeson and follow-up email communications regarding his witnessing and video recordings of spill events. | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 04/18/18 | Bloom, Justin | Review econ expert retainer, communications re: retention, sign and circulate | 0.42 | 0.42 | $ 385 | 0.00 | $ 150 | $ 160.42 |
| 04/18/18 | Bloom, Justin | Call with Chris Sproul and Heather Kryczka to discuss potential supplemental environmental project costs. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/18/18 | Bloom, Justin | Emails with co-counsel re: depo planning | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/18/18 | Bloom, Justin | Review draft protective order | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |

Exhibit 1 - Page 21

Exhibit 1 - Page 22

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 04/18/18 | Bloom, Justin | Prepare cost/fees spreadsheet for settlement purposes. | 0.33 | 0.00 | $ 385 | 0.33 | $ 150 | $ 50.00 |
| 04/18/18 | Bloom, Justin | Review SEP projects in preparation for settlement discussions. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/18/18 | Bloom, Justin | follow-up communications with Tampa Bay Estuary Program re: SEP | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 04/18/18 | Bloom, Justin | Review Mike Deeson materials, emails with PL team re: fact witnesses | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 04/19/18 | Bloom, Justin | Emails with Tom Christ re: RDII approaches, City of Venice example | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 04/19/18 | Bloom, Justin | Communications to connect Andy Hayslip and Tom Christ for GIS work. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/19/18 | Bloom, Justin | Emails with Schmidt and Deeson re: footage and fact witnesses | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/19/18 | Bloom, Justin | Review list of fact witnesses with Schmidt and communications to-date; status of their willingness to testify at trial. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/20/18 | Bloom, Justin | Review plantiffs 1st production and resp to interrogs | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 04/20/18 | Bloom, Justin | Calls with Kaki Schmidt re: Rule 3.01h, Call to Matt Farmer re Rule, research local rule | 0.83 | 0.00 | $ 385 | 0.83 | $ 150 | $ 125.00 |
| 04/23/18 | Bloom, Justin | CH2MHill production communcations, provide copies | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/23/18 | Bloom, Justin | Review discussion re: following Carpenter's rationale for basin retension applied to St. Petersburg | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/23/18 | Bloom, Justin | Review of City Council meeting recordings for purposes of identifying admissions made by party opponent and other admissible evidence as it relates to the condition of the city's wastewater system (past and present) and future plans by City re: system as it relates to plaintiffs' claim for injunctive relief. | 0.33 | 0.00 | $ 385 | 0.33 | $ 150 | $ 50.00 |
| 04/23/18 | Bloom, Justin | Review corresp re 3rd party production | 0.42 | 0.42 | $ 385 | 0.00 | $ 150 | $ 160.42 |
| 04/24/18 | Bloom, Justin | 3rd party subpoena emails with Marnie, provide copies of subpoenas, discuss authentication | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/24/18 | Bloom, Justin | document management - 3rd party production | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 04/24/18 | Bloom, Justin | Call with Kaki Schmidt re: plaintiffs production, research location of original document | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 04/24/18 | Bloom, Justin | Call with Kaki and follow-up on Subpoenas with Marni to authenticate | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 04/25/18 | Bloom, Justin | fact witness communications - deeson. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/25/18 | Bloom, Justin | 3rd party subpoena emails with Marnie, Schmidt, Coyne, provide copies of subpoenas, discuss authentication | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/25/18 | Bloom, Justin | Review emails re: rainfall records, research experts | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/25/18 | Bloom, Justin | Supplemental production - search documents | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/25/18 | Bloom, Justin | Review Pinellas Co Task force documents and corresp with County to search for additional documents. | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 04/26/18 | Bloom, Justin | Communications with Tom Christ re: GIS | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |

Exhibit 1 - Page 23

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 04/26/18 | Bloom, Justin | followup emails with expert re Call with Brian Bolves, Paria Heeter, Molly Coyne to meet and confer re outstanding document production issues. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/26/18 | Bloom, Justin | Review meet and confer correspondence in advance of phone conf. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/26/18 | Bloom, Justin | Call with Brian Bolves, Paria Heeter, Molly Coyne to meet and confer re outstanding document production issues. | 0.97 | 0.97 | $ 385 | 0.00 | $ 150 | $ 372.17 |
| 04/27/18 | Bloom, Justin | Emails re brown and caldwell production | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 04/27/18 | Bloom, Justin | Confer Bloom/Schmidt regarding searching for additional witnesses, news footage, and status of grant funding. | 0.30 | 0.30 | $ 385 | 0.00 | $ 150 | $ 115.50 |
| 04/29/18 | Bloom, Justin | brown and caldwell 3rd party production emails. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/29/18 | Bloom, Justin | Calls with Tom Christ re: GIS, followup emails | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/29/18 | Bloom, Justin | depostion emails - re: mayor   Emails with litigation team regarding the need to take the Deposition of Mayor Kriseman. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/29/18 | Bloom, Justin | Emails with Beamon and Schmidt re: fact witnesses, calls to potential witnesses | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 04/30/18 | Bloom, Justin | Review Pinellas Co Task force documents and corresp with County to search for additional documents. | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 04/30/18 | Bloom, Justin | 3rd party production emails. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/30/18 | Bloom, Justin | Email comparing notes following up on meet and confer re production | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/30/18 | Bloom, Justin | Emails re: expert report - gis access | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 04/30/18 | Bloom, Justin | Emails re: expert report evidence | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 04/30/18 | Bloom, Justin | Call with Annie Beamon and Kaki Schmidt re: fact witnesses | 0.80 | 0.80 | $ 385 | 0.00 | $ 150 | $ 308.00 |
| 04/30/18 | Bloom, Justin | Research and outreach fact witnesses | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 05/01/18 | Bloom, Justin | Communications with sampling/lab contact | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/01/18 | Bloom, Justin | Emails re: GIS materials and fact witness aid to expert | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/01/18 | Bloom, Justin | Call with Mike Deeson - fact witness, notes to group on Fact witnesses | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 05/01/18 | Bloom, Justin | Review 10th Production for CMOM | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 05/01/18 | Bloom, Justin | Calls and emails to potential fact witnesses - Young, McClash, Sullivan | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 05/01/18 | Bloom, Justin | Address confidentiality issues with team, email A. Hayslip re: confid. Modify access in databases to protect GIS | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 05/02/18 | Bloom, Justin | 3rd party production communications - Brown Caldwell | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 05/02/18 | Bloom, Justin | GIS files correspondence with Coyne and Schmidt, research database | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/02/18 | Bloom, Justin | discovery search for schmidt | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 05/02/18 | Bloom, Justin | Call with potential expert witness and follow up emails and research | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 05/03/18 | Bloom, Justin | Calls with Tom Christ and Hayslip re: gis | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 05/03/18 | Bloom, Justin | Call with Schmidt, Tom Christ, Andy Hayslip re: GIS files | 0.30 | 0.30 | $ 385 | 0.00 | $ 150 | $ 115.50 |
| 05/03/18 | Bloom, Justin | contact fact witnesses to determine the extent of their witnesses spills, harm caused, and willingness to testify at trial. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 05/04/18 | Bloom, Justin | Call with Fred Evenson re: Palenchar deposition prep | 0.58 | 0.58 | $ 385 | 0.00 | $ 150 | $ 224.58 |
| 05/04/18 | Bloom, Justin | Prepare documents/exhibits for Palenchar and Frey depositions | 4.00 | 4.00 | $ 385 | 0.00 | $ 150 | $ 1,540.00 |
| 05/05/18 | Bloom, Justin | Prepare documents/exhibits for Palenchar and Frey depositions | 3.00 | 3.00 | $ 385 | 0.00 | $ 150 | $ 1,155.00 |
| 05/06/18 | Bloom, Justin | Review SEP emails and analysis | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/06/18 | Bloom, Justin | Prepare documents/exhibits for Palenchar and Frey depositions | 3.00 | 3.00 | $ 385 | 0.00 | $ 150 | $ 1,155.00 |
| 05/07/18 | Bloom, Justin | Calls to potential Fact Witnesses - Ward, Fedyszyn to determine the extent of their witnesses spills, harm caused, and willingness to testify at trial. | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 05/07/18 | Bloom, Justin | Frey and Palenchar Depo Prep, document review and preparation of exhibits | 3.00 | 3.00 | $ 385 | 0.00 | $ 150 | $ 1,155.00 |
| 05/08/18 | Bloom, Justin | 3rd party production communications - Brown Caldwell | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/08/18 | Bloom, Justin | ch2m hill subpoena emailes | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/08/18 | Bloom, Justin | USF communications re: friendly subpoena.- Email to legal | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 05/08/18 | Bloom, Justin | Frey and Palenchar Depo Prep, document review and preparation of exhibits | 4.00 | 4.00 | $ 385 | 0.00 | $ 150 | $ 1,540.00 |
| 05/09/18 | Bloom, Justin | Prep for Frey and Palenchar and attend Frey Deposition | 4.00 | 0.00 | $ 385 | 4.00 | $ 150 | $ 600.00 |
| 05/10/18 | Bloom, Justin | Emails and review of potential harm expert | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/10/18 | Bloom, Justin | Deposition of Palenchar in Tampa | 4.00 | 0.00 | $ 385 | 4.00 | $ 150 | $ 600.00 |
| 05/11/18 | Bloom, Justin | Call with Kaki Schmidt re: materials for harm expert, followup email | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 05/11/18 | Bloom, Justin | Call with USF counsel re: subpoena/sunshine request | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 05/11/18 | Bloom, Justin | Emails and conf call re: expert witness retention | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 05/14/18 | Bloom, Justin | Emails re: Dr. Young helping experts | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/14/18 | Bloom, Justin | Emails re: expert report, potential draft review by retired engineer, discussion with engineer | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 05/14/18 | Bloom, Justin | Emails and calls with Fact Witnesses | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 05/15/18 | Bloom, Justin | fact witness communications - contacting complainants | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 05/16/18 | Bloom, Justin | Call with Fred Evenson re: injunctive relief motion | 0.22 | 0.22 | $ 385 | 0.00 | $ 150 | $ 83.42 |
| 05/16/18 | Bloom, Justin | fact witness communications | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 05/16/18 | Bloom, Justin | Begin research on injunctive relief motion | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 05/16/18 | Bloom, Justin | Prepare responses to discovery for Suncoast Waterkeeper | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 05/17/18 | Bloom, Justin | Review Evenson letter to Bolves re: Palenchar depo | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/18/18 | Bloom, Justin | Research and call Schmidt re:CMO service deadline conventions for MDFL - expert report | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |

Exhibit 1 - Page 24

Exhibit 1 - Page 25

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 05/18/18 | Bloom, Justin | Review correspondence and send email to PL team re: def req to take depositions. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 05/19/18 | Bloom, Justin | Review Tom Christ expert report | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 05/20/18 | Bloom, Justin | Review or emails follow-up to Palenchar depo, stipulation by Def. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/20/18 | Bloom, Justin | Communications re: request to depose SCWK, Bloom. Emails to co-counsel, Board. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 05/20/18 | Bloom, Justin | Prepare exhibits for injunction. | 1.50 | 1.50 | $ 385 | 0.00 | $ 150 | $ 577.50 |
| 05/21/18 | Bloom, Justin | Call with K.Schmidt re: upcoming depositions | 0.30 | 0.30 | $ 385 | 0.00 | $ 150 | $ 115.50 |
| 05/21/18 | Bloom, Justin | Research attorney disqualification rules to determine whether to move for protective order on notice of deposition of Justin Bloom. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 05/21/18 | Bloom, Justin | potential fact witness calls | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 05/23/18 | Bloom, Justin | Emails with USF re: subpoena for records | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/24/18 | Bloom, Justin | Calls and emails with Kaki Schmidt re: deposition of Standings and corp. rep - whether or not to move for a protective order Def's desire to depose Bloom | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 05/25/18 | Bloom, Justin | Call with counsel for USF re: 3rd Party Subpoena for Harwood study. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/25/18 | Bloom, Justin | Emails with Mote re: possible studies | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/25/18 | Bloom, Justin | investigation of NE plant for stormwater flows. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 05/27/18 | Bloom, Justin | Communications with Kaki Schmidt re: fact witnesses | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 05/27/18 | Bloom, Justin | Communications re: investigation of NE stormwater flow | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 05/28/18 | Bloom, Justin | Review and edit settlement letter | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 05/29/18 | Bloom, Justin | Emails with Kaki Schmidt re: non-expert witness disclosure | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/29/18 | Bloom, Justin | Review and edit settlement letter | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/29/18 | Bloom, Justin | Review and edit supplement to initial disclosure | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 05/29/18 | Bloom, Justin | Review of pollution notices and corresp with Coyne and Schmidt about updating records with additional spills | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 05/29/18 | Bloom, Justin | Communications with potential fact witnesses | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 05/31/18 | Bloom, Justin | Call Schmidt/Bloom regarding nearby POTWs that discharge to surface waters to determine their NPDES effluent limitations for purposes of identifying pollutants in sewage that are typically regulated; related to calculation of statutory maximum. | 0.20 | 0.20 | $ 385 | 0.00 | $ 150 | $ 77.00 |
| 05/31/18 | Bloom, Justin | Communications with Annie Beaman and declarants in prep for Beaman depo. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 05/31/18 | Bloom, Justin | Review USF response to emailed subpoena, research legal issue raised in letter limiting USF's response. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 06/01/18 | Bloom, Justin | Review emails re: settlement position and potential compel/protective order issues | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 06/01/18 | Bloom, Justin | Edit letter to Manson re: deposition dispute | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |

Exhibit 1 - Page 26

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 06/01/18 | Bloom, Justin | Research and email to Kaki S. re: SEP short-list | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 06/01/18 | Bloom, Justin | Call with Kaki Schmidt re: settlement and discovery disputes | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 06/01/18 | Bloom, Justin | Review of local rules and practice and law re: protection from doc requests and bloom deposition, call with Kaki Schmidt | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 06/01/18 | Bloom, Justin | Review of settlement materials, emails to K. Schmidt re: fees and SEP | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 06/01/18 | Bloom, Justin | Research re: deposing opposing counsel | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 06/03/18 | Bloom, Justin | Review and edit proposed stipulation regarding Advisory/Warning as meet/confer and avoid the need to file for a preliminary injunction. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 06/04/18 | Bloom, Justin | fees discussion in settlement offer - emails | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/05/18 | Bloom, Justin | Call with Kaki Schmidt re: depositions | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 06/05/18 | Bloom, Justin | Call with DEP re: subpoena, email revised terms | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 06/05/18 | Bloom, Justin | Draft declaration for injunctive relief | 4.00 | 4.00 | $ 385 | 0.00 | $ 150 | $ 1,540.00 |
| 06/06/18 | Bloom, Justin | Review and edit mediation letter, sproul email | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 06/06/18 | Bloom, Justin | Draft declaration and call with Fred Evenson re: injuction | 2.50 | 2.50 | $ 385 | 0.00 | $ 150 | $ 962.50 |
| 06/07/18 | Bloom, Justin | Review witness disclosure, emails with Kaki Schmidt and Annie Beamon | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 06/07/18 | Bloom, Justin | Finalize witness list, call Collins | 0.42 | 0.42 | $ 385 | 0.00 | $ 150 | $ 160.42 |
| 06/07/18 | Bloom, Justin | Draft declaration, call and emails with Fred Evenson and Ben re: injunctive relief | 1.67 | 1.67 | $ 385 | 0.00 | $ 150 | $ 641.67 |
| 06/08/18 | Bloom, Justin | Review and comment of settlement letter | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 06/08/18 | Bloom, Justin | Research whether a court can enter summary judgment against a party when they default for MSJ (fail to file opposition brief). | 0.50 | 0.00 | $ 385 | 0.50 | $ 150 | $ 75.00 |
| 06/08/18 | Bloom, Justin | Prepare cover letter, work on proposed stipulation for injunction | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 06/09/18 | Bloom, Justin | Edit proposed stipulation and cover for injunction | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 06/09/18 | Bloom, Justin | Review defendant's expert disclosures | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 06/11/18 | Bloom, Justin | Email to USF re: Subpoena | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 06/11/18 | Bloom, Justin | Finalize proposed subpoena and cover letter - email bolves - re: injunction | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 06/11/18 | Bloom, Justin | Draft subpoenas for Newstations, edit USF and emails to K. Schmidt, research media subpoenas | 1.58 | 1.58 | $ 385 | 0.00 | $ 150 | $ 609.58 |
| 06/13/18 | Bloom, Justin | Call w/ K. Schmidt re settlement and injunction | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/13/18 | Bloom, Justin | Call w/ K. Schmidt re settlement and injunction | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/14/18 | Bloom, Justin | Draft and edit Motion and Declaration - Protective Order | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 06/15/18 | Bloom, Justin | Call with K. Schmidt re: injunction, seek photos and evidence | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 06/15/18 | Bloom, Justin | Draft motion for injunctive relief, declaration | 2.00 | 2.00 | $ 385 | 0.00 | $ 150 | $ 770.00 |

Exhibit 1 - Page 27

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 06/15/18 | Bloom, Justin | Review settlement letter | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 06/16/18 | Bloom, Justin | Preparation for Court ordered status conference 6/19. | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 06/18/18 | Bloom, Justin | Settlement emails from Kaki and response re: SEPs, research SEPs | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 06/19/18 | Bloom, Justin | Prep for Court ordered status case management conference | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 06/19/18 | Bloom, Justin | Proceedings held before Judge James D. Whittemore STATUS CONFERENCE held on 6_19_2018 | 2.63 | 2.63 | $ 385 | 0.00 | $ 150 | $ 1,013.83 |
| 06/19/18 | Bloom, Justin | Review and research - St. Pete communications to State re: Rec. Water Quality results - communicate w/ K. Schmidt in preparation for motion for preliminary injunction on City's faiure to notify public when water quality standards are high. | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 06/20/18 | Bloom, Justin | Communications with USF re: 3rd party subpoena | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/20/18 | Bloom, Justin | Email with K. Schmidt and Annie Beaman re: potential fact witness | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 06/20/18 | Bloom, Justin | meeting with Kaki Schmidt re: settlement conference | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 06/20/18 | Bloom, Justin | Preparation for settlement conference, SEP research, Monitoring/Notification components | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 06/21/18 | Bloom, Justin | Settlement conference, follow-up call with C. Sproul, mtgs with K. Schmidt, Tom Christ | 9.00 | 7.00 | $ 385 | 2.00 | $ 150 | $ 2,995.00 |
| 06/22/18 | Bloom, Justin | receive and review USF 3rd Party Subpoena docs | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 06/23/18 | Bloom, Justin | Settlement emails with team | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 06/24/18 | Bloom, Justin | housekeeping - costs and fees | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 06/24/18 | Bloom, Justin | reseach private lateral efforts in Pinellas County, respond to K Schmidt email | 0.58 | 0.58 | $ 385 | 0.00 | $ 150 | $ 224.58 |
| 06/24/18 | Bloom, Justin | Review palenchar email and documents re; monitoring and reporting, report card/assessment report in preparation for motion for preliminary injunction | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 06/24/18 | Bloom, Justin | Review expert reports and rebuttals in prep for Settlement meeting | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 06/25/18 | Bloom, Justin | Call w. K. Schmidt re: settlement strategy for Wednesday mtg. | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 06/25/18 | Bloom, Justin | Call with A. Hayslip re: SEP proposal | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/25/18 | Bloom, Justin | Call with Annie Beaman re: SEPs | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 06/25/18 | Bloom, Justin | Compile SEP project list and research priority projects | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 06/25/18 | Bloom, Justin | Conference call with team, including clients to discuss settlement | 2.00 | 2.00 | $ 385 | 0.00 | $ 150 | $ 770.00 |
| 06/26/18 | Bloom, Justin | Call with Fox 13 and email re: 3rd party subpoena | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/26/18 | Bloom, Justin | Calls Schmidt/Bloom regarding settlement discussions the next day and areas of potential compromise. | 0.70 | 0.70 | $ 385 | 0.00 | $ 150 | $ 269.50 |
| 06/26/18 | Bloom, Justin | Review DOJ guidance on SEPs | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |

Exhibit 1 - Page 28

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 06/27/18 | Bloom, Justin | attend settlement conference, post conf. meeting with Mike G, Kaki S.  Post conf. call with Fred E.  Post conf call with plaintiffs team and clients. | 9.50 | 7.00 | $ 385 | 2.50 | $ 150 | $ 3,070.00 |
| 06/29/18 | Bloom, Justin | Call with K. Schmidt re: deposition and filings | 0.18 | 0.18 | $ 385 | 0.00 | $ 150 | $ 70.58 |
| 06/29/18 | Bloom, Justin | Call with K. Schmidt and (part of time) M. Goodstein re settlement strategy | 0.45 | 0.45 | $ 385 | 0.00 | $ 150 | $ 173.25 |
| 06/29/18 | Bloom, Justin | Calls with Brian Bolves re: Joint CMO modification | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 06/29/18 | Bloom, Justin | Edit draft, file and emails with K Schmidt, M. Goodstein, B. Pierce re: cmo modification, motion for settlement conf. | 2.00 | 2.00 | $ 385 | 0.00 | $ 150 | $ 770.00 |
| 07/01/18 | Bloom, Justin | Emails re: lateral ordinances in Pinellas - w/ Pinellas Co | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 07/02/18 | Bloom, Justin | Call with Kaki Schmidt, review settlement letter. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 07/05/18 | Bloom, Justin | Call Schmidt/Bloom regarding settlement payment to TBEP, structure and letters needed for DOJ notice. | 0.20 | 0.20 | $ 385 | 0.00 | $ 150 | $ 77.00 |
| 07/05/18 | Bloom, Justin | assembling costs and fees | 0.33 | 0.00 | $ 385 | 0.33 | $ 150 | $ 50.00 |
| 07/05/18 | Bloom, Justin | sep calls with K. Schmidt and TBEP, TX Estuary Program | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 07/06/18 | Bloom, Justin | Review settlement document by K. Schmidt, email communications with team | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 07/06/18 | Bloom, Justin | Review, edit, file, discuss CMO joint motion | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 07/07/18 | Bloom, Justin | costs and fees review and emails with Kaki S | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 07/08/18 | Bloom, Justin | Finalize costs fees, research morey invoices | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 07/12/18 | Bloom, Justin | Emails with team re: settlement | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 07/17/18 | Bloom, Justin | Call with K. Schmidt re: settlement | 0.42 | 0.42 | $ 385 | 0.00 | $ 150 | $ 160.42 |
| 07/17/18 | Bloom, Justin | Review settlement documents and emails | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 07/17/18 | Bloom, Justin | Conference call with K Schmidt and Tom Christ re: settlement, follow-up call with K. Schmidt | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 07/18/18 | Bloom, Justin | Research Public Advisories and Notification Protocol for settlement | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 07/18/18 | Bloom, Justin | Review settlement documents, emails from K. Schmidt | 0.75 | 0.75 | $ 385 | 0.00 | $ 150 | $ 288.75 |
| 07/19/18 | Bloom, Justin | Call with K. Schmidt re: settlement negotiations | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 07/19/18 | Bloom, Justin | Edit draft of amendment to Consent Order - research health advisory/notification issue | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 07/21/18 | Bloom, Justin | Call with K. Schmidt re: settlement | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 07/21/18 | Bloom, Justin | Review and edit settlement docs | 2.00 | 2.00 | $ 385 | 0.00 | $ 150 | $ 770.00 |
| 07/23/18 | Bloom, Justin | Call with K. Schmidt re" settlement | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 07/23/18 | Bloom, Justin | Calls with Kaki Schmidt re: settlement - recreational water adisory issue, edit spreadsheet | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 07/24/18 | Bloom, Justin | Calls with K. Schmidt re: settlement - attorneys fees and costs | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 07/24/18 | Bloom, Justin | Review spreadsheet, research area parks and water quality issue re: settlement, emails to A. Hayslip and K. Schmidt. | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |

Exhibit 1 - Page 29

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|------|----------|-------------|-------------|---------------|-----------|----------------|----------------|----------|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 07/24/18 | Bloom, Justin | Call Schmidt/Bloom regarding public advisories issue in draft consent order. | 0.20 | 0.20 | $ 385 | 0.00 | $ 150 | $ 77.00 |
| 07/26/18 | Bloom, Justin | Review and edit joint motion to reopen - and status rept for filing | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 07/26/18 | Bloom, Justin | Review and edit status report for filing | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 07/26/18 | Bloom, Justin | Review article and share / discussion re: rate fee increases before city council | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 07/26/18 | Bloom, Justin | Review Stipulated Order, discussion re: costs and fees. | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 07/27/18 | Bloom, Justin | Calls with Kaki Schmidt and Whittemore's Clerk re: Status Report and Motion to Reopen | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 07/27/18 | Bloom, Justin | Emails and review, file status report | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 07/27/18 | Bloom, Justin | set-up spreadsheet tracking st. pete spills reported to DEP | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 07/29/18 | Bloom, Justin | Emails re: final settlement documents, approvals | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.00 |
| 07/30/18 | Bloom, Justin | Review emails re: reservation of rts - fees | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 08/09/18 | Bloom, Justin | Communications via phone and email re: settlement approval by city council, calls to client and Hayslip. | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 08/10/18 | Bloom, Justin | Emails re: lodging v reopening settlement, next steps | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 08/12/18 | Bloom, Justin | discussion with Kaki Schmidt re: settlement | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 08/12/18 | Bloom, Justin | Call Schmidt/Bloom regarding PR for settlement, FDEP status, upcoming fee petition, case management planning to propose to defense counsel. | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 08/29/18 | Bloom, Justin | Emails re: motion to reopen and retention of jurisdiction - w/ K. Schmidt | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 08/29/18 | Bloom, Justin | order transcript of Status Conf | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 08/29/18 | Bloom, Justin | Review status conf transcript and email K. Schmidt re: Motion to re-open | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 08/30/18 | Bloom, Justin | Review and discuss research re: retention of jurisdiction for settlement | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 08/31/18 | Bloom, Justin | Settlement communications, calls with K. Schmidt, Brian Bolves, review proposed pleadings. | 1.33 | 1.33 | $ 385 | 0.00 | $ 150 | $ 513.33 |
| 09/04/18 | Bloom, Justin | Emails with K. Schmidt re: motion to reopen v. extend admin closure | 0.08 | 0.08 | $ 385 | 0.00 | $ 150 | $ 32.08 |
| 09/04/18 | Bloom, Justin | Call with St. Pete clerk re: transcript | 0.07 | 0.00 | $ 385 | 0.07 | $ 150 | $ 10.00 |
| 09/04/18 | Bloom, Justin | Emails with K. Schmidt re: transcript of Council Mtg | 0.08 | 0.00 | $ 385 | 0.08 | $ 150 | $ 12.50 |
| 09/05/18 | Bloom, Justin | Calls and emails with K. Schmidt re: consent order and filing joint motion with court, edit joint motion | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 256.67 |
| 09/06/18 | Bloom, Justin | Call with Kaki Schmidt re: settlement - dep amended consent order, filing motion to reopen, review final versions | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 128.33 |
| 09/10/18 | Bloom, Justin | Settlement communications w co-counsel re: Order on Motion to Re-Open | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |
| 09/19/18 | Bloom, Justin | Settlement communications - Tom Christ and K. Schmidt re; amended c.o | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 64.17 |

Exhibit 1 - Page 30

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 09/27/18 | Bloom, Justin | Compile records for costs and fees | 2.00 | 0.00 | $ 385 | 2.00 | $ 150 | $ 300.00 |
| 09/28/18 | Bloom, Justin | Call Schmidt/Bloom concerning 1.7 million gallon discharge and status update concerning City Council meeting and timing of FDEP signature. | 0.40 | 0.40 | $ 385 | 0.00 | $ 150 | $ 154.00 |
| 10/15/18 | Bloom, Justin | Calls with K. Schmidt re: filing settlement documents, File Notice of Settlement. | 0.50 | 0.00 | $ 385 | 0.50 | $ 150 | $ 75.00 |
| 10/16/18 | Bloom, Justin | Call with K. Schmidt re: settlement lodging, timetable for fee petition and SEP. | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 10/16/18 | Bloom, Justin | Emails with K Schmidt and F. Evenson re: SEP | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 10/31/18 | Bloom, Justin | Call with Fred Evenson re: SEP, draft email response to P. Heeter re: SEP, draft email to TBEP (Ed Sherwood) re: SEP | 1.00 | 1.00 | $ 385 | 0.00 | $ 150 | $ 385.00 |
| 11/01/18 | Bloom, Justin | Calls with Fred Evenson, adding TBEP Director Ed Sherwood, re: SEP | 0.67 | 0.67 | $ 385 | 0.00 | $ 150 | $ 257.95 |
| 11/01/18 | Bloom, Justin | Call with K. Schmidt re TBEP SEP and DOJ policy, locating other settlements containing NEP recipients for SEP funds; allocation of funds in response to initial TBEP proposal; discussion of possible change to recipient and coordination with City if so. | 0.28 | 0.28 | $ 385 | 0.00 | $ 150 | $ 107.80 |
| 11/01/18 | Bloom, Justin | Draft email to TBEP Director Sherwood re: SEP | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 65.45 |
| 11/02/18 | Bloom, Justin | Research into SEPs | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 127.05 |
| 11/02/18 | Bloom, Justin | Call with K. Schmidt and J. Gregg from DOJ regarding TBEP as SEP recipient and discussion about level of specificity needed in letter requested by DOJ regarding SEP funds. | 0.40 | 0.40 | $ 385 | 0.00 | $ 150 | $ 154.00 |
| 11/02/18 | Bloom, Justin | Call Schmidt/Bloom following call with DOJ regarding follow-up with TBEP, legal entity paperwork, allocation, projects. | 0.20 | 0.20 | $ 385 | 0.00 | $ 150 | $ 77.00 |
| 11/05/18 | Bloom, Justin | Email to DOJ re: TBEP as SEP recipient, providing info on the TBEP | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/08/18 | Bloom, Justin | Call Schmidt/Bloom regarding follow-up with TBEP project criteria, DOJ position. | 0.30 | 0.30 | $ 385 | 0.00 | $ 150 | $ 115.50 |
| 11/08/18 | Bloom, Justin | Draft DOJ letter for TBEP SEP | 0.33 | 0.33 | $ 385 | 0.00 | $ 150 | $ 127.05 |
| 11/08/18 | Bloom, Justin | Email to TBEP Sherwood re: SEP and DOJ criteria, potential projects | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 65.45 |
| 11/08/18 | Bloom, Justin | Follow-up call with K. Schmidt and DOJ/Gregg from DOJ regarding TBEP as SEP and level of specificity needed in letter requested by DOJ regarding SEP funds. | 0.30 | 0.30 | $ 385 | 0.00 | $ 150 | $ 115.50 |
| 11/08/18 | Bloom, Justin | Follow-up call with K. Schmidt re: DOJ call and creation of template letter for TBEP SEP | 0.20 | 0.20 | $ 385 | 0.00 | $ 150 | $ 77.00 |
| 11/08/18 | Bloom, Justin | Review TBEP proposed RFP language, compare to project proposals, draft language for DOJ letter | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 65.45 |

Exhibit 1 - Page 31

| Date | Attorney | Description | Billed Time | Attorney Time | Atty Rate | Paralegal Time | Paralegal Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|
| | | | 383.84 | 335.17 | | 48.67 | | $ 136,341.59 |
| 11/08/18 | Bloom, Justin | Call with K. Schmidt and TBEP concerning proposed projects to be funded with settlement funds consistent with DOJ guidelines. | 0.30 | 0.30 | $ 385 | 0.00 | $ 150 | $ 115.50 |
| 11/11/18 | Bloom, Justin | Review email from TBEP, edit DOJ letter, send to K. Schmidt | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/15/18 | Bloom, Justin | Communications w/ K. Schmidt re: SEP letter from TBEP | 0.17 | 0.17 | $ 385 | 0.00 | $ 150 | $ 65.45 |
| 11/16/18 | Bloom, Justin | Communications w/ K. Schmidt, Fred Evenson re: SEP letter from TBEP | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/28/18 | Bloom, Justin | Emails with K. Schmidt re: anticipated settlement filings and future monitoring/oversight work. | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/28/18 | Bloom, Justin | Email with Tom Christ re: future monitoring/oversight work. | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/30/18 | Bloom, Justin | Calls with Kaki Schmidt, joined by Chris Sproul re: filing Notice of DOJ approval and Stip Order | 0.25 | 0.25 | $ 385 | 0.00 | $ 150 | $ 96.25 |
| 11/30/18 | Bloom, Justin | Review and edit Notice of DOJ letter | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.50 |
| 11/30/18 | Bloom, Justin | Attempt to file ecf - notice. ECF down | 0.67 | 0.00 | $ 385 | 0.67 | $ 150 | $ 100.50 |
| 12/01/18 | Bloom, Justin | Call with Kaki Schmidt, edit and file Notice | 0.33 | 0.00 | $ 385 | 0.33 | $ 150 | $ 49.50 |
| 12/03/18 | Bloom, Justin | Review and file motions to reopen and settle, emails/call with K. Schmidt | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |
| 12/05/18 | Bloom, Justin | Call with Court Deputy for Call-in instructions re: Dec 5 hearing. Email K. Schmidt instructions. | 0.17 | 0.00 | $ 385 | 0.17 | $ 150 | $ 25.50 |
| 12/05/18 | Bloom, Justin | Research and prepare spreadsheet re: ongoing spills for upcoming hearing | 0.50 | 0.50 | $ 385 | 0.00 | $ 150 | $ 192.50 |

Exhibit 2

to the

Declaration of Justin Bloom

In Support of

Plaintiffs' Motion for Attorneys'
Fees and Costs

Suncoast Waterkeeper et al. v. City of St.
Petersburg Case No. 8:16-cv-03319-JDW-AEP



September 28, 2016

*Via Certified Mail, Return Receipt Requested*

Mayor Rick Kriseman
City of St. Petersburg
St. Petersburg City Hall
175 5th St. N.
St. Petersburg, FL 33701
Email: mayor@stpete.org

Mr. Claude D. Tankersley, P.E.
City of St. Petersburg
Public Works Administrator
1650 Third Avenue North
St. Petersburg, Florida, 33713

**Re: Sixty-Day Notice of Violations of Clean Water Act and Notice of Intent to File Suit**

Dear Mr. Kriseman and Mr. Tankersley:

I am writing on behalf of Suncoast Waterkeeper, Inc. ("SCWK"), Our Children's Earth Foundation ("OCE") and Ecological Rights Foundation ("ERF") to notify you of serious and ongoing violations of the federal Clean Water Act ("CWA") at the City of St. Petersburg's publicly owned treatment works ("the POTW") for the collection and treatment of sanitary sewage. The POTW includes the following wastewater treatment facilities (Facilities) and associated wastewater collection/transmission systems (Systems) serving the City of St. Petersburg and other portions of Pinellas County.

| | |
|---|---|
| Albert Whitted Water Reclamation Facility | 601 8th Ave. S.E. |
| Northeast Water Reclamation Facility | 1160 62nd Ave. N.E. |
| Northwest Water Reclamation Facility | 7500 26th Ave. N. |
| Southwest Water Reclamation Facility | 3800 54th Ave. S. |
| St. Petersburg Master Reuse System | 1650 Third Ave. N. |

The purpose of this letter is further to provide notice of SCWK, OCE and ERF's intent to file a civil action against the City of St. Petersburg ("St. Petersburg") sixty days (60) days after the date of this letter.

R. Kriseman                                    2
C. Tankersley
Sept. 28, 2016

## I. IDENTITY OF PERSONS GIVING NOTICE AND THEIR COUNSEL

In accord with 40 C.F.R. section 135.3(b), OCE hereby gives notice of the names, addresses, and telephone numbers of the person giving notice, which are SCWK, OCE and ERF.

SCWK is a non-profit public benefit corporation with members throughout the Tampa Bay area, dedicated to protecting and restoring the Florida Suncoast's waterways through enforcement, fieldwork, advocacy, and environmental education for the benefit of the communities that rely upon these precious coastal resources. SCWK has been registered as a non-profit corporation in Florida since 2012 and has maintained its good and current standing in Florida since that time. SCWK is licensed member of Waterkeeper Alliance, Inc., an international non-profit environmental organization, made up of over 300 separate Waterkeeper programs, such as Suncoast Waterkeeper.

OCE is a non-profit public benefit corporation with members throughout the United States, including Florida and specifically the Tampa Bay area, dedicated to protecting the public, especially children, from the health impacts of pollution and other environmental hazards and to improving environmental quality for the public benefit. Another aspect of OCE's mission is to participate in environmental decisionmaking, enforce environmental laws (including via citizen suits), both federal and state, to reduce pollution, and to educate the public concerning those laws and their enforcement.

ERF is a non-profit public benefit corporation with members across the United States, including Florida and specifically the Tampa Bay area. Among other work it does, ERF focuses on protecting surface waters from pollution and degradation. ERF represents citizens who are striving to protect waterways from pollution and secure the multitude of public and private benefits that follow from clean, vibrant waters:  safe drinking water, abundant and diverse wildlife populations, healthy recreational opportunities, and economic prosperity from commercial, sport and subsistence fishing; and other commercial activities that depend on clean water. To further its environmental advocacy goals, ERF actively seeks federal and state agency implementation of state and federal water quality related laws, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

SCWK, OCE and ERF's members use the ocean and bay waters and other waters adjoining and in St. Petersburg for body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation. These SCWK, OCE and ERF members are concerned about water quality and are and will continue to be adversely affected by St. Petersburg's sewage discharge violations. SCWK, OCE and ERF may be contacted at:

Suncoast Waterkeeper, Inc.
P.O. Box 1028

R. Kriseman                                    3
C. Tankersley
Sept. 28, 2016

> Sarasota, FL 34230
> Tel: (941) 275-2922
> E-mail:  jbloom@suncoastwaterkeeper.org
>
> Our Children's Earth Foundation
> 1625 Trancas St. #2218
> Napa, CA 94558-9998
> Tel: (510) 910-4535
> E-mail: annie.beaman@gmail.com
> Or: 3701 Sacramento St., #194
> San Francisco, CA 94118
> Tel: (415) 342-0042
>
> Ecological Rights Foundation
> 867 "B" Redwood Drive
> Garberville, California, 95542.
> Tel: (707) 923-4372.
> E-mail: ecorights@earthlink.net

SCWK, OCE and ERF has retained the following legal counsel to represent them in this
matter:

> Justin Bloom, Esq.
> P.O. Box 1028
> Sarasota, FL 34230
> Tel: (941) 275-2922
> Fax: (866) 574-2169
> E-mail:  bloomesq1@gmail.com
>
> Christopher A. Sproul, Esq.
> Environmental Advocates
> 5135 Anza Street
> San Francisco, CA 94121
> Tel: (415) 533-3376
> Fax: (415) 358-5695
> E-mail: csproul@enviroadvocates.com
>
> Fredric Evenson
> Ecology Law Center
> P.O. Box 1000
> Santa Cruz, CA 95061
> Telephone: (831) 454-8216
> Email: evenson@ecologylaw.com

All communications should be addressed to legal counsel at the above addresses.

R. Kriseman                                          4
C. Tankersley
Sept. 28, 2016

## II. FACTUAL BACKGROUND

St. Petersburg is a municipality incorporated under the laws of the State of Florida and a person within the meaning of Section 403.031(5), Fla. Stat. St. Petersburg owns and operates the POTW and appurtenant collection system, which collectively is a publicly owned treatment works as defined in CWA section 212(2)[1] and 40 C.F.R. section 125.58(s). The POTW and related collection system collects and treats sanitary sewage from St. Petersburg's residents and businesses.

The CWA prohibits the discharge of pollutants by any person to waters of the United States except in compliance with a permit duly issued under the CWA. CWA § 301(a), 33 U.S.C. § 1311(a). The CWA authorizes EPA, or states with permit programs approved by EPA, to issue National Pollutant Discharge Elimination System (NPDES) permits allowing for the discharge of pollutants into waters of the United States. CWA § 402, 33 U.S.C. § 1342.

The stormwater element of the federal NPDES program is mandated by CWA § 402(p), 33 U.S.C. §1342(p), and implemented through federal regulations including 40 C.F.R. 122.26. EPA has approved the State of Florida's Department of Environmental Protection (DEP) to administer an NPDES permit program in Florida. DEP is authorized under Section 403.0885 of the Florida Statutes (F.S.) and Rule 62-624 of the Florida Administrative Code (F.A.C.) to implement the NPDES program. As part of this program, DEP has determined that a Municipal Separate Storm Sewer System (MS4) permit is required for the operation of St. Petersburg's stormwater systems.

DEP has issued MS4 Permit Number FLS000007-004 (the "MS4 Permit") to the City of St. Petersburg. The MS4 Permit authorizes St. Petersburg to discharge stormwater to waters of the State in accordance with the approved Stormwater Management Program, effluent limitations, monitoring requirements, and other provisions as set forth in the permit. St. Petersburg is the owner and/or operator of the St. Petersburg MS4. *See* MS4 Permit § I.A. Specifically, St. Petersburg is required to effectively prohibit the discharge of non-stormwater into its storm sewer system. *Id*. § I.D. Additionally, St. Petersburg is required to implement procedures to prevent, contain, and respond to spills that may discharge into the MS4. *See* MS4 Permit, Illicit Discharges and Improper Disposal, §7(d).

St. Petersburg has repeatedly violated the CWA by discharging raw and partially treated sewage from the POTW collection systems without NPDES permit authorization. Additionally, St. Petersburg has repeatedly violated the MS4 Permit by allowing the discharge of non-stormwater into its storm sewer system.

---

[1] 33 U.S.C. § 1292(2).

R. Kriseman                                     5
C. Tankersley
Sept. 28, 2016

### A. St. Petersburg Sewage Spills

St. Petersburg has repeatedly spilled raw and partially treated sewage from its collection system that carries sewage to the POTW. Such raw and partially treated sewage has repeatedly overflowed or spilled from St. Petersburg sewer lines, manholes, pump stations, and various other POTW equipment/conveyances. A partial list of St. Petersburg's sewage spills is attached as Exhibit 1 to this Notice Letter.

These spills have resulted from a variety of poor or inadequate system maintenance, operation, repair, replacement and rehabilitation practices. These poor practices have led to sewer line blockages (generally caused by build-up of grease, accumulation of sediment and debris, and root intrusion), unaddressed defects in sewer lines such as extensive line cracking, sags in lines, and misaligned joints; broken sewer lines, pump station equipment failures, undersized sewer lines or pump station pumping and/or storage capacity, and the overwhelming of system capacity due to excessive infiltration and inflow of storm water and groundwater during wet weather.

These spills have sent raw and partially treated sewage streaming into private residences and businesses, streets, storm drains, streams, Tampa Bay, and the Gulf of Mexico. These spills have repeatedly posed serious public health threats and created severe nuisance in exposing substantial numbers of people to raw and partially treated sewage. Raw and partially treated sewage contains a variety of human bacteriological, viral, and parasitic pathogens, and exposure to raw and partially treated sewage is well-known to cause various human illnesses. In addition to human waste, sanitary sewage contains various toxic chemicals from the solvents, detergents, cleansers, inks, pesticides, paints, pharmaceuticals and other chemicals discarded by households and businesses. Thus, St. Petersburg's sewage spills pose a serious public health risk in exposing members of the public and SCWK, OCE and ERF's members to sewage-borne pathogens and various toxic pollutants. These persistent, repeated sewage spills also have threatened harm to the sensitive freshwater and marine environments of St. Petersburg's waters, as the pathogens and toxic pollutants in sewage can adversely affect freshwater and marine life.

## III. VIOLATIONS OF THE FEDERAL CLEAN WATER ACT

### A. Sewage Spills

#### 1. Violation of CWA Section 301(a)'s Prohibition On Unpermitted Discharges to Waters of the United States.

As noted above, St. Petersburg has repeatedly spilled raw and partially treated sewage from its sewage collection system. At least some of these sewage spills have flowed into waters of the United States. St. Petersburg does not and could not have NPDES permit authorization to discharge raw or partially treated sewage from its collection system to waters of the United States, which include the Gulf of Mexico,

R. Kriseman                                    6
C. Tankersley
Sept. 28, 2016

Tampa Bay, all wetlands adjacent to the Gulf of Mexico, and/or Tampa Bay, freshwater
streams and other waters that are tributary to the Gulf of Mexico and/or Tampa Bay, and
any wetlands adjacent to such tributaries. All such discharges of raw or partially treated
sewage have thus constituted the unauthorized discharge of pollutants in violation of
CWA section 301(a), which expressly provides:

> Except as in compliance with this section and sections . . . 1342 [which
> provides for NPDES permit authorization for pollutant discharges] . . . the
> discharge of any pollutant by any person shall be unlawful. 33. U.S.C.
> §1311(a).

### 2.  Sewage Discharges to St. Petersburg's MS4 in Violation of the MS4 Permit

St. Petersburg's sewage spills have flowed into St. Petersburg's MS4. The MS4
Permit regulates discharges into the MS4. The MS4 Permit prohibits the discharge of
non-stormwater (material other than stormwater) into the MS4. MS4 Permit, § I.D. Raw
or partially treated sewage that is discharged into the MS4 is not stormwater. St.
Petersburg violates the MS4 Permit every time a sewage spill from the St. Petersburg
POTW discharges into the MS4.  All the sewage spills that are identified in Exhibit 1 as
having reached storm drains are examples of sewage spills that St. Petersburg has
discharged into the MS4.

### 3.  Dates and Locations of Violations

A partial list of St. Petersburg's sewage spills, provided by way of example, is set
forth as Exhibit 1 to this letter. This partial list indicates the date and location of these
sewage spills and identifies whether these spills entered waters of the United States
and/or the MS4. As noted, these above-described spills are illustrative of the types of
sewage spills from St. Petersburg's sewage collection system. Additionally, local news
agencies have reported several spills and/or discharges of raw or partially treated sewage
from St. Petersburg's sewage collection system in June, July, August, and September
2016. These recent spills and/or discharges were the subject of a proposed Consent
Order, OGC File No. 16-1280. On information and belief, SCWK, OCE and ERF have
concluded that St. Petersburg has had additional sewage spills in the past five years,
many of which have caused unpermitted discharge of sewage to waters of the United
States and/or the MS4. This notice includes any additional sewage spills from the St.
Petersburg For example, during recent wet weather in June, August and September,

R. Kriseman                                    7
C. Tankersley
Sept. 28, 2016

The Facilities are individually permitted under the State of Florida Domestic Wastewater Facility Permit program ("State Permits").[2] The dates and locations of, and all other pertinent details concerning, St. Petersburg's sewage spills are well known to St. Petersburg, as St. Petersburg is required to monitor and report these spills to the Florida Department of Environmental Protection. *See* State Permits, General Conditions, § IX.20.a.(4) and (b).  Each of these spills that has caused pollutants to flow into waters of the United States constitutes a separate violation of CWA section 301(a).

OCE will include in its suit against St. Petersburg claims for additional violations when additional information becomes available. St. Petersburg has taken inadequate affirmative steps to eliminate its sewage spills, thus these violations are ongoing and will continue in the future.

## IV.    NOTICE OF INTENT TO SUE ST. PETERSBURG FOR VIOLATIONS OF THE CLEAN WATER ACT

SCWK, OCE and ERF contend that St. Petersburg has failed in the respects set forth above to comply with the requirements imposed by CWA section 301(a) and the State Permits. CWA section 505(b), 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of his/her intention to sue. 40 C.F.R. section 135.2 provides that, if the alleged violator is a State or local agency, service of notice shall be accomplished by certified mail addressed to, or by personal service upon, the head of such agency. This section further provides that a copy of the notice shall be mailed to the chief administrative officer of the water pollution control agency for the State in which the violation is alleged to have occurred, the EPA Administrator and the EPA Regional Administrator for the EPA Region in which such violation is alleged to have occurred. Accordingly, this notice is being sent to you as the Mayor of St. Petersburg. In addition, a copy of this notice is being sent to Claude D. Tankersley, Public Works Administrator. We are also sending copies to the EPA Administrator, the Regional Administrator of EPA Region 4, the Executive Director of the State Office of Water Quality, and the Executive Director of the Southwest Florida Water Management District (and a courtesy copy to the U.S. Department of Justice).

By this letter, pursuant to CWA section 505(a) and (b), 33 U.S.C. §1365(a) and (b), SCWK, OCE and ERF hereby put you on notice that after the expiration of sixty (60) days from the date of this Notice of Intent To File Suit, SCWK, OCE and ERF intend to file an enforcement action in federal court against St. Petersburg for the latter's CWA violations.

---

[2] Albert Whitted Water Reclamation Facility, Wastewater Permit No. FLA128830; Northwest Water Reclamation Facility, Wastewater Permit No. FLA128821; Northeast Water Reclamation Facility, Wastewater Permit No. FLA128856; Southwest Water Reclamation Facility, Wastewater Permit No. FLA 128848.

R. Kriseman                          8
C. Tankersley
Sept. 28, 2016

 SCWK, OCE and ERF intend to seek civil penalties and, in addition, injunctive relief preventing further CWA violations pursuant to CWA sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), and such other relief as is permitted by law. Pursuant to CWA section 309(d), 33 U.S.C. § 1319(d), and 40 C.F.R. section 19.4, each of the above-described CWA violations subjects St. Petersburg to a penalty of up to $32,500 per day per violation for all separate CWA violations. *See* 69 Fed. Reg. 7121 (Feb. 13, 2004).

 In addition to the violations set forth above, this notice covers all ongoing CWA violations and violations evidenced by information that becomes available to SCWK, OCE and ERF after the date of this Notice of Intent to File Suit.

 SCWK, OCE and ERF are interested in discussing effective remedies for the violations noted in this letter. If you wish to pursue such discussions in the absence of further litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period. Although SCWK, OCE and ERF are always interested in avoiding unnecessary litigation, they do not intend to delay the filing of a complaint in federal court if discussions are continuing when the notice period ends.

 Sincerely,

Justin Bloom

cc:

| Gina McCarthy, Administrator |
| U.S. Environmental Protection Agency |
| 1200 Pennsylvania Avenue, N.W. |
| Washington, D.C. 20460 |
| mccarthy.gina@epa.gov |
| Heather McTeer Toney, Regional Administrator, EPA Region 4 |
| Sam Nunn Atlanta Federal Center |
| 61 Forsyth St. SW |
| Atlanta, GA 30303-8960 |
| mcteertoney.heather@epa.gov |
| Brian Armstrong |
| Executive Director |
| Southwest Florida Water Management District |
| 2379 Broad St., Brooksville, FL 34604 |
| brian.armstrong@watermatters.org |

R. Kriseman                                        9
C. Tankersley
Sept. 28, 2016

Jonathan P. Steverson, Secretary
Ryan Matthews, Director Office of Water Quality
Florida Department of Environmental Protection
3900 Commonwealth Blvd., MS 46
Tallahassee, FL 32399-3000
jon.steverson@dep.state.fl.us
ryan.matthews@dep.state.fl.us

# EXHIBIT 1

## Southwest WRF

| DATE OF DISCHARGE VIOLATION | LOCATION OF DISCHARGE | TYPE OF DISCHARGE | SOURCE OF DISCHARGE | CAUSE OF DISCHARGE | Estimated Total Volume of Discharge | Estimated Volume of Discharge to Surface Water | Estimated Volume of Discharge to Storm System | FLOWED TO SURFACE WATER (NAME) | FLOWED TO STORMWATER SYSTEM (NAME) | REACH SURFACE WATER (Y=1/N=0) | REACH STORM DRAIN (Y=1/N=0) | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 27,304,460.00 | 15,308,500.00 | | | | 19 | | |
| 9/1/2011 | 3800 54th Av. S. | RAS sludge | other | line break | 15.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 9/1/2011 | 3800 54th Av. S. | RAS sludge | other | line break | 50.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 9/1/2011 | 3800 54th Av. | RAS sludge | other | line break | 5.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 2/25/2011 | St. Petersburg County Club Golf Course | aluminum sulfate liquid 48.5% by wt. | contractor | contractor | 2,480.00 | 2,480.00 | 2,480.00 | pond along hole #2 at SP CC | pond along hole #2 at SP CC | 1 | 1 | |
| 5/17/2011 | 550 34 St. S. | na | manhole overflow | grease | 30.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 5/24/2011 | 3010 58th ave. S. | na | manhole overflow | grease | 5.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 8/1/2011 | SWWRF | raw sewage | other | debris | 300.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 8/30/2011 | SWWRF | digested sludge | other | cut hose | 100.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 9/1/2011 | 3800 54th Av. S. | RAS sludge | other - hole in hose | contractor | 5.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 9/10/2011 | 4074 24th Av. | wastewater | manhole overflow | other | 12,000.00 | 12,000.00 | 0.00 | Clam Bayou Cr. | na | 1 | 0 | |
| 10/13/2011 | 3800 54th Av. S | WAS sludge | plubbed sample line | debris | 10.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 1/3/2012 | na | reclaimed water | reclaimed water line | mechanical failure | 50.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 3/4/2012 | 3800 Beach Dr. SE | na | na | grease | 10.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 4/27/2012 | Underground in front of GBT building | reclaimed water | reclaimed water line | line break | 750.00 | 750.00 | 0.00 | na | na | 1 | 0 | |
| 5/9/2012 | 536 52nd St. S. | na | manhole overflow | grease | 25.00 | 0.00 | 25.00 | na | na | 0 | 0 | |
| 6/24/2012 | 4th St. S | raw sewage | manhole overflow | extreme weather | 2,000.00 | 2,000.00 | 0.00 | Tampa Bay | na | 1 | 0 | |
| 6/25/2012 | 4936 Sunrise Dr. S | raw sewage | manhole overflow | extreme weather | 700.00 | 700.00 | 0.00 | Tampa Bay | na | 1 | 0 | |
| 9/4/2012 | Interstate 275 N. near exit 22 | biosolids | trailer from sludge hauler | traffic incident | 3 cubic yards | 3 cubic yards | 0.00 | na | na | 0 | 0 | |
| 9/14/2012 | SWWRF | air release | | debris | 500.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 1/19/2012 | 54th ave S. | reclaimed water | reclaimed water overflow | contractor | 420.00 | 0.00 | 0.00 | na | na | 0 | 0 | |
| 12/26/2012 | 34 Av. N | reclaimed water | manhole overflow | line break | 100.00 | 100.00 | 0.00 | Lake Magoire | na | 1 | 0 | |
| 4/23/2013 | 4751A Osprey Dr. S | raw sewage | force main | contractor | 200.00 | 1,000.00 | 0.00 | na | na | 1 | 0 | inconsistent discharge amount |

## Southwest WRF

| DATE OF DISCHARGE/VIOLATION | LOCATION OF DISCHARGE | TYPE OF DISCHARGE | SOURCE OF DISCHARGE | CAUSE OF DISCHARGE | Estimated Total Volume of Discharge | Estimated Volume of Discharge to Surface Water | Estimated Volume of Discharge to Storm System | FLOWED TO SURFACE WATER (NAME) | FLOWED TO STORMWATER SYSTEM (NAME) | REACH SURFACE WATER (Y=1/N=0) | REACH STORM DRAIN (Y=1/N=0) | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/28/2013 | Country Club | raw sewage | manhole overflow | grease | 20.00 | 0.00 | 0.00 | na | na | na | 0 | |
| 7/16/2013 | SW Plant | reclaimed water | plant effluent | mechanical failure | 1,100,000.00 | 0.00 | 0.00 | na | na | na | 0 | |
| 8/21/2013 | 757 18th Ave | raw sewage | manhole overflow | grease | 50.00 | 50.00 | 0.00 | na | na | na | 1 | |
| 9/25/2013 | 3800 54th Av. S | partially treated | bypass deep bed filters | extreme weather | 10,462,000.00 | 0.00 | 0.00 | na | na | na | 0 | |
| 9/29/2013 | distribution wet well | reclaimed water | reclaimed water line | mechanical failure | 150.00 | 0.00 | 0.00 | na | na | na | 0 | |
| 10/25/2013 | 275 57th St. N | raw sewage | manhole overflow | roots | 100.00 | 0.00 | 0.00 | na | na | na | 0 | |
| 12/14/2013 | 2546 Kingston St. S. | raw sewage | manhole overflow | grease | 40.00 | 0.00 | 0.00 | na | na | na | 0 | |
| 1/25/2014 | 4600 Emerson Av. | raw sewage | manhole overflow | grease | 50.00 | 0.00 | 0.00 | na | na | na | 0 | |
| 3/16/2014 | 3735 45th Way N. | raw sewage | manhole overflow | grease | 50.00 | 0.00 | 50.00 | na | na | na | 1 | |
| 3/26/2014 | RAS Pumping Station | RAS sludge | RAS pump leak | mechanical failure | 75.00 | 0.00 | 0.00 | na | na | na | 0 | |
| 4/25/2014 | 6145 Sun Blvd. | raw sewage | manhole overflow | grease | 660.00 | 400.00 | 0.00 | Boda Ciega Bay? | na | na | 0 | |
| 5/17/2014 | 3311 19th Av. S. | raw sewage | manhole overflow | grease | 100.00 | 0.00 | 0.00 | na | na | na | 1 | |
| 5/17/2014 | 4600 Fairfield Av. S | raw sewage | manhole overflow | grease | 120.00 | 0.00 | 120.00 | na | na | na | 1 | |
| 11/6/2014 | 2540 Roy Hanna Dr. S | raw sewage | manhole overflow | Other | 8,000.00 | 0.00 | 0.00 | na | na | na | 0 | |
| 1/17/2015 | 6242 3rd Av. S | raw sewage | manhole overflow | roots | 60.00 | 0.00 | 0.00 | na | na | na | 1 | |
| 1/27/2015 | 2824 54th Av. S. | raw sewage | manhole overflow | debris | 100.00 | 60.00 | 40.00 | na | na | na | 1 | |
| 2/13/2015 | 4327 Juanita Way, S. | raw sewage | manhole overflow | contractor | 50,000.00 | 40,000.00 | 0.00 | Coquino Key? | na | na | 1 | |
| 8/3/2015 | 1400 38th St. N. | raw sewage | manhole overflow | extreme weather | 950.00 | 470.00 | 0.00 | Jorgensen Lake run-off pond | na | na | 0 | |
| 7/20/2015 | 5th Ave. S /114th St. S. | raw sewage | manhole overflow | contractor | 150.00 | 0.00 | 150.00 | Booker Cr. | na | na | 1 | surface water body name provided, but no gallons reported flowing into it, only to stormwater sewer |

Southwest WRF

| DATE OF DISCHARGE VIOLATION | LOCATION OF DISCHARGE | TYPE OF DISCHARGE | SOURCE OF DISCHARGE | CAUSE OF DISCHARGE | Estimated Total Volume of Discharge | Estimated Volume of Discharge to Surface Water | Estimated Volume of Discharge to Storm System | FLOWED TO SURFACE WATER (NAME) | FLOWED TO STORMWATER SYSTEM (NAME) | REACH SURFACE WATER (Y=1/N=0) | REACH STORM DRAIN (Y=1/N=0) | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/2/2015 | SW Water Reclamation Facility | raw sewage | other | extreme weather | 450,000.00 | 15,000,000.00 | na | Clam Bayou | na | 1 | 1 | To avoid sewer water backing up into homes and spilling from manholes, the city elected to pump down the collection system into Clam Bayou until the flows were manageable at the plant. |
| 8/5/2015 | 50th Street Street / 31st Avenue | raw sewage | manhole overflow | extreme weather | 186,000.00 | 186,000.00 | 0.00 | Boca Ciega Bay | na | 1 | 0 | |
| 1/29/2015 | 2350 Lamparilla Way S. | raw sewage | manhole overflow | grease | 80.00 | 50.00 | 30.00 | | not provided | 1 | 1 | |
| 8/3/2015 | 1400 38th St. N. | raw sewage | manhole overflow | extreme weather | 950.00 | 0.00 | 950.00 | | not provided | 0 | 1 | |
| 8/2/2015 | 53rd Av. N and 10th St. N. | raw sewage | manhole overflow | extreme weather | 25,000.00 | 0.00 | 25,000.00 | na | not provided | 0 | 1 | |
| 8/8/2015 | Albert Whitted Reclamation Facility | treated water | storage tank | extreme weather | 15,000,000.00 | 15,000,000.00 | | | | | | not clear where discharge flowed |
| 6/7/2016 | Beach Drive @ Coffee Pot Blvd + 1st St @ 30th Ave | | manhole overflow | extreme weather | 60,000.00 | 60,000.00 | | Coffee Pot Bayou | | 1 | 1 | type of discharge not reported |
| 6/8/2016 | 38th St. South, 26th Ave South | raw sewage | manhole overflow | rain | 57,750.00 | | 57,750.00 | | Clam Bayou | 0 | 1 | |
| 8/29/2016 | 2125 Anastasia Way South | raw sewage | force main | hole in force main | over 1,000.00 | | over 1,000.00 | | "pond on golf course" | unclear | 1 | |
| 8/31/2016 | 28th Ave. S, 35th St. S. | raw sewage | manhole overflow | rain | unknown | | unknown | | unknown | | | |
| 9/5/2016 | 601 8th Ave SE | partially treated effluent | hydraulic overload | rain | between 78 and 93 million gallons | between 78 and 93 million gallons | | Tampa Bay | | 1 | | |
| 9/9/2016 | 507 12th Ave. S. | raw sewage | manhole overflow | "work at Albert Whitted Pump Station" | 2,400.00 | 2,400.00 | | Booker Creek | | 1 | 0 | |
| 9/19/2016 | 5800 54th Ave. S. | treated effluent | operator failed to return valve | operator error | 69,000.00 | | | | | | 0 | contained onsite |

## Northwest WRF

| DATE OF DISCHARGE VIOLATION | LOCATION OF DISCHARGE | TYPE OF DISCHARGE | SOURCE OF DISCHARGE | CAUSE OF DISCHARGE | Estimated Total Volume of Discharge | Estimated Volume of Discharge to Surface Water | Estimated Volume of Discharge to Storm System | FLOWED TO SURFACE WATER (NAME) | FLOWED TO STORMWATER SYSTEM (NAME) | REACH SURFACE WATER (Y=1/N=0) | REACH STORM DRAIN (Y=1/N=0) | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 708,925 | 14,240 | | | | 9 | | |
| 7/12/2011 | 5932 Dartmouth Ave N | raw sewer | manhole | grease | 100 | 0 | na | na | na | 0 | 0 | |
| 6/12/2013 | Northwest WRF | treated effluent | chlorine contact basin | mechanical failure/contractor | 205,000 | 4,000 | 0 | not provided | na | 1 | 0 | |
| 8/14/2013 | East side of Chlorine Contact Basin 7202 Dartmouth Ave N | reclaimed water | reclaimed water line | line break | 500 | 200 | 200 | not provided | not provided | 1 | 1 | |
| 12/7/2011 | 7202 Dartmouth Ave N | raw sewer | manhole | grease | 75 | 0 | na | na | na | 0 | 0 | |
| 3/27/2012 | 108 108th Av. | raw sewer | discharge hose | line break | 80,000 | 0 | 80,000 | na | na | 0 | 1 | |
| 9/4/2012 | 1st S. & Sunset Dr. S | raw sewer | not provided | other | 1,500 | 1,500 | not provided | not provided | na | 1 | 1 | |
| 1/3/2012 | Northwest WRF | digested sludge | #2 digester | mechanical failure | 300 | 0 | 0 | na | na | 0 | 0 | |
| 1/13/2013 | 6191 24th Ave N | raw sewer | manhole | roots | 40 | 40 | 0 | na | na | 1 | 0 | |
| 6/7/2016 | Sunset Blvd & Central Ave | raw sewer | manhole | extreme weather | 900 | 900 | 0 | intracoastal waterway at Central Av Bridge | na | 1 | 0 | |
| 6/7/2016 | 22rd Av @ 60th Way N | raw sewer | manhole | extreme weather | 7,500 | 7,500 | 0 | drainage ditch behind address | na | 1 | 0 | |
| 6/7/2016 | 691 56th St. N | raw sewer | manhole | extreme weather | 7,500 | 7,500 | 0 | drainage ditch in the middle of location | na | 1 | 0 | |
| 6/7/2016 | plant lift station | partially treated | lift station | mechanical failure | 500 | 500 | 0 | from storm sewer to retention pond | na | 1 | 0 | |
| 5/13/2013 | 10324 Paradise Blvd. | raw sewer | lift station | mechanical failure | 700 | 0 | 0 | na | na | 0 | 0 | |
| 6/4/2013 | Northwest WRF | WAS sludge | sample port | mechanical failure | 400,000 | 0 | 400,000 | na | na | 0 | 1 | |
| 12/18/2013 | between clarifiers 2 and 3 | reclaimed water | reclaimed water line | line break | 450 | 0 | 0 | na | na | 0 | 0 | |
| 2/5/2014 | | reclaimed water | reclaimed water line | line break | 1,200 | 0 | 1 | na | na | 0 | 1 | |
| 3/18/2014 | | treated effluent | other | mechanical failure | 50 | 50 | 0 | Jungle Lake | na | 1 | 0 | |
| 10/15/2014 | 2901 55th St. | raw sewer | manhole | line break | 400 | 0 | 0 | na | na | 0 | 0 | |
| 8/2/2015 | 120 108th Ave N | raw sewer | air release valve | mechanical failure | 2,000 | 0 | 0 | na | na | 0 | 0 | |

## Northwest WRF

| DATE OF DISCHARGE VIOLATION | LOCATION OF DISCHARGE | TYPE OF DISCHARGE | SOURCE OF DISCHARGE | CAUSE OF DISCHARGE | Estimated Total Volume of Discharge | Estimated Volume of Discharge to Surface Water | Estimated Volume of Discharge to Storm System | FLOWED TO SURFACE WATER (NAME) | FLOWED TO STORMWATER SYSTEM (NAME) | REACH SURFACE WATER (Y=1/N=0) | REACH STORM DRAIN (Y=1/N=0) | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/10/2016 | south digester #1 | digested sludge | digester | extreme weather | 5 | 0 | 0 | na | na | 0 | 0 | |
| 6/11/2016 #2 | north digester | digested sludge | digester | extreme weather | 5 | 0 | 0 | na | na | 0 | 0 | |
| 8/30/2016 | Influent Head Works | raw sewer | other headworks | alarm failure | 500 | 50 | | Jungle Lake | na | 1 | | |
| 8/31/2016 | East Barscreen Headworks- | raw sewer | East headworks barscreen | power failure | 2,000 | 0 | 0 | not provided | not provided | | | |
| 8/31/2016 9/7/2016 | 6049 22 Ave N. 245 76th St. N; 435 Park St. N; 430 Park St. N; 5753 1st Ave N; 5701 1st Ave N; 5778 5th Ave N; 441 57th St. N; 5575 5th Ave N; 601 96th St. N; 601 56th St. N; 424 Park St. N; 8400 36th Ave N. 3600 66th Ave. N | raw sewer | manholes | not specified | over 1000 gallons at each location | not specified | not specified | not provided | not provided | | | |
| 9/1-9/7/2016 WRF | storage tanks and chlorine contact chamber at NW WRF | treated effluent | pump bypass, RWS storage tank, plant effluent, other chlorine contact chamber | extreme weather, "treating more water than we could discharge down the wells" | 58 million gallons | not specified | not specified | Jungle Lake stormwater pond | Walter Fuller Park area | 1 | 1 | flowed to in-plant system |

# Northeast WRF

| DATE OF DISCHARGE VIOLATION | LOCATION OF DISCHARGE | TYPE OF DISCHARGE | SOURCE OF DISCHARGE | CAUSE OF DISCHARGE | Estimated Total Volume of Discharge | Estimated Volume of Discharge to Surface Water | Estimated Volume of Discharge to Storm System | FLOWED TO SURFACE WATER (NAME) | FLOWED TO STORMWATER SYSTEM (NAME) | REACH SURFACE WATER (Y=1/N=0) | REACH STORM DRAIN (Y=1/N=0) | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 295,085 | 115,030 | | | | 12 | | |
| 5/25/2011 | 1160 62nd Av. NE | reclaimed water | reclaimed water line | line break | 100 | 0 | 0 | na | na | 0 | 0 | |
| 8/15/2011 | 900 62nd Av. NE | raw sewer | air release valve | pipe break | 5,000 | 5,000 | 0 | not provided | na | 1 | 0 | |
| 10/13/2011 | 1160 62nd Av. NE | reclaimed water | chlorine contact chamber | installation of replacement level sensor | 50 | 0 | 0 | na | na | 0 | 0 | |
| 10/30/2011 | 418 45th Av. N | raw sewer | manhole | grease | 30 | 0 | 30 | na | not provided | 0 | 1 | |
| 2/28/2012 | 1160 62nd Av. NE | treated effluent | reclaimed water line | line break | 200 | 0 | 0 | na | na | 0 | 0 | |
| 3/31/2012 | 1160 62nd Av. NE | reclaimed water | reclaimed water line | mechanical failure | 50 | 0 | 0 | na | na | 0 | 0 | |
| 6/25/2012 | 701 62nd Av. N | raw sewer | manhole | extreme weather | 500 | 500 | 0 | creek at 54 Av N and 7 St. N | storm grate mouth of ally, 2576 40th Av. N | 1 | 0 | |
| 1/13/13 | 3941 26th St. N | raw sewer | manhole | roots | 25 | 0 | 25 | na | na | 0 | 1 | |
| 6/24/2013 | Grand Canal Blvd. & Bayou Grande Blvd. | raw sewer | sanitary sewer line | line break | 7,500 | 200 | 1,000 | not provided | not provided | 1 | 1 | |
| 8/7/2013 | 875 62 Av. NE | raw sewer | na | pipe break | 100 | 0 | 0 | na | na | 0 | 0 | |
| 12/3/2013 | 260 Bayview Dr. NE | raw sewer | manhole | grease | 80 | 80 | 0 | Tampa Bay | na | 1 | 0 | |
| 12/10/2013 | inlet chlorine contact chamber | reclaimed water | plant effluent | open filter valve | 850 | 0 | 0 | na | na | 0 | 0 | |
| 3/4/2014 | northeast WWTP | partially treated | manhole | cleaning filter | 5,000 | 0 | 0 | na | na | 0 | 0 | |
| 3/16/2014 | 200 78th Av. NE | raw sewer | manhole | not provided | 50 | 0 | 50 | na | not provided | 0 | 1 | |
| 6/23/2014 | 1101 116th Circle. N | raw sewer | pipe | line break | 100 | 50 | 0 | retention pond and creek located on 116th Circle N at 1100 block | na | 1 | 0 | |
| 4/7/2014 | contact basin | treated effluent | plant effluent | operator miscalculation | 250 | 0 | 0 | na | na | 0 | 0 | |
| 3/17/2014 | clarifier | reclaimed water | not provided | mechanical failure | 7,000 | 0 | 0 | na | na | 0 | 0 | |
| 2/20/2015 | 1160 62nd Av. NE | reclaimed water | in-plant service line | line break | 5,000 | 0 | 0 | na | na | 0 | 0 | |
| 10/31/2014 | northeast WWTP | reclaimed water | underground sewer line | line break | 16,000 | 0 | 50 | na | not provided | 0 | 1 | |
| 4/18/2015 | 1160 62nd Av. NE | reclaimed water | reclaimed water line | line break | 30,000 | 200 | 200 not provided | ditch to unnamed lake on east side of plant grounds | dry pond NE of plant grounds | 1 | 1 | |

## Northeast WRF

| DATE OF DISCHARGE VIOLATION | LOCATION OF DISCHARGE | TYPE OF DISCHARGE | SOURCE OF DISCHARGE | CAUSE OF DISCHARGE | Estimated Volume of Total Volume of Discharge | Estimated Volume of Discharge to Surface Water | Estimated Volume of Discharge to Storm System | FLOWED TO SURFACE WATER (NAME) | FLOWED TO STORMWATER SYSTEM (NAME) | REACH SURFACE WATER (Y=1/N=0) | REACH STORM DRAIN (Y=1/N=0) | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/5/2015 | plant irrigation valve stem leak | reclaimed water | plant irrigation | line break | 850 | 0 | na | na | na | 0 | 0 | not clear how much to surface water, how much to storm water. |
| 6/10/2015 | 1160 62nd Av. NE | reclaimed water | reclaimed water line | line break | 49,500 | 0 | 0 | na | na | 0 | 0 | |
| 8/2/2015 | 53rd Av N & 10th St. | raw sewer | manhole | extreme weather | 25,000 | 18,000 | 7,000 | drainage canal south side of 54th ave. | na | 1 | 1 | |
| 3/2/2016 | 346 31st Av. N | raw sewer | not provided | grease | 500 | | 500 | catch basin NW corner of 31st Av & 2nd St. | na | | | |
| 6/7/2016 | 1st St. N @ 42nd Av | raw sewer | manhole | extreme weather | 45,000 | 45,000 | 0 | canal on east side of 1st st, N by way of stormwater box culvert | na | 1 | 0 | |
| 6/7/2016 | 52nd Av N @ 10th St | raw sewer | manhole | extreme weather | 51,300 | 0 | 0 | canal between 53rd and 54th | na | 1 | 0 | |
| 6/8/2016 | not provided | raw sewer | manhole | extreme weather | 45,000 | 45,000 | 0 | unnamed canal | na | 1 | 0 | |
| 7/21/2016 | 519 Appian Way NE | raw sewer | manhole | grease | 50 | 0 | na | na | na | 0 | 0 | |
| 8/9/2016 | 1021 53rd Ave N | raw sewer | manhole | rain | 250 | 0 | 250 | na | drainage ditch | 0 | 1 | |
| 8/9/2016 | 948 51st Ave. N | raw sewer | manhole | rain | 50 | 50 | | | drainage ditch | | 1 | |
| 8/9/2016 | 5100 MLK St. N | raw sewer | manhole | rain | 50 | | 50 | | drainage ditch | | 1 | |
| 8/10/2016 | 701 50th Ave N | raw sewer | manhole | rain | 75 | 0 | 0 | na | drainage ditch | 0 | 1 | |
| 8/22/2016 | 1101 116th St. Circle N. | raw sewer | bypass hose | pipe break | 900 | 0 | 0 | | flowed to drainage ditch | 0 | | |
| 8/24/2016 | NE WRF | WAS sludge | other | contractor | 2,500 | 500 | 500 | tidal pond | | 1 | | |

Northeast WRF

| DATE OF DISCHARGE VIOLATION | LOCATION OF DISCHARGE | TYPE OF DISCHARGE | SOURCE OF DISCHARGE | CAUSE OF DISCHARGE | Estimated Total Volume of Discharge | Estimated Volume of Discharge to Surface Water | Estimated Volume of Discharge to Storm System | FLOWED TO SURFACE WATER (NAME) | FLOWED TO STORMWATER SYSTEM (NAME) | REACH SURFACE WATER (Y=1/N=0) | REACH STORM DRAIN (Y=1/N=0) | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/31/2016- 9/7/2016 | 4200 1st St. N.; 4139 7th St. N.; 701 50th Ave. N. 701 51st Ave N. 701 52nd Ave. N. 918 52nd Ave. N.; 948 52nd Ave. N. 1020 52nd Ave. N. 1030 53rd Ave. N. 1200 52nd Ave. N. 1225 52nd Ave. N. 916 N. 916 50th Ave N. 966 50th Ave N. 982 50th Ave. N. 3900 25th St. N | raw sewer | manholes | extreme weather | 58 million gallons | over 1000.00 | over 1,000.00 | unspecified- "widely distributed" |  | 1 | 1 |  |
| 9/1/2016 | 7500 28th Ave. N. | treated effluent | not provided | extreme weather | over 1,000.00 | not provided | not provided | not provided | not provided |  |  |  |

Exhibit 3

to the

Declaration of Justin Bloom

In Support of

Plaintiffs' Motion for Attorneys'
Fees and Costs

Suncoast Waterkeeper et al. v. City of St.
Petersburg Case No. 8:16-cv-03319-JDW-AEP



September 30, 2016

James Giattina, Director
Water Protection Division
U.S. EPA, Region 4
Giattina.Jim@epa.gov

Denisse D. Diaz, Chief
NPDES Permitting and Enforcement Branch
Water Protection Division
U.S. EPA, Region 4
Diaz.Denisse@epa.gov

Ryan Matthews, Director
Office of Water Policy
Florida Department of Environmental Protection
Ryan.Matthews@dep.state.fl.us

Mary Yeargan, PG
District Director, Southwest District
Florida Department of Environmental Protection
mary.yeargan@dep.state.fl.us

Re:    Clean Water Act Enforcement, City of St. Petersburg, Florida

Chief and Directors,

On Wednesday, Sept. 28, Suncoast Waterkeeper, Inc. ("SCWK"), Our Children's Earth
Foundation ("OCE") and Ecological Rights Foundation ("ERF") (collectively, "the
NGOs"), filed their Sixty-Day Notice of Violations of Clean Water Act and Notice of
Intent to File Suit for serious and ongoing violations of the federal Clean Water Act
("CWA") at the City of St. Petersburg's publicly owned treatment works.

The NGOs request a meeting and/or conference call at your earliest convenience to
discuss a coordinated response to pursuing appropriate enforcement against the City of
St. Petersburg designed to bring the city promptly into compliance with the Clean Water
Act. The NGOs and our members are very concerned about the grave water pollution
crisis brought on by the City's gross negligence towards management of its
sewage system. Our members have been adversely impacted by being placed at risk of
getting sick, by being exposed to the noxious odors produced by sewage discharges, by
having to see the waters they enjoy swimming, boating, and wading in discolored and
befouled, by knowing that wildlife and seagrasses in Tampa Bay have undoubtedly been

harmed by the onslaught of pathogens, nutrients, and toxins that are in raw or inadequately treated sewage. Potentially adding to these injuries, now local waters are suffering from red tide conditions that are at least at risk of having been exacerbated by St. Petersburg's sewage spills. These red tide conditions are causing extensive fish kills and rendering local waters again unfit for water contact recreation.

A most unfortunate aspect of this problem was the City's inexcusable delay in notifying the public of the sewage discharges, which greatly increased the risks of members of the public being exposed to sewage related pathogens and eroded confidence in government's ability to protect human health and the environment.

To ensure that there is a timely and complete remedy that will as promptly as possible reduce the risks of repeat sewage spills from St. Petersburg like those witnessed in June, August and September (and before as well), the NGOs want a seat at the table in negotiating a judicial consent decree that will provide the necessary backstop and backbone to secure real change from St. Petersburg. It is important from our perspective that there be citizen participation in working out an enforcement response so that the local citizenry can be confident that this enforcement response has been complete, appropriately strict, and well tailored to community needs and input.

Collectively, the NGOs have many years of experience with Clean Water Act citizen suit actions designed to remedy sewage spill problems. Several of our citizen suits have involved coordinated federal EPA, state agency, and NGO pursuit as co-plaintiffs and ended in joint consent decrees that we believe have been quite effective. We feel we have valuable experience to bring to bear in addressing a remedy for St. Petersburg's spills and we hope that your agencies will be receptive to working with us in a similar vein now.

Please let us know at your earliest convenience whether you are amenable to meeting with us and/or having a conference call to further discuss the matter.

Sincerely,

Justin Bloom, Esq.
P.O. Box 1028
Sarasota, FL 34230
Tel: (941) 275-2922
Fax: (866) 574-2169
E-mail:  bloomesq1@gmail.com

Christopher A. Sproul, Esq.
Environmental Advocates
5135 Anza Street
San Francisco, CA 94121

Tel: (415) 533-3376
Fax: (415) 358-5695
E-mail: csproul@enviroadvocates.com

Fredric Evenson, Esq.
Ecology Law Center
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Email: evenson@ecologylaw.com

Exhibit 4

to the

Declaration of Justin Bloom

In Support of

Plaintiffs' Motion for Attorneys'
Fees and Costs


Suncoast Waterkeeper et al. v. City of St.
Petersburg Case No. 8:16-cv-03319-JDW-AEP

  

April 4, 2018

Mayor Rick Kriseman
City of St. Petersburg
St. Petersburg City Hall
175 5th St. N.
St. Petersburg, FL 33701
Email: mayor@stpete.org

Councilmember Charlie Gerdes, Email: Charlie.Gerdes@stpete.org
Councilmember Brandi Gabbard, Email: Brandi.Gabbard@stpete.org
Councilmember Ed Montanari, Email: Ed.Montanari@stpete.org
Councilmember Darden Rice, Email: Darden.Rice@stpete.org
Councilmember Steve Kornell, Email: Steve.Kornell@stpete.org
Councilmember Gina Driscoll, Email: Gina.Driscoll@stpete.org
Councilmember Lisa Wheeler-Bowman, Email: Lisa.Wheeler-Bowman@stpete.org
Councilmember Amy Foster, Email: Amy.Foster@stpete.org

**Re: Proposed Resolution Increasing Retainer Sum for Manson Bolves Donaldson Varnes, P.A. to $500,000 in Clean Water Act Citizen Suit against the City of St. Petersburg, April 5, 2018 Agenda Item K.2**

Dear Mayor Kriseman and St. Petersburg City Councilmembers:

We write on behalf of the three non-profit plaintiff organizations involved with the Clean Water Act citizen suit against the City of St. Petersburg: Suncoast Waterkeeper, Our Children's Earth Foundation, and Ecological Rights Foundation. Through our ongoing legal campaign, we seek an enforceable agreement that will ensure compliance with federal law and provide our members and other St. Petersburg residents with certainty regarding eventual sewage system improvements. We write at a time when the litigation is accelerating to urge you to carefully consider the City's options for resolving this lawsuit and moving forward toward goals we believe we share; namely, ecosystem stewardship, public health protection, and necessary maintenance and improvements to St. Petersburg's beleaguered sewage collection and treatment system.

As you are aware, Executive Assistant City Attorney Joseph Patner has recommended the City Council approve a resolution increasing the retainer for Manson Bolves Donaldson Varnes, P.A. to $500,000 in the Clean Water Act citizen suit brought by Suncoast Waterkeeper ("SCWK"), Our Children's Earth Foundation ("OCE") and

R. Kriseman, et al.                           2
April 4, 2018

Ecological Rights Foundation ("ERF") against the City of St. Petersburg.[1] We urge the City Council that rather than continue to dedicate a large amount of taxpayer dollars towards fighting the citizen suit with losing arguments, the City Council approve a much more modest sum and direct the City Attorney and its outside counsel at Manson Bolves to pursue in earnest settlement of this citizen suit.

        We filed our federal court citizen suit because St. Petersburg has repeatedly violated the Clean Water Act by discharging raw and only partly treated sewage from its sewage collection and treatment system, endangering the health of our members and the public generally and significantly harming the environment. As St. Petersburg's consultants' reports and the testimony of St. Petersburg staff in depositions that we have taken in our case have well-documented, the St. Petersburg sewage collection system is aging and is in poor condition. St. Petersburg's consultant reports have documented in detail extensive defects in the City's sewer main lines that have led to excessive rainfall derived infiltration and inflow (RDII) into the City's sewage collection system. This excessive RDII has led to massive sewage spills from St. Petersburg's sewage collection system that befouled Tampa Bay's waters that are heavily used for water contact recreation and support sensitive wildlife. These spills have sent raw and partially treated sewage streaming into streets, storm drains, Tampa Bay, Clam Bayou, and various other local waters. These spills have repeatedly posed serious public health threats and created severe nuisance in exposing substantial numbers of people to raw and partially treated sewage. Raw and partially treated sewage contains a variety of human bacteriological, viral, and parasitic pathogens, and exposure to raw and partially treated sewage is well-known to cause various human illnesses. In addition to human waste, sanitary sewage contains various toxic chemicals in the wastes discarded by households and businesses. Thus, St. Petersburg's sewage spills pose a serious public health risk in exposing members of the public and SCWK, OCE and ERF's members to sewage-borne pathogens and various toxic pollutants. These sewage spills further contributed to killing off of vital sea grasses, bird deaths, and likely exacerbated red tide conditions with nutrient loading.

        These sewage spills were caused by years of St. Petersburg's considerable neglect in undertaking the sewer line replacement and rehabilitation projects necessary to reduce RDII in its sewage collection system. There remains an urgent need for St. Petersburg to implement extensive sewer line repair and rehabilitation work to address its excessive RDII problem. The City continues to lag behind in completing work that should have been done years ago--well in advance of the irresponsible closure of the Albert Whitted Wastewater Reclamation Facility in the face of a consultant report

---

[1] SCWK, OCE and ERF are non-profit citizen groups with members across the United States, including Florida and specifically the Tampa Bay area. SCWK, OCE and ERF's members use the ocean and bay waters and other waters adjoining and in St. Petersburg for body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation. These SCWK, OCE and ERF members are concerned about water quality and are and will continue to be adversely affected by St. Petersburg's sewage discharge violations.

R. Kriseman, et al.                                3
April 4, 2018

expressly warning (presciently) city staff that the other existing treatment plants lacked the capacity to handle the added wastewater flow in a storm event that would result from closure of the Albert Whitted facility.

We further filed our lawsuit because, as has been repeatedly reported in the press, St. Petersburg officials have not been forthcoming to the public, members of the City Council, and officials in other cities, including Gulfport, concerning these spills and the public health threats they posed. St. Petersburg officials were slow to warn the public that large amounts of sewage had been spilled into waters they recreate in and have been less than candid about the causes of these spills and the fixes that are needed to prevent future spills. Against this backdrop, we felt it very important that there be citizen watchdogs backed by the authority of a federal court to ensure that St. Petersburg is transparent about it sewage spill problem going forward and the steps it is taking to curb future sewage spills.

OCE and ERF, along with other citizen groups that are part of the nationwide Waterkeeper Alliance that SCWK belongs to, have been involved in several sewage spill cases under the Clean Water Act in other areas of the country. All of these actions have been resolved through settlement agreements that have helped improve the local environment and curb sewage spill problems. We were hopeful that St. Petersburg would follow the example of these other cities. Unfortunately, instead, the City's administration and its legal representatives have elected to pursue an extensive legal campaign to defeat the citizen suit rather than settle.

To date, the City's lawyers have brought three motions in federal court that failed and a fourth one that is almost certain to soon fail. The first of these motions sought to have the case dismissed on the argument that our groups' members hadn't been sufficiently harmed by the sewage spills so as to have standing to sue. The City withdrew this motion when it became clear that the City was flat wrong. The City next brought a motion to have the case dismissed on the argument that a Florida Department of Environmental Protection (FDEP) consent order issued to the City would preempt and bar our citizen suit. Federal Court Judge Whittemore denied this motion, holding that the FDEP's administrative enforcement scheme is not comparable to the Clean Water Act, which would be required before any FDEP administrative enforcement action could preempt a Clean Water Act citizen suit (see attached January 19, 2018 Order from Judge Whittemore). The City also filed a motion requesting the court to stay our citizen suit until the outcome of the FDEP administrative action, but Judge Whittemore denied this motion as well, expressly finding that "though the terms of the final consent order may be considered with respect to any relief granted in this case, those terms will not resolve all the issues or moot the remedies available under the CWA" (see attached January 22, 2018 Order from Judge Whittemore).

The City has filed a fourth motion asserting two arguments:  (1) that it is not liable under the Clean Water Act for several of its sewage spills in issue because they didn't reach surface waters protected under federal law, so-called "waters of the United States" and (2) our case is "moot" because the violations were "isolated, wholly-past,

R. Kriseman, et al.                              4
April 4, 2018

and/or are not reasonably likely to recur."   Like the prior motions, this fourth motion
also is likely to fail.

On the first argument as to "Waters of the United States," a City employee
acknowledged under oath that he had not prepared the key declaration in support of the
motion and he further testified to an erroneous understanding of the legal term "waters
the United States," saying it only meant "any major water body that falls within the
jurisdiction of the United States government." This is plainly wrong, U.S. Environmental
Protection Agency regulations define waters of the United States to not be limited to
"major water bodies," but instead to include any water subject to the ebb and flow of the
tide, the territorial seas of the United States, wetlands adjacent to such waters, and any
tributaries to any such waters--regardless of size. 40 C.F.R. § 230.3(o). The employee
also testified that some of the spills that he identified in his declaration as not having
reached waters of the United States plainly reached waters that are subject to the ebb and
flow the tide (such as the 45th Avenue Canal and the 54th Avenue Ditch) or that
are tributary to such waters (such as Jungle Lake, and another unnamed canal leading to
Placido Bayou)--thus are jurisdictional waters of the United States.

The second argument is equally meritless — that the case is "moot" because we
cannot show that the precise sewage spills that we list in our complaint will recur at the
same locations that they did in the past. The City's lawyers are again wasting the City's
resources in pressing this argument. United States Supreme Court decisions have made
the law clear: to establish mootness, the City "bears the formidable burden of showing
that it is absolutely clear the allegedly wrongful behavior could not reasonably be
expected to recur." *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189-90
(2000). To meet this standard, the City would have to show that it has eliminated *all
possibility* of further sewage spills to waters of the United States not just from the precise
locations where sewage spilled in the past but from anywhere within its still existing
sewage collection system. Obviously, the City cannot meet this burden, given that it
spilled over 400,000 gallons and illegally injected 15 million gallons into the deep wells
during Hurricane Irma just six months ago.  In addition, a City employee testified that
addressing the cause of a specific past spill does not mean that a similar spill will not
occur elsewhere in the system for the same reason. Clearly the violations are ongoing
and our citizen claims are not moot.[2] *See San Francisco Baykeeper v. Tidewater Sand &
Gravel*, 1997 U.S. Dist. LEXIS 22602, at **26-27 (N.D. Cal. Sept. 9, 1997); *Save Our
Bays & Beaches v. City & County of Honolulu*, 904 F. Supp. 1098, 1120-21 (D. Hawaii

---

[2] Even if the City's compliance activities could moot a case for injunctive relief, they
could not moot a case for declaratory relief and penalties. *Laidlaw*, 528 U.S. at 192-93
(penalties under the CWA can issue without an injunction); *San Francisco Baykeeper v.
Tosco Corp.*, 309 F.3d 1153, 1159-60 (9th Cir. 2002) ("district courts can still impose
civil penalties for violations that have already taken place"); *Nw. Envtl. Def. Ctr. v.
Grabhorn*, 2009 U.S. Dist. LEXIS 101359, at **48-49 (D. Or. Oct. 30, 2009). The citizen
groups have proven and the City has effectively conceded that it has violated the Clean
Water Act, at a minimum entitling the citizen groups to declaratory judgment, civil
penalties and the recovery of litigation expenses.

R. Kriseman, et al.                                    5
April 4, 2018

1994) (finding plaintiffs' claims not moot when defendant continued to *operate* sewage plant).

    As a result of the City electing to pursue a litigation approach rather than a settlement approach, we have had no choice but to pursue extensive discovery. To date, we have taken nine depositions of City and FDEP officials and have scheduled or proposed three to four additional depositions. We have also had to ask for extensive document productions. The City's attorneys have proposed taking their own deposition or depositions and have served us with requests for production of documents as well. This continues to add up to extensive costs for all concerned. Perhaps the City Council has not been apprised of this, but should the City continue to pursue this case to trial, rather than negotiate a Consent Decree with plaintiffs, Clean Water Act section 505 (33 U.S.C. § 1365) would make the City liable to our citizen groups for our attorneys fees and costs in addition to having to pay its own lawyers. Indeed, a citizen plaintiff in a Clean Water Act citizen suit that has established that a defendant violated the Clean Water Act is entitled to an award of fees and costs unless "special circumstances" are shown. *See Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1092 (9th Cir. 2011). The court's discretion to deny a fee award to a prevailing plaintiff is narrow, and denial is "extremely rare." *St. John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054, 1062-64 (9th Cir. 2009); *Resurrection Bay Conservation Alliance*, 640 F.3d at 1092. Such an award easily be hundreds of thousands of dollars given the extensive litigation approach that the City has been pursuing and the court's denial of two of the City's motions already.

    Additionally, if the City continues to pursue a litigation approach rather than a settlement, it will almost certainly be on the hook for potentially large civil penalties that the Clean Water Act will mandate be paid to the U.S. Treasury. This would be an unfortunate turn of events, as settlements of Clean Water Act citizen suits need not include penalties payable to the U.S. Treasury, and our citizen groups would advocate that rather than pay a fine to the U.S. Treasury, St. Petersburg fund locally environmentally beneficial projects.

    With respect to the City's potential civil penalty liability for its Clean Water Act violations, numerous cases have held that once a defendant's Clean Water Act liability is established, the district court's assessment of some amount of civil penalty is mandatory. *See Atlantic States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990) ("This language [Clean Water Act § 309(d)] makes clear that once a violation has been established, some form of penalty is required."); *Leslie Salt Co. v. United States,* 55 F.3d 1388, 1397 (9th Cir. 1995) ("We agree with the [Fourth and Eleventh C]ircuits that have held that civil penalties are mandatory under section 309(d)"); *Stoddard v. W. Carolina Reg'l Sewer Auth.,*784 F.2d 1200, 1208 (4th Cir. 1986) (finding that section 309(d)'s penalty provision "leaves little doubt that . . . a penalty in some form is mandated. Liability under the [CWA] is a form of strict liability."); *Haw.'s Thousand Friends v. City & County of Honolulu,* 821 F. Supp. 1368, 1394 (D. Haw. 1993) ("Civil penalties are mandatory once [CWA] violations are found…."); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 244 F. Supp. 2d 41, 48 n.6

R. Kriseman, et al.                                        6
April 4, 2018

(N.D.N.Y. 2003). Accordingly, the issue is not whether, but how large a civil penalty the court will assess for the City's violations. This penalty must be substantial to deter Clean Water Act noncompliance and impose appropriate retribution. *Laidlaw Envt'l Serv's*, 528 U.S. at 185 ("A would-be polluter may or may not be dissuaded by the existence of a remedy on the books, but a defendant once hit in its pocketbook will surely think twice before polluting again."); *see, e.g., United States v. City of San Diego*, 1991 WL 163747 at **3-6, 21 ELR 21,223 (S.D. Cal. Apr. 18, 1991) (penalizing San Diego $3 million for Clean Water Act violations, the most serious of which were about 400 sewage spills to waters); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77 (2nd Cir. 2006); *cert. denied City of New York v. Catskill Mts. Chapter of Trout Unlimited, Ltd.*, 127 S. Ct. 1373 (2007) (materially approving of District Court assessment of $5,749,000 CWA civil penalty against the City of New York even though violations created no substantial environmental harm and city reasonably believed its discharges were lawful); *Upper Chattahoochee Riverkeeper v. Atlanta*, 98 F. Supp. 2d 1380, 1384 (N.D. Ga. 2000) (stipulated penalty of $20,000 per sewage spill imposed, rejecting defendant's argument that this penalty was excessive under Clean Water Act section 309(d)'s penalty assessment factors).

Moreover, should this matter be litigated, the Court would be compelled to set a civil penalty large enough to be at least equal to the City's economic benefit of noncompliance to achieve deterrence. *United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 529-531 (4th Cir. 1999), *cert. denied, Smithfield Foods, Inc. v. United States*, 531 U.S. 813 (2000); *United States v. Dean Dairy*, 150 F.3d 259, 263-264 (3rd Cir. 1998); *United States v. Allegheny Ludlum Corp.*, 187 F. Supp. 2d 426, 436-437 (W.D. Pa. 2002), *aff'd in part and vacated in part on other grounds United States v. Allegheny Ludlum Corp.*, 366 F.3d 164 (3rd Cir. 2004). St. Petersburg's consultants' reports well-establish that the City should have incurred large sums years ago for the capital projects needed to prevent the City's large SSOs in recent years. The City has enjoyed a very large economic benefit in avoiding these costs for several years. *See, e.g.*, *Sierra Club, Lone Start Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 574 (5th Cir. 1996) (economic benefit includes both avoided and delayed costs of compliance); *United States v. City of Beaumont*, 786 F. Supp. 634, 637-38 (E.D. Tex. 1992) ($400,000 civil penalty imposed to recover city's economic benefit of noncompliance of $316,000 and to impose additional deterrent penalty).

Consideration of the remaining statutory penalty criteria would warrant increasing the City's civil penalty above its economic benefit of noncompliance. In spilling raw sewage on multiple days to waters used by the public, the City has posed public health risks, making its violations necessarily serious. *See City of San Diego*, 1991 WL 163747 at *3. The economic impact of the penalty factor would not weigh in favor of any reduction in the City's civil penalty. At most, the penalty would necessitate a slight increase in the City's sewer rates, which alone is insufficient basis for reducing a city's penalty. *Hawaii's Thousand Friends*, 821 F. Supp. at 1396 ("The impact of a penalty on the city will be a slight increase in the monthly rates paid by users of the sewer system. Therefore, economic impact is not a mitigating factor."). The City's belated efforts to reduce its sewage spills would not warrant any substantial reduction in its civil penalties

R. Kriseman, et al.                                7
April 4, 2018

as these efforts should have commenced before our suit. The sewage spills proved in this case have extended over several years, weighing against any reduction in the City's penalty for the prior history of such violations factor. *See, e.g., United States v. Smithfield Foods*, 972 F. Supp. 338, 349 (E.D. Va. 1997), *rev'd in part on other grounds,* 191 F.3d 516.

In closing, we again urge the City Council not to approve a large increase in the litigation budget to continue fighting our citizen suit, but instead to increase the sought retainer amount by a modest sum while directing its counsel to pursue settlement. The citizen groups remain ready to reach a reasonable settlement along the lines of the many settlement agreements reached in similar cases. A settlement will: (1) ensure that the City will implement the measures needed to curb its sewage spills given the oversight and authority of the federal court, (2) provide for appropriate consultation with and accountability to the public and our group as citizen watchdogs, and (3) excuse the City from paying large civil penalties to the U.S. Treasury and to keep funds that otherwise might be paid to the federal government available for local beneficial use.

We know that you share our goals to protect our environment. We applaud the City for its many environmentally-friendly initiatives. However, we encourage you not to be lulled into a path of a legal standoff that prevents constructive dialogue to implement a reasonable solution. There is a problem, and we are prepared to offer a solution that will result in full compliance with the Clean Water Act, a resolution of our citizen suit, and certainty for St. Pete residents.

Thank you for consideration of our views.

Sincerely,

Joseph McClash
Board Chair
Suncoast Waterkeeper

A. Beaman
Director of Advocacy & Outreach
Our Children's Earth Foundation

R. Kriseman, et al.                                    8
April 4, 2018

Cc: Brian Bolves, Esq.
Douglas Manson, Esq.
Manson Bolves Donaldson, P.A.
Justin Bloom, Esq.
Molly Coyne, Esq.
Frederic Evenson, Esq.
Kaki Schmidt, Esq.
Christopher Sproul, Esq.

Exhibit 5

to the

Declaration of Justin Bloom

In Support of

Plaintiffs' Motion for Attorneys'
Fees and Costs

Suncoast Waterkeeper et al. v. City of St.
Petersburg Case No. 8:16-cv-03319-JDW-AEP

# COUNCIL ![pelican logo] MEETING

### CITY OF ST. PETERSBURG

Municipal Building
175-5ᵗʰ Street North
Second Floor Council Chamber

**August 9, 2018**
**3:00 PM**

**A.** **Meeting Called to Order and Roll Call.**
Invocation and Pledge to the Flag of the United States of America.

**B.** **Approval of Agenda with Additions and Deletions.**

**C.** **Awards and Presentations**

   1.  Keep St. Pete Lit – SunLit Festival

   2.  Senior Hall of Fame Inductees Presentation

**D.** **Reports**

   1.  Pier Report

   (a)  Accepting Addendum No. 3 in an amount not to exceed $1,085,737 submitted by Skanska USA Building, Inc. ("Skanska") to the Guaranteed Maximum Price ("GMP") proposal dated April 3, 2018 for the installation of the structural system for the Doc Ford's Restaurant; providing that the total GMP for the Pier Approach Project shall not exceed $16,883,197; authorizing the Mayor or his designee to execute the Fifth Amendment to the Construction Manager at Risk Agreement with a GMP between the City of St. Petersburg, Florida, and Skanska dated January 10, 2017, as amended, to incorporate  Addendum No. 3 to the GMP proposal into such agreement, as amended; authorizing the City Attorney's office to make non-substantive changes to the Fifth Amendment; and providing an effective date.

   2.  Acknowledgment of Harborage Marina L.L.C. funding commitment; and approval of a supplemental appropriation for FY18 special municipal election cost.

**E.** **Intergovernmental Reports**

   1.  Land Use & Transportation

   2.  Homeless Leadership Board

   3.  Public Arts Commission

    4.    Tampa Bay Regional Planning Council

**F.**    <u>**Legal**</u>

    1.    <u>Settlement Suncoast Waterkeeper, Our Children's Earth Foundation, and Ecological Rights Foundation v. City of St. Petersburg, Case No: 8:16-cv-3319-JDW-AEP.</u>

**G.**    <u>**Adjournment**</u>

BEFORE THE STATE OF FLORIDA
DEPARTMENT OF ENVIRONMENTAL PROTECTION

| | | |
|---|---|---|
| STATE OF FLORIDA DEPARTMENT | ) | IN THE OFFICE OF THE |
| OF ENVIRONMENTAL PROTECTION | ) | SOUTHWEST DISTRICT |
| | ) | |
| v. | ) | OGC FILE NO. 16-1280 |
| | ) | |
| CITY OF ST. PETERSBURG | ) | |

<u>AMENDED</u> CONSENT ORDER

This <u>Amended</u> Consent Order (Order) is entered between the State of Florida Department of Environmental Protection (Department) and the City of St. Petersburg (Respondent or City) to reach settlement of certain matters at issue between the Department and Respondent.

The Department finds and the Respondent neither admits nor denies the following:

1.      The Department is the administrative agency of the State of Florida having the power and duty to protect Florida's air and water resources and to administer and enforce the provisions of Chapter 403, Florida Statutes (Fla. Stat.), and the rules promulgated and authorized in Title 62, Florida Administrative Code (Fla. Admin. Code). The Department has jurisdiction over the matters addressed in this Order.

2.      The Respondent is a municipal corporation in the State of Florida and a person within the meaning of Section 403.031(5), Fla. Stat.

3.      The Respondent is the owner and operator of the following wastewater treatment facilities (Facilities) and associated wastewater collection/transmission systems (Systems), as well as the operator of the municipal separate storm sewer systems (MS4) operated under State of Florida Municipal Separate Storm Sewer System NPDES Permit No. FLS000007-004 (MS4 Permit), serving the City of St. Petersburg and other portions of Pinellas County:

| | |
|---|---|
| Albert Whitted Water Reclamation Facility | 601 8th Ave. S.E. |
| Northeast Water Reclamation Facility | 11606 2nd Ave. N.E. |
| Northwest Water Reclamation Facility | 7500 26th Ave. N. |
| Southwest Water Reclamation Facility | 3800 54th Ave. S. |
| St. Petersburg Master Reuse System | 1650 Third Ave. N. |

1

4.      The Facilities are further described as follows:

a.      Albert Whitted Water Reclamation Facility (Albert Whitted Facility), a 12.4 million gallons per day (MGD) annual average daily flow (AADF), Type I modified conventional activated sludge domestic wastewater treatment plant.  The Albert Whitted Facility is operating pursuant to Wastewater Permit No. FLA128830 (Albert Whitted Facility Permit), issued on June 1, 2017.  The Albert Whitted Facility is located at 601 8th Avenue Southeast, St. Petersburg, in Pinellas County, Florida (Albert Whitted Property).  The Respondent owns the Albert Whitted Property on which the Albert Whitted Facility is located.

b.      Northeast Water Reclamation Facility (Northeast Facility), a 16.0 million gallons per day (MGD) annual average daily flow (AADF), Type I complete-mix activated sludge domestic wastewater treatment plant.  The Northeast Facility is operated under Wastewater Permit No. FLA128856 (Northeast Permit), which became effective on June 13, 2016, and will expire on June 12, 2021.  The Northeast Facility is located at 1160 62nd Ave Northeast, St. Petersburg, in Pinellas County, Florida (Northeast Property).  The Respondent owns the Northeast Property on which the Northeast Facility is located.

c.      Northwest Water Reclamation Facility (Northwest Facility), a 20.0 million gallons per day (MGD) annual average daily flow (AADF), Type I, complete mix activated sludge, domestic wastewater treatment plant.  The Northwest Facility is operated under Wastewater Permit No. FLA128821 (Northwest Permit), which became effective on September 14, 2015, and will expire on September 13, 2020.  The Northwest Facility is located at 7500 26th Avenue North, St. Petersburg, in Pinellas County, Florida (Northwest Property).  The Respondent owns the Northwest Property on which the Northwest Facility is located.

d.      Southwest Water Reclamation Facility (Southwest Facility), a 20.0 million gallons per day (MGD) annual average daily flow (AADF), Type I, complete mix activated sludge, domestic wastewater treatment plant.  The Southwest Facility is operated under Wastewater Permit No. FLA128848 (Southwest Permit), which became effective on June 29, 2015, revised on July 29, 2015, and  renewed  on May 8, 2018.   The Southwest Facility is located at 3800 54th Avenue South, St. Petersburg, in Pinellas County, Florida (Southwest Property).  The Respondent owns the Southwest Property on which the Southwest Facility is located.

e.      St. Petersburg Master Reuse System (St. Petersburg Reuse), a 56 million

**Commented [A1]:** Deleted: "and will expire on June 28, 2017. The renewal application for the Southwest Permit is currently pending before the Department"

2

gallons per day (MGD) annual average daily flow (AADF), Part III slow-rate public access master reuse system.  The St. Petersburg Reuse is operated under Wastewater Permit No. FLA012881 (St. Petersburg Permit), which became effective on April 11, 2013, and will expire on April 10, 2023. The St. Petersburg Reuse is located city-wide with offices at 1650 3rd Avenue North, St. Petersburg, in Pinellas County, Florida (St. Petersburg Property).

 5. The Department makes the following findings of fact and conclusions of law to which the Respondent neither admits nor denies:

 a. Beginning on July 25, 2015, and continuing through August 22, 2015, several weather systems moved into and stalled over the State of Florida bringing heavy rainfall, strong winds, tidal surge, record river flood staging, flash floods and heavily saturated ground.

 b. From August 2, 2015 through August 10, 2015, unpermitted discharges of wastewater and effluent from several of the Facilities and Systems into waters of the State and/or into adjacent canals, ditches and ponds that are connected to waters of the State occurred. These unpermitted discharges resulted in the release of approximately 31.5 million gallons of untreated wastewater and effluent.  The Respondent reported these discharges to the Department.

 c. On August 6, 2015, Governor Rick Scott issued Executive Order Number 15- 158, declaring a State of Emergency for Severe Weather and Flooding in Five Counties, which included Dixie, Hillsborough, Pasco, Pinellas and Taylor Counties. Section 3 delegates Local Government Agencies the authority to waive or deviate from their respective rules, ordinances, or orders.

 d. On June 6, 2016, Governor Rick Scott issued Executive Order Number 16- 136, declaring a State of Emergency for Tropical Storm Colin, which included 34 counties including Pinellas County.  Section 4 authorizes some State, regional and local agencies and other governmental bodies, in responding to the emergency, to waive or deviate from the statutes, rules ordinances, and orders they administer.

 e. From June 6, 2016 through June 9, 2016, unpermitted discharges of wastewater and effluent from several of the Facilities and Systems into waters of the State and/or into adjacent canals, ditches and ponds that are connected to waters of the State occurred. These unpermitted discharges resulted in the release of approximately 230,000 gallons of untreated wastewater and effluent through overflows at manholes and 9.77 million gallons of partially treated wastewater through the emergency outfall at Albert Whitted Facility.  The Respondent

3

reported these discharges to the Department.

        f.     On August 31, 2016, Governor Rick Scott issued Executive Order Number 16-205, declaring a State of Emergency for Tropical Depression #9, which included 42 counties (expanded to 51 counties), which included Pinellas County. Section 4 authorizes some State, regional and local agencies and other governmental bodies, in responding to the emergency, to waive or deviate from the statutes, rules ordinances, and orders they administer.

        g.     From August 31, 2016 through September 13, 2016, unpermitted discharges of wastewater of wastewater and effluent from several of the Facilities and Systems into waters of the State and/or into adjacent canals, ditches and ponds that are connected to waters of the State occurred. These unpermitted discharges resulted in the release of an unknown volume of untreated wastewater and effluent through overflows at manholes and lift stations; and between 78 and 93 million gallons of partially treated wastewater through the emergency outfall at the Albert Whitted Facility; and 58 million gallons of partially treated effluent from the Northwest Facility to adjacent properties to the south and into Jungle Lake to the north. Additionally, 220.51 million gallons of partially treated effluent was disposed into the deep injection wells at the Northwest Facility and 561 million gallons of partially treated effluent was disposed into the deep injection wells at the Southwest Facility. The Respondent reported these discharges to the Department.  An attempt was made to open an outfall to Boca Ciega Bay that was not successful and resulted in less than 1000 gallons of discharge from two manholes on 26th Avenue N, adjacent to the Northwest Facility.  The Respondent reported this discharge to the Department.

        h.     Other unpermitted discharges and/or discharges in violation of Respondent's MS4 Permit, occurring between 2011 and 2016, from several of the Facilities and Systems were reported to the Department by the Respondent and were considered by the Department and resolved by this Consent Order.

        i.     The facts contained in paragraphs 5b, 5e, 5g and 5h constitute violations by the Respondent of Fla. Admin. Code R. 62-600.410(1) and (3), 62-604.130(1) and, 62-604.130(4), as well as Section 403.161(1)(b), Fla. Stat.

        Having reached a resolution of the matter, Respondent and the Department mutually agree and it is **ORDERED:**

6. Respondent shall comply with the following corrective actions within the stated time periods:

a. No later than February 1, 2018, design and complete a "splitter box" to bypass headworks and provide disc filters to the Southwest Facility to increase peak capacity. No later than September 30, 2019, complete construction on the Southwest Facility's treatment improvements to increase its maximum daily treatment capacity (SW Construction). SW Construction shall include, but not necessarily be limited to, improvements of the headworks and screening capacity; addition of a fourth secondary clarifier; additional effluent dual media filters and/or conversion to an alternate filtration technology; addition of a third chlorine contact basin; additional effluent pumps; additional and sufficient piping modifications to handle additional flow; and

b. No later than February 28, 2018, complete construction of at least one of the two new injection wells at the Southwest Facility (SW Injection); No later than September 30, 2017, complete design and permitting for the SW Injection; No later than October 31, 2017, advertise for the construction of the SW Injection; and

c. No later than February 28, 2018, complete construction of the new effluent filter at the Northwest Facility (NW Effluent Filter); No later than January 2017 begin design NW Effluent Filter; No later than October 31, 2017, begin construction of NW Effluent Filter; and

d. No later than February 28, 2018, complete construction of a new injection well at the Northwest Facility (NW Injection); No later than September 30, 2017 complete design and permitting for the NW Injection; No later than October 31, 2017 advertise for the construction of the NW Injection; pumping upgrades shall be made to increase pressure at the new well(s); and

e. In order to balance wet weather flow between the Southwest and Northwest Facilities during wet weather events, Respondent shall construct and operate an additional lift station and force main estimated to cost $7.5 million. This new lift station is proposed to be located in the Southwest St. Petersburg area. Respondent shall obtain substantial completion of the project by October 31, 2021; and

f. The City's Fats, Oils, and Grease (FOG) Program shall include a schedule for implementing measures for expanded residential outreach to educate the public about reducing FOG discharges to the collection system from residential sources, which shall include communications to residents in areas where the City has discovered repeat FOG problems and posting of educational

materials on the City's website. The FOG Program shall further include a protocol for communication between food service establishment (FSE) inspectors responsible for enforcing the City's Grease Management Ordinance (Municipal Code, Chapter 27, Article III, Division 4) and the Water Resources Department ("WRD"), including protocols for notifying WRD of FOG violations and for inspecting, tracking and monitoring gravity lines that could be affected by FOG from those sources. The Root Control Program shall provide for regularly scheduled root cleaning in certain repeat problem areas.  The Routine Sewer Cleaning Program shall provide for a routine 5 year cleaning cycle on gravity lines, with more frequent routine cleaning of repeat problem areas.  The City shall implement the above measures for FOG, roots and routine sewer cleaning by December 15, 2018.  As part of the Integrated Water Resources Master Plan, Respondent shall add provisions to its SSAMP for a FOG Program, Roots Program and Routine Sewer Cleaning Program.

g.      On June 1, 2018, Respondent shall submit to the Department a status update on the Integrated Water Resources Master Plan for evaluating current and future capabilities of Respondent's Facilities and Systems referenced in paragraph 3 and 4.  No later than December 31, 2019, Respondent shall complete and submit to the Department the Integrated Water Resources Master Plan which will provide for 1) modelling of the Facilities and Systems to determine the Facilities required to meet the planned level of service; 2) a long term Capital Improvement Plan ("CIP") for implementing identified potable water, reclaimed water, stormwater, and wastewater projects; 3) an assessment of needs to optimize and prioritize the investment into the System to maximize the benefits to meet environmental compliance and City needs; 4) Integrated plan to provide funding for the construction and processes to manage stormwater and wastewater projects; 5) a plan that incorporates the findings of the Flow Mitigation Report referenced below, to provide for the priority and schedule for further projects and management to reduce stormwater inflow and infiltration into the Systems; 6) measures for continued routine maintenance of the wastewater collection/transmission systems pursuant to applicable generally recognized industry standards; and 7) identify the necessary annual level of maintenance and capital expenditure necessary to properly maintain the Systems in the long term.  As part of its Integrated Water Resources Master Plan, Respondent shall establish a Sewer System Asset Management Plan ("SSAMP") setting forth the measures and implementation schedules for the City's  maintenance and  operation of its publicly owned treatment works ("POTW"), including provisions for a gravity sewer line and manhole inspections and

response program; a force main condition assessment and cleaning program; a pump station condition assessment and repair, replacement and rehabilitation program; a Rainfall Derived Infiltration and Inflow ("RDII") evaluation and reduction plan; FOG and root control programs; a sewer cleaning program; and information management system that is regularly updated and linked to required GIS layers. The SSAMP shall be consistent with the Integrated Water Resources Master Plan recommendations. The Integrated Water Resources Master Plan shall include: (i) a schedule and budget for implementation of its SSAMP and for operating and maintaining its POTW, and (ii) determination of financial resources to implement its SSAMP and operate and maintain its POTW, including evaluation of increases in funding for sewer facilities. Following submittal of its CIP as required above in this paragraph, Respondent shall annually update its CIP for: implementing identified potable water, reclaimed water, stormwater, and wastewater projects. The CIP will incorporate, funding for repairs needed pursuant to the SSAMP inspection/assessments process and for all other commitments under this Amended Consent Order; and

h.      As part of the Integrated Water Resources Master Plan, Respondent shall add provisions to its SSAMP for a Pump Station Condition Assessment and Repair, Replacement and Rehabilitation Program, which shall specify methods and a time schedule for assessments of the condition and performance of the City's pump stations. "Pump Stations" shall mean facilities comprised of pumps that lift wastewater to a higher hydraulic elevation, including all related electrical, mechanical, and structural systems necessary to the operation of that pumping station. The Pump Station Condition Assessment and Repair, Replacement and Rehabilitation Program shall: (1) include evaluation of condition of electrical, mechanical, and structural systems, (2) ensuring appropriate maintenance of spare parts inventory, (3) evaluate and, as necessary, update or improve utilization of SCADA alarm systems, (4) evaluate the need for and, as necessary, ensure backup power generation, and (5) evaluate and, as necessary, ensure availability of portable pumps to address pump station failures. Respondent shall include in this program an appropriate repeat cycle for pump station condition assessment. By October 31, 2018, Respondent shall commence pump station condition assessments and institute repairs, rehabilitation or replacement when the assessment indicates such actions are warranted; and

i.      As part of the Integrated Water Resources Master Plan, Respondent shall add provisions to its SSAMP for a Rainfall Derived Infiltration and Inflow ("RDII") Evaluation and Reduction Plan. This Plan shall require evaluation of the sources and extent of contribution from

7

RDII to the collection system flow (the collection system means sewer main lines, sewer lateral lines, and manholes) via evaluation of sewer line condition, smoke testing, flow metering, evaluation of MS4 mapping, and other appropriate methodologies.

1)       Phase 1 Infiltration Screening Study:  The RDII Plan shall include a Phase 1 Infiltration screening study for each flow meter basin (where permanent flow meters are installed) or pump station service area that shall consist of an infiltration measurement/estimate based upon night-time flow divided by the length-diameter of the gravity sewer line in the service area. For the Phase I Infiltration Screening Study, the one test of each flow meter basin shall use continual flow measurement for two nights (12:00 am through 5:59 am) taken: one during the dry season and one during the wet season. Units shall be in gpd/inch diameter miles.

2)       Phase 2 Infiltration Screening Study:  For any flow meter basin or pump station service area showing excessive infiltration from the Phase 1 study, the City shall perform an additional assessment of infiltration and RDII sources and potential remedies for reducing these flows for each flow meter / pump station service area. The excessive infiltration screening threshold for the Phase 2 RDII evaluation will be determined during the IWRMP and SSAMP process.

j.       As part of the Integrated Water Resources Master Plan, Respondent shall include a conclusion, with justification, whether Respondent should reopen the Albert Whitted Facility.  If Respondent concludes it should reopen the Albert Whitted Facility, Respondent shall provide a timeline with associated measures required to reopen.  If Respondent concludes it should not reopen the Albert Whitted Facility, then Respondent shall include a plan for providing alternative replacement capacity; and

k.       No later than December 31, 2018, submit the final report of Respondent's Wet Weather Flow Mitigation Program (Flow Mitigation Report). The Flow Mitigation Report at a minimum shall provide the results of the flow monitoring study, a ranking of basins and the results of the inflow and infiltration (I/I) study, and identify all areas within the Systems in need of replacement or rehabilitation. No later than December 31, 2016, Respondent shall complete first collection cycle of field data.   No later than December 31, 2017, Respondent shall complete second collection cycle of field data.  No later than October 31, 2018, Respondent shall complete

8

data evaluation and update the hydraulic model. No later than December 31, 2018, Respondent shall use the hydraulic model to simulate a stress test of the Systems and submit the Flow Mitigation Report to the Department; and

l.      From 2018 through 2023, the City commits to spending $16 million per year (adjusted on an annual basis starting on July 1, 2018, by the United States Government Bureau of Labor Statistics, CPI for All Urban Customers: Water and Sewage Maintenance) on pipe and lateral lining and replacement (including private laterals as determined appropriate by the City), and manhole rehabilitation (collectively Maintenance).  In addition to this five year commitment, the City shall as part of the Integrated Water Resources Master Plan identify the necessary annual level of Maintenance and capital expenditure necessary to properly maintain the Systems in the long term. The Integrated Water Resource Master Plan shall include the review and consideration of the I/I reduction data that is currently being gathered by the City's consultants in establishing the annual level of Maintenance and capital expenditures necessary to continue to reduce I/I within the wastewater collection system. The Maintenance shall target the areas of greatest I/I first.  No later than January 31, 2022, the City shall complete the Maintenance in the targeted collection system areas as recommended in the Flow Mitigation Report and in accordance with the annual funding commitments made herein; and

m.      No later than June 30, 2020, Respondent shall pass an ordinance regarding the replacement of private laterals that contribute I/I to the City's Systems. By October 15, 2018, the City shall start giving notice to property owners found with defective private laterals in need of repair or replacement and tracking those properties in its information system; and

n.      Gravity Sewer Line and Manhole Inspections and Response Program. By October 1, 2023, Respondent shall have completed an initial 5-year inspection of all of the City's gravity sewer lines and manholes, at a rate of approximately 20% of the gravity sewer lines and manholes inspected each year for 5 years.  "Gravity Sewer Line" shall mean a pipe that receives, contains and conveys wastewater not normally under pressure, but is intended to flow unassisted under the influence of gravity. Such inspection shall be with CCTV inspection of gravity sewer lines, with Pipeline Assessment Certification Program (PACP) and Manhole Assessment Certification Program (MACP) condition assessments and grading system under NASSCO guidelines.  CCTV inspection of gravity lines will include, to the extent feasible, examination of public lateral sewer lines  by pausing at public laterals to estimate lateral infiltration and by turning CCTV cameras

---

**Commented [A2]:** Deleted: "as presented to City " and deleted "for at least the next five years", and instead replaced with "from 2018 through 2023"

**Commented [A3]:** Deleted: "$14" and replaced with "$16" million

**Commented [A4]:** Deleted: "and (ii) pass an ordinance regarding the replacement of private laterals that contribute to I/I to the City's Systems" because this is now addressed below in 6m.

toward the public lateral lines where they enter the main lines. The City shall prioritize areas for inspection which are identified as areas of high groundwater infiltration or high rain-derived infiltration and inflow, according to data developed under the Wet Weather Overflow Mitigation Program – Phase II. After the initial 5-year inspection of the entire system (City's gravity sewer lines and manholes), Respondent shall perform continuous 10-year inspection cycles of all of the City's gravity sewer lines and manholes under the PACP/MACP standards, at a rate of 10% of the gravity sewer lines and manholes inspected each year.  Once the City is in a 10-year inspection cycle, QTV may only be used to inspect gravity lines that are new or newly-lined within the last 5 years.  Any gravity sewer line where the passage of the CCTV camera was blocked by the condition (including roots and debris) of the pipe or the camera was unable to view the pipe walls and joints due to high flows shall result in the sewer line segment being defined as failed and shall be repaired or replaced within twelve (12) months of the failed attempt to inspect that line and re-inspected within five (5) years. The City shall take corrective action (i.e., lining, repair, replacement or rehabilitation) on the gravity lines and manholes based on the findings of the PACP/MACP assessments and consistent with industry standards and professional engineering judgment indicating appropriate corrective action, and it shall document the corrective actions taken or scheduled to be taken.  Nothing herein prohibits the City from addressing defects at any time, regardless of the status of inspection work or Prioritization Plan.   Respondent's SSAMP shall include a Gravity Sewer Line and Manhole Inspection and Response Program, which shall include gravity sewer line inspection via CCTV and visual inspection of manholes under National Association of Sewer Service Companies ("NASSCO") standards and standard operating procedure to remediate defects; and

    o.  Respondent shall complete Microbial Testing of the following areas identified in Respondent's Water Quality Report Card as needing further investigation:  (i) Salt Creek  (ii) Fossil Park Lake, (iii) 54th Street Canal, (iv) 45th Street Canal, (v) Clam Bayou, (vi) Lake Maggiore, (vii) Booker Creek, and (viii) South Side of 38th Ave; Respondent shall budget up to $800,000 for this task. If the Microbial Testing indicates the presence of fecal indicator bacteria in excess of the 10% threshold value for Class III Fresh Waters (62-302.530, F.A.C.) or action values for "Healthy Beaches Program" for Marine Waters then Microbial Source Tracking of the waterbody will be implemented to completion; and

    p.  No later than April 30, 2017, renew existing manhole rehabilitation contract and finish year 2 of existing cured in place pipe (CIPP) mainline sewer lining contract;

No later than April 30, 2017, renew existing CIPP mainline sewer lining contract; No later than June 30, 2017, award a second CIPP mainline sewer and public laterals lining contract; and

q.      Beginning 30 days from the effective date of this Order and continuing semiannually thereafter, the Respondent shall submit a written report (Implementation Report) to the Department summarizing the status of implementing Paragraph 6 and proposing any modifications deemed essential to minimize wastewater overflows from the Systems and Facilities (i.e. the Implementation Report shall be due on January 28 and July 28 each year during the pendency of this Order).  Any modifications are subject to Department approval.  The Implementation Report shall also include a projection of the work to be performed during the following year; and

r.      Critical force mains for purposes of this Paragraph refers to the force mains associated with the twenty-two (22) pump stations located at the following addresses: 4200 sunrise Dr S, 101 Elcan Blvd SE, 500 Snell Isle Blvd NE, 3501 Poplar St NE, 5002 Shore Acres Blvd NE, 9110 3rd St N, 3801 30th Ave N, 8320A Elbow Lane N, 601 Grevilla Ave S, 4015 9th St S MLK St, 5499 4th St S, 1942 Serpentine Dr S, 6100 Pinellas Bayway S, 4950 54th Ave S, 10201 9th ST N, 11801A 28th St N, 6901 Park Cir S (Pas Ave/2nd St), 9600 San Martin Blvd N (C.R. 823), 512 Sands Point Dr, 340 Carillon Park Way N, 9399 28th St N, and 601 8th Ave SE.  Within twelve (12) months of the effective date of this Amended Order, Respondent shall perform a desktop assessment of all force mains, and within two (2) years of the effective date of this Amended Order, Respondent shall clean all Critical force mains, and thereafter re-assess these Critical force mains every 5 years. Within 6 months of completing any Critical force main condition assessments, Respondent shall add to its CIP any force main repair, rehabilitation or replacement projects warranted based on the results of Respondent's force main condition assessment. Respondent shall identify and ensure the proper GIS mapping of its force main condition assessment and cleaning as part of Respondent's Information Management System, including (a) the location of all force mains within the Systems, (b) all force main line air release valves (ARVs), and (c) all force main line operation valves; and

s.      By December 31, 2019, Respondent shall install elapsed time meters on each pump station with fixed speed pumps with pump horsepower in excess of 25hp for purposes of tracking the Nominal Average Pump Operating Time (NAPOT) such that when the NAPOT exceeds 10 hours/day, the City should investigate potential sources and remedies for high NAPOT runtimes. For purposes of this Paragraph, "NAPOT" shall be defined for single speed pumps as the

11

**Commented [A5]:** Deleted: "paragraphs 6a through 6i" and instead made this provision apply to all of paragraph 6

daily average total pump operating hours for the previous twelve (12) months divided by one less than the total number of pumps installed at the station, calculated monthly on a rolling basis, unless otherwise subsequently agreed by the parties in writing. For multi-speed or variable speed pumps, Respondents shall calculate the pump operating time based upon power consumption unless otherwise subsequently agreed to by the parties in writing.  By May 30, 2019, Respondent shall install permanent flow meters throughout the system, in locations recommended by its consultant for the Wet Weather Flow Mitigation Program – Phase II, in order to monitor system response to wet weather events and detect problems within the Systems.

7.    Upon the effective date of this Order, Respondent shall report to the Department all unpermitted wastewater and effluent discharges from the Systems and the Facilities as soon as possible, but within 24 hours from the time the Respondent becomes aware of the discharge, as required by 62-604.550 and 62-620.610(20) Fla. Admin. Code R., respectively

8.    Public Advisories and Notification Protocol: By October 31, 2018, for Non-SSO Water Quality Monitoring, the Respondent shall commence notifying the Pinellas County Department of Health and applying the "Healthy Beaches" protocol for advisories/notification to the public when sampling conducted in "Recreational" and "Background" monitoring areas indicates high levels of indicator bacteria in excess of 10% threshold value for Class III Fresh Waters (62-302.530, F.A.C.) or action values for "Healthy Beaches Program" for Marine Waters for the following locations:  Weedon Island Park, Fossil Park, Salt Creek Park, Walter Fuller Park, Jungle Prada Park, Grandview Park, Bay Vista Park, Clam Bayou Nature Preserve and Sunset Park.  For SSOs and Unauthorized Discharges, the Respondent shall follow the protocol for advisories/notification to the public outlined in Respondent's 2018 Capacity, Management, Operation, and Maintenance (CMOM) Program. Respondent shall amend its 2017 Sewage Spill Response Contingency Plan to add a section for the public notification protocol described in Respondent's 2018 CMOM and shall implement such protocol. Advisories and notifications should include notifying the public as soon as possible through social media, calls or emails to neighborhood associations, website, press releases, posters and signs at access points controlled by the City.

9.    No later than December 31, 2017, complete and submit to the Department a Water Quality Monitoring Assessment Report providing for 1) the identification of the public use of recreational waters in and around the area(s) of the potential wastewater discharge to such waters; 2) the evaluation of effectiveness of the existing monitoring program to detect changes to

receiving water bodies and provide recommendations  for baseline, wet weather condition, and compliance testing frequency, parameters and process; 3) the analysis of the need for soil testing at potential wastewater discharge outfalls; 4) the identification of any water quality data gaps in existing monitoring to ensure adequate coverage for determining the effects of any wastewater discharge to the water body; 5) the creation of a Water Quality Report Card to be published on the Respondent's website and distributed  to the public.  By April 30, 2018, Respondent shall update its Capacity, Management, Operation, and Maintenance (CMOM) Program for its Systems.  This shall be done in accordance with USEPA document 305-B-05-002, dated January 2005, and shall contain an updated Sanitary Sewer Overflow Response Plan, which in turn, shall contain detailed provisions for environmental monitoring derived from the Water Quality Monitoring Assessment Report.   The Respondent will also include a detailed section in the CMOM on public notification providing for posting of signage within 24 hours of a wastewater discharge at or near recreational waters identified in the Water Quality Monitoring Assessment Report and the method for public notification within 24 hours of wastewater discharges to Waters of the State to Respondent's website, social media and other media outlets.

10.    In any event, by December 31, 2022, and thereafter, the Facilities and Systems shall be in compliance with all Department rules that are the subject of this ~~Consent~~ Order.

11.    Within 180 days of the effective date of this Order, Respondent shall submit a written estimate of the total cost of the corrective actions required by this Order to the Department. The written estimate shall identify the information the Respondent relied upon to provide the estimate.

12.    Respondent agrees to pay to the Department stipulated penalties in the amount of $1,000.00 per day for each day Respondent fails to comply with paragraphs 6 through 7, 9, 10, 16 through 18 and 32 of this Order. The Department may demand stipulated penalties at any time after violations occur.  Respondent shall pay stipulated penalties owed within 30 days of the Department's issuance of written demand for payment, and shall do so as further described in paragraph  19, below. Nothing in this paragraph shall prevent the Department from filing suit to specifically enforce any terms of this Order.  If the Department is required to file suit to recover stipulated penalties, the Department will not be foreclosed from seeking civil penalties for violations of this Order or any other provision of law in an amount greater than the stipulated penalties under this paragraph.

**Commented [A6]:** Deleted: "90" days and changed to 180 days

**Commented [A7]:** Because the amount has already been paid, deleted: "Within 60 days of the effective date of this Order, Respondent shall pay the Department $10,000.00 for costs and expenses incurred by the Department during the investigation of this matter and the preparation and tracking of this Order. "

13

13.     For any discharge of wastewater from any of Respondent's Facilities or Systems through a point source not permitted in any NPDES permit, as well as any overflow, spill or release of wastewater to public or private property from any of Respondent's Facilities or Systems (Discharge), Respondent agrees to pay to the Department stipulated penalties as follows:

| a. | Amount per day per Discharge | Discharge Volume |
|----|------------------------------|------------------|
|    | $500.00                      | up to 5,000 gallons |
|    | $1,000.00                    | 5,001 to 10,000 gallons |
|    | $2,500.00                    | 10,001 to 25,000 gallons |
|    | $5,000.00                    | 25,001 to 100,000 gallons |
|    | $10,000.00                   | more than 100,000 gallons |

b.      Under this paragraph, the term "day" shall mean each successive 24-hour period after the commencement of the Discharge. Each Discharge shall be considered to have ceased when the Discharge has ceased. The Department will evaluate each Discharge on a case-by-case basis and the Department may decide at its sole discretion not to collect or demand a penalty. The Department may demand stipulated penalties at any time after violations occur. Respondent shall pay stipulated penalties owed within 30 days of the Department's issuance of written demand for payment, and shall do so as further described in paragraph 19, below.  On an assessed penalty under this paragraph, the Respondent may elect to off-set the penalty amount by implementing a Department approved Pollution Prevention (P2) Project. Nothing in this paragraph shall prevent the Department from filing suit to specifically enforce any terms of this Order.

c.      Respondent shall not be liable for stipulated penalties under paragraph 13 above if Respondent demonstrates that the Discharge was caused by an Act of God, vandalism, a non-Respondent contractor, or any act of a third party not working directly or indirectly on behalf of Respondent and Respondent demonstrates that it has used all reasonable measures to prevent such Discharge.

d.      If the Department is required to file suit to recover stipulated penalties, the Department will not be foreclosed from seeking civil penalties for violations of this Order or any other provision of law in an amount greater than the stipulated penalties under this paragraph.

14.  Respondent was assessed by the Department $810,000.00 as a civil penalty for the violations in paragraph 5.

15.     In lieu of making cash payment of $810,000.00 in civil penalties as set forth in Paragraph 14, Respondent may elect to off-set the amount of $810,000.00 by implementing a

**Commented [A8]:** Deleted: "Within 30 days after the effective date of this Order, Respondent shall pay to" and replaced with "was assessed"

14

Pollution Prevention (P2) Project, which must be approved by the Department.  P2 is a process improvement that reduces the amount of pollution that enters the environment; by conserving resource (including water, raw materials, chemicals, and energy) use, or by minimizing waste generation (including domestic and industrial wastewater, solid and hazardous waste, and air emissions).  A P2 Project must reduce pollution or waste within the process beyond what is required by federal, state, or local law, to be eligible for civil penalty offset under this Order.  If Respondent chooses to implement a P2 Project, Respondent shall notify the Department of its election by certified mail within 30 days of the effective date of this Order.

16.    If Respondent elects to implement a P2 Project as provided in Paragraph 15, Respondent shall submit a completed P2 Project Plan (Plan) within 90 days of the effective date of this Order.  The Plan must be completed using Exhibit 1, "P2 Project Plan" template.

17.    In the event the Department requires additional information to process the Plan described in Paragraph 15, Respondent shall provide a modified Plan containing the information requested by the Department within 30 days of the date of the request.

18.    If any balance remains after the entire P2 credit is applied to the allowable portion of the civil penalty, Respondent shall pay the difference within 30 days of written notification by the Department to Respondent that the balance is due.

19.    Respondent shall make all payments required by this Order by cashier's check, money order, City check or on-line payment.  Cashier's check, money order, or City check shall be made payable to the "Department of Environmental Protection" and shall include both the OGC number assigned to this Order and the notation "Water Quality Assurance Trust Fund."  Online payments by check can be made by going to the DEP Business Portal: http://www.fldepportal.com/go/pay/.  It will take several days after this order is final and effective filed with the Clerk of the Department before ability to make online payment is available.

20.    Except as otherwise provided, all submittals and payments required by this Order shall be sent to Kelley Boatwright (KelleyBoatwright@dep.state.fl.us) Department of Environmental Protection, Southwest District Office, 13051 N. Telecom Parkway, Temple Terrace, Florida 33637-0926.

21.    Respondent shall allow all authorized representatives of the Department access to the Facilities and the properties referenced in paragraphs 3 and 4 at reasonable times for determining compliance with the terms of this Order and the rules and statutes administered by the Department.

22.    If any event, including administrative or judicial challenges by third parties unrelated

to Respondent, occurs which causes delay or the reasonable likelihood of delay in complying with the requirements of this Order, Respondent shall have the burden of proving the delay was or will be caused by circumstance s beyond the reasonable control of Respondent and could not have been or cannot be overcome by Respondent's due diligence.  Neither economic circumstances nor the failure of a contractor, subcontractor, materialman, or other agent (collectively referred to as "contractor") to whom responsibility for performance is delegated to meet contractually imposed deadlines shall be considered circumstances beyond the control of Respondent (unless the cause of the contractor's late performance was also beyond the contractor 's control). Upon occurrence of an event causing delay, or upon becoming aware of a potential for delay, Respondent shall notify the Department by the next working day and shall, within seven calendar days, notify the Department in writing of (a) the anticipated length and cause of the delay, (b) the measures taken or to be taken to prevent or minimize the delay, and (c) the timetable by which Respondent intends to implement these measures. If the parties can agree that the delay or anticipated delay has been or will be caused by circumstances beyond the reasonable control of Respondent, the time for performance hereunder shall be extended.  The agreement to extend compliance must identify the provision or provisions extended, the new compliance date or dates, and the additional measures Respondent must take to avoid or minimize the delay, if any. Failure of Respondent to comply with the notice requirements of this paragraph in a timely manner constitutes a waiver of Respondent's right to request an extension of time for compliance for those circumstances.

23.    The Department, for and in consideration of the complete and timely performance by Respondent of all the obligations agreed to in this Order, hereby conditionally waives its right to seek judicial imposition of damages or civil penalties for the violations described above up to the date of the filing of this Order.  This waiver is conditioned upon Respondent's complete compliance with all the terms of this Order.

24.    This Consent Order covers all SSOs and discharge violations, including unpermitted discharges and any discharges in violation of Respondent's MS4 Permit, that occurred from any of Respondent's Facilities or Systems and that were known by the Department as of the effective date of this Consent Order.

25.    This Order is a settlement of the Department's civil and administrative authority arising under Florida law to resolve the matters addressed herein.  This Order is not a settlement of any criminal liabilities which may arise under Florida law, nor is it a settlement of any violation which may be prosecuted criminally or civilly under federal law.  Entry of this Order does not relieve

Respondent of the need to comply with applicable federal, state, or local laws, rules, or ordinances.

26.     The Department hereby expressly reserves the right to initiate appropriate legal action to address any violations of statutes or rules administered by the Department that are not specifically resolved by this Order.

27.     Respondent is fully aware that a violation of the terms of this Consent Order may subject Respondent to judicial imposition of damages, civil penalties up to $10,000.00 per day per violation, and criminal penalties.

28.     Respondent acknowledges and waives its right to an administrative hearing pursuant to Sections 120.569 and 120.57, Fla. Stat., on the terms of this Order.  Respondent also acknowledges and waives its right to appeal the terms of this Order pursuant to Section 120.68, Fla. Stat.

29.     Electronic signatures or other versions of the parties' signatures, such as .pdf or facsimile, shall be valid and have the same force and effect as originals.  No modifications of the terms of this Order will be effective until reduced to writing, executed by both Respondent and the Department, and filed with the clerk of the Department.

30.     The terms and conditions set forth in this Order may be enforced in a court of competent jurisdiction pursuant to Sections 120.69 and 403.121, Fla. Stat.  Failure to comply with the terms of this Order constitutes a violation of Section 403.161(l)(b), Fla. Stat.

31.     This Order is a final order of the Department pursuant to Section 120.52(7), Fla. Stat., and it is final and effective on the date filed with the Clerk of the Department unless a Petition for Administrative Hearing is filed in accordance with Chapter 120, Fla. Stat.  Upon the timely filing of a petition, this Order will not be effective until further order of the Department.

32.     Respondent shall publish the following notice in a newspaper of daily circulation in Pinellas County, Florida.  The notice shall be published one time only within 15 days of the effective date of this Order.  Respondent shall provide a certified copy of the published notice to the Department within 10 days of publication.

STATE OF FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
NOTICE OF CONSENT ORDER

The Department of Environmental Protection ("Department") gives notice of agency action of entering a Consent Order with the City of St. Petersburg, pursuant to section 120.57(4), Florida Statutes.  The Consent Order addresses alleged unpermitted wastewater and effluent and stormwater discharges from the City's stormwater facilities and wastewater reclamation facilities and associated wastewater collection/transmission systems to State waters, and the implementation

17

plan to minimize further discharges.  The Consent Order is available for public inspection during normal business hours, 8:00a.m. to 5:00p.m., Monday through Friday, except legal holidays, at the Department of Environmental Protection , Southwest District Office, 13051 North Telecom Parkway, Temple Terrace, Florida 33637-0926.

Persons who are not parties to this Consent Order, but whose substantial interests are affected by it, have a right to petition for an administrative hearing under sections 120.569 and 120.57, Florida Statutes.  Because the administrative hearing process is designed to formulate final agency action, the filing of a petition concerning this Consent Order means that the Department's final action may be different from the position it has taken in the Consent Order.

The petition for administrative hearing must contain all the following information:

a)      The OGC Number assigned to this Consent Order;

b)      The name, address, and telephone number of each petitioner; the name, address, and telephone number of the petitioner 's representative, if any, which shall be the address for service purposes during the proceeding;

c)      An explanation of how the petitioner's substantial interests will be affected by the Consent Order;

d)      A statement of when and how the petitioner received notice of the Consent Order;

e)      Either a statement of all material facts disputed by the petitioner or a statement that the petitioner does not dispute any material facts;

f)      A statement of the specific facts the petitioner contends warrant reversal or modification of the Consent Order;

g)      A statement of the rules or statutes the petitioner contends require reversal or modification of the Consent Order; and

h)      A statement of the relief sought by the petitioner, stating precisely the action petitioner wishes the Department to take with respect to the Consent Order.

The petition must be filed (received) at the Department's Office of General Counsel, 3900 Commonwealth Boulevard, MS# 35, Tallahassee, Florida 32399-3000 within 21 days of receipt of this notice.  A copy of the petition must also be mailed at the time of filing to the District Office at Florida Department of Environmental Protection, Southwest District Office , 13051 North Telecom Parkway, Temple Terrace, Florida 33637-0926. Failure to file a petition within the 21-day period constitutes a person's waiver of the right to request an administrative hearing and to participate as a party to this proceeding under Sections 120.569 and 120.57, Florida Statutes.  Before the deadline for filing a petition, a person whose substantial interests are affected by this Consent Order may choose to pursue mediation as an alternative remedy under section 120.573, Florida Statutes. Choosing mediation will not adversely affect such person's right to request an administrative hearing if mediation does not result in a settlement. Additional information about mediation is provided in section 120.573, Florida Statutes and Rule 62-110.106(12), Florida Administrative Code.

34.     Rules      referenced      in      this      Order      are      available      at http://www.dep.state.fl.us/legal/Rules/rulelist.htm.

18

FOR THE RESPONDENT:

_____

Rick Kriseman
Mayor
City of St. Petersburg


DONE AND ORDERED this _____ day of _____,  2018  in  Hillsborough  County,
Florida.

STATE OF FLORIDA  DEPARTMENT OF
ENVIRONMENTAL PROTECTION



District  Director

19

FILED, on this date, pursuant to Section 120.52, FLA. STAT., with the designated Department Clerk, receipt of which is hereby acknowledged.

_____
Clerk

Attachments:   Exhibit 1:       P2 Project Plan

Copies furnished to:
Lea Crandall, Agency Clerk, Mail Station 35

20

**Exhibit 1**

**P2 Project Plan (Plan)**

*(Note: Provide the information specified and delete existing text within parentheses)*
(Facility Name) (Address) (Telephone)
(Preparer Name/Title)

**A.     Project Description:** (Summarize P2 Projects selected. Describe the processes or operations to be modified, and the specific changes to be made.  Include details such as the specific equipment to be installed, materials to be substituted, and the actual changes to be made to processes or operations.  Include manufacturer or vendor information, and specifications.)

**B.     Environmental and Economic Benefits:**   (Explain why and how each Project proposed constitutes P2).

Specify how each material, chemical, water and energy is saved, and from which processes or operations.  Specify how each solid and hazardous waste, industrial wastewater and air emissions are generated, the waste type, and from which processes or operations. **Describe generally in paragraph format.**

Estimate the *annual* savings in *resources-* raw materials, chemicals, water, and energy at the process or operation front end.  Estimate the *annual* reductions in *wastes -* solid and hazardous waste, wastewater, and air emission reductions at the process or operation back end.

Figures quoted should represent weights or volumes annually, and should be equalized for production rate changes. Associated cost savings should be included. **Describe specifically using the tables provided.**

Complete the first table for each per Project individually.  Add or average corresponding figures from each Project table to complete the Plan table for *multiple Projects*.

| *(Project Name)* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Annual Resource Consumption Comparison** | | | | | | | |
| Item | Quantity Used  (galllb/kwh-specify) | | | Purchasing Cost ($) | | | Percent (%) Reduction |
| | Before | After | Reduction | Before | After | Reduction | |
| Water | | | | | | | |
| Chemicals | | | | | | | |
| Materials | | | | | | | |
| Energy | | | | | | | |

FDEP v. City of St. Pete - OGC File No. 16-1280

21

| Total Annual Cost Savings = | | | | | | |
|---|---|---|---|---|---|---|
| **Annual Waste Generation Comparison** | | | | | | |
| Item | Quantity Generated (gal/lb/tons - specify) | | | Disposal Cost ($) | | | Percent (%) Reduction |
| | Before | After | Reduction | Before | After | Reduction | |
| Hazardous Waste | | | | | | | |
| Industrial Wastewater | | | | | | | |
| Solid Waste | | | | | | | |
| Air Emissions | | | | | | | |
| Total Annual Cost Savings = | | | | | | | |
| Total Annual Avoided Cost Savings = | | | | | | | |

| *Summary of All P2 Projects* | | | | | | |
|---|---|---|---|---|---|---|
| **Annual Resource Consumption Comparison** | | | | | | |
| Item | Quantity Used (gal/lb/kwh - specify) | | | Purchasing Cost ($) | | | Percent (%) Reduction |
| | Before | After | Reduction | Before | After | Reduction | |
| Water | | | | | | | |
| Chemicals | | | | | | | |
| Materials | | | | | | | |
| Energy | | | | | | | |
| Total Annual Cost Savings = | | | | | | | |
| **Annual Waste Generation Comparison** | | | | | | |
| Item | Quantity Generated (gal/lb/tons - specify) | | | Disposal Cost ($) | | | Percent (%) Reduction |
| | Before | After | Reduction | Before | After | Reduction | |
| Hazardous Waste | | | | | | | |
| Industrial Wastewater | | | | | | | |
| Solid Waste | | | | | | | |
| Air Emissions | | | | | | | |
| Total Annual Cost Savings = | | | | | | | |
| Total Annual Avoided Cost Savings = | | | | | | | |

**C.** **Project Cost:** (Include per Project the itemized, subtotal and Project total costs. A projected payback period in months or years needs to be included.

Provide a grand total cost for all Projects and an averaged projected payback *period, for multiple Projects.* **(Use list or table format for all.)**

**D.** **Implementation Schedule:** (Provide a brief discussion of the steps necessary to implement the Projects and expected time frames for completion. A table or list format is preferred. The schedule shall include a list of milestones with dates, or timeframes based on Plan

22

approval date, including Progress and Final Report submittals.  Provide a description of any anticipated problems and options.  (*The implementation should take no longer than six months to complete.*)

        **E.**    **Project Reporting:**

       1.    Within 90 days of approval of the Project Plan, the Respondent shall submit a P2 Project Progress Report to the Department that describes the Respondent's progress in implementing the P2 Project and meeting the requirements in the Plan, and includes a list of equipment ordered, purchased, and/or installed.

       2.    Within 180 days of approval of the Plan, the Respondent shall submit to the Department a P2 Project Final Report that includes the following:

          a.    A confirmation that the information presented in Sections A-C of the Summary is unchanged, or an updated version with the sections changed appropriately.  A statement that the Project(s) was/were implemented successfully.  An explanation of any problems encountered and corrections applied.

          b.    Attached expense reports, receipts, purchasing instruments and other documents itemizing costs expended on preparing and implementing the Project.

       3.    The Department shall review the Final Report and determine:

          a.    Whether the project was properly implemented; and
          b.    Which expenses apply toward pollution prevention credits.

       4.    A $1.00 pollution prevention credit for each $1.00 spent on applicable costs will be applied against the portion of the civil penalty that can be offset.

          a.    The following costs are allowable to offset the allowable amount of the civil penalty:

              i.    Preparation of the P2 Project;
              ii.    Design of the P2 Project;
              iii.    Installation of equipment for the P2 Project;
              iv.    Construction of the P2 Project;
              v.    Testing of the P2 Project;
              vi.    Training of staff concerning the implementation of the P2 Project; and
              vii.    Capital equipment needed for the P2 Project.

          b.    The following costs shall not apply toward P2 credit:

              i.    Costs incurred in conducting a waste audit;
              ii.    Maintenance and operation costs involved in implementing the P2 Project;

|       |                                                                 |
|-------|-----------------------------------------------------------------|
| iii.  | Monitoring and reporting costs;                                 |
| iv.   | Salaries of employees who perform their job duties;             |
| v.    | Costs expended to bring the facility into compliance with current law, rules and regulations; |
| vi.   | Costs associated with a P2 Project that is not implemented;     |
| vii.  | Costs associated with a P2 Project that has not been approved by the Department;  and |
| viii. | Legal costs.                                                    |

      c.       If any balance remains after the entire P2 credit is applied to the allowable portion of the civil penalty, Respondent shall pay the difference within 30 days of written notification by the Department to the Respondent that the balance is due.

      5.     The Department may terminate the P2 Project at any time during the development or implementation of it, if the Respondent fails to comply with the requirements in this document, act in good faith in preparing and implementing the project, or develop and implement the P2 Project in a timely manner.  The Respondent may terminate the P2 Project at any time during its development or implementation.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SUNCOAST WATERKEEPER, OUR
CHILDREN'S EARTH FOUNDATION, and
ECOLOGICAL RIGHTS FOUNDATION,

    Plaintiffs,

  v.

CITY OF ST. PETERSBURG,

    Defendant.

Case No.: 8:16-cv-03319-JDW-AEP

## STIPULATED ORDER OF PARTIAL DISMISSAL AND COURT'S RETENTION OF JURISDICTION

   Plaintiffs Suncoast Waterkeeper, Our Children's Earth Foundation, and Ecological Rights Foundation ("Plaintiffs") and Defendant City of St. Petersburg hereby enter into this Stipulated Order of Partial Dismissal and Court's Retention of Jurisdiction ("Stipulated Order") in settlement of this action.

   **NOW, THEREFORE,** the Parties hereby stipulate and the Court orders as follows:

   1. **Amended Consent Order OGC No. 16-1280:** In partial settlement of this action, the City agreed to request an amendment to Consent Order OGC No. 16-1280 from the Florida Department of Environmental Protection ("FDEP") to include additional requirements.  FDEP amended the Consent Order on _____ ("Amended Consent Order"), and the Amended Consent Order is attached to this Stipulated Order as Attachment A.  The Parties agree the City's compliance with the Amended Consent Order is enforceable by this Court.

1

2. **Additional Public Interest Project:**   By October 1, 2018, the City shall make a payment of $200,000 to the Tampa Bay Estuary Program (263 13th Avenue South, Suite 350, St. Petersburg, FL 33701) to be used for projects to secure significant environmental benefits to the watersheds and ocean waters in and adjacent to the City.   A copy of such payment shall be sent to the Plaintiffs under Paragraph 3.

3. **Reporting and Communication Between the Parties**: Until the Termination Date, the City shall provide Plaintiffs courtesy copies of all reports to FDEP under the Amended Consent Order at such time that reports are provided to FDEP.   Additional documents requested by Plaintiffs in relation to work performed under the Amended Consent Order shall be provided pursuant to the Florida's Public Records Act. Nothing herein prevents the City from regularly communicating with Plaintiffs' sewage engineer concerning the work required under the Amended Consent Order.   All documents and payments required to be forwarded by one Party to another shall be sent to the following individuals as electronic computer files at the e-mail addresses specified below, or to a mailing address if a given document cannot be e-mailed. Any change in the individuals designated by either Party must be made in writing to the other Parties.

Plaintiff Environmental Groups:
Executive Director
Suncoast Waterkeeper
P.O. Box 1028
Sarasota, FL 34230
jbloom@suncoastwaterkeeper.org

Defendant City of St. Petersburg:
Director of Water Resources Division
 City of St. Petersburg
Post Office Box 2842
St. Petersburg, Florida 33731-2842
John.Palenchar@stpete.org

Jacqueline Kovilaritch
City Attorney
City of St. Petersburg
Post Office Box 2842
St. Petersburg, Florida 33731-2842
jacqueline.kovilaritch@stpete.org

4.   **Compliance Monitoring Fund**:   The City shall pay to the Plaintiffs a total of $15,000 per year for five years to fund compliance monitoring of the City's commitments under this Stipulated Order and its Attachment, for services provided by the Plaintiffs' professional engineers licensed in the State of Florida and for mediation under Paragraph 6. The Compliance Monitoring Fund payments shall be made annually, commencing on January 2, 2019 and annually thereafter with final payment on January 2, 2023.   By February 15 following the end of the each year in which payment is received, Plaintiffs shall (a) report to the City the total amount expended on its engineer or on mediation hereunder in the prior calendar year and (b) refund unused funds to the City if the total amount reported is less than $15,000.

5.   **Attorneys' Fees and Costs:**   Plaintiffs' claim for "costs of litigation (including reasonable attorney and expert witness fees)" under Section 505(d) of the Clean Water Act is not resolved by this Stipulated Order, and Plaintiffs reserve all rights to seek such fees and costs.   So as not to impede settlement, Defendant agrees that Section 505(d) of the Clean Water Act provides a process where a court may award to Plaintiffs their reasonable attorneys' fees and costs in an amount to be determined by the Magistrate of this Court, the Honorable Anthony E. Porcelli, in accordance with applicable principles of law. The hearing before the Magistrate on the amount of attorneys' fees and costs shall be held as soon as possible after the Effective Date of this Stipulated Order.   The Court's Order issued under Local Rule 3.08(b) (Dkt 168) shall have no effect on Plaintiffs' rights under Section 505(d) of the Clean Water Act.

6.   **Dispute Resolution**:   The Dispute Resolution procedure of this Paragraph shall be the exclusive mechanism to resolve any disputes arising under this Stipulated Order and its Attachment. This procedure does not apply to disputes between the City and FDEP regarding the Amended Consent Order.   Any dispute that arises under this Stipulated Order shall initially be subject to a period of informal negotiations, which shall not extend beyond thirty (30) days unless the Parties otherwise mutually agree in writing to an extension of the informal negotiation period and/or a mediation process. The dispute shall be considered to have arisen on the date one Party receives written notification from the other, specifically referencing this Paragraph, that there is a dispute. Such notice shall clearly state the matter in dispute.   If the Parties cannot resolve a dispute by informal negotiations, whether before or immediately after the lapse of the thirty (30) day informal negotiations, then the Parties must seek the intervening role of a certified federal court mediator, with such individual chosen by mutual agreement of the Parties.   If the Parties cannot agree upon a mediator after exchanging no fewer than five (5) proposed mediator recommendations per party, then after a period of thirty (30) days (following the expiration of the informal negotiation period), either Party may file a Dispute Resolution motion with the Court. The mediation period shall not extend beyond forty-five (45) days from the end of the informal negotiation period, unless the Parties otherwise mutually agree in writing to an extension of the mediation period.   If the Parties cannot resolve a dispute by mediation, at the conclusion of the forty-five (45) day mediation period, either Party may file a Dispute Resolution motion with the court.   The motion shall refer to this Stipulated Order and Paragraph and shall set forth the nature of the dispute and a proposal for its resolution. The opposing Party shall have thirty (30) days in which to file a response with an alternate proposal for resolution. As to any and all disputes under this Paragraph, the Court shall determine which proposed resolution is most appropriate, in light of the circumstances and proposals presented to it and consistent with the Clean Water Act.

7.   **Effective Date**:   Under Section 505(c)(3) of the Clean Water Act, Plaintiff will provide a copy of this Stipulated Order to the United States Environmental Protection Agency ("EPA") and the United States Department of Justice ("DOJ"), and the Court may not enter the Stipulated Order prior to forty-five (45) days from the date the Stipulated Order is received by EPA and DOJ. 33 U.S.C. § 1365(c)(3).   In the event EPA or DOJ comments raise concerns on the provisions of this Stipulated Order during the review period, the Parties agree to meet and confer to attempt to resolve any issue(s) raised by EPA or DOJ. At the end of the forty-five (45) day review period, or after receipt of comments from EPA or DOJ, whichever occurs first, the Parties will jointly notify the Court of any comments received from EPA or DOJ, any resolution of those comments, and move the Court to enter the Stipulated Order.   The attached Amended Consent Order will undergo an administrative twenty-one (21) day notice period, and if challenge by any party this Court will not enter the Stipulated Order until completion of the administrative process under Chapter 120, Florida Statutes**.**   The Stipulated Order becomes effective on the date signed and issued by the Court.

8.   **Termination Date**: This Stipulated Order shall terminate on December 31, 2024.

9.   **Incorporation and Modification**: This Stipulated Order and its Attachment contain the entire agreement between the Parties and no major modifications shall be valid unless in writing, mutually agreed to and executed by the Parties, and entered by the Court; except that the Parties may mutually agree in writing to minor modifications of this Stipulated Order without further consent of the Court and such written minor modifications shall be deemed incorporated into this Stipulated Order.

10.   **Retention of Jurisdiction and Partial Dismissal**:   The Court shall retain jurisdiction to enforce the terms of this Stipulated Order and its Attachment A until the Termination Date and

to resolve disputes that are not resolved through the dispute resolution process prescribed above that may arise between the Parties.  In consideration of the City's agreement to this Stipulated Order and Attachment A, Plaintiffs' agree that the claims alleged in the Second Amended Complaint through August 2, 2018, except for Plaintiffs claims under Section 505(d) of the Clean Water Act, are dismissed with prejudice consistent with the terms and condition of this Stipulated Order.  The partial settlement of this action as embodied in this Stipulated Order and its Attachment is fair, reasonable, in the public interest, and furthers the objectives of the Clean Water Act.  The case is not dismissed as to Plaintiffs' claim for attorney fees and costs under Section 505(d) of the Clean Water Act.

**IT IS SO STIPULATED** through agreement of counsel as authorized to so stipulate by their respective clients:

Respectfully submitted,

August __, 2018

| | |
|---|---|
| /s/ Justin Bloom | /s/ Brian A. Bolves |
| Justin Bloom | Brian A. Bolves, FBN 367079 |
| FL Bar # 89109 | Manson Bolves Donaldson Varn, P.A. |
| Justin Bloom Attorney at Law, PA | 1011 West Swann Avenue |
| P.O. Box 1028 | Tampa, FL 33606 |
| Sarasota, FL 34230 | P: 813.514.4700 |
| Telephone: (917) 991-7593 | F: 813.514.4701 |
| Facsimile: (866) 574-2169 | E: bbolves@mansonbolves.com |
| Email: bloomesq1@gmail.com | Attorney for Defendant CITY OF ST. PETERSBURG |

/s/ Kathryn Schmidt
Kathryn Schmidt (Pro Hac Vice)
Hunsucker Goodstein PC
730 17th Street, Suite 220
Denver, CO 80202
P: 303-564-1298
F: 720.302.2700
E: kschmidt@hgnlaw.com
Attorneys for Plaintiffs, SUNCOAST
WATERKEEPER, OUR CHILDREN'S
EARTH FOUNDATION, ECOLOGICAL
RIGHTS FOUNDATION

Pursuant to the foregoing stipulation of the Parties, **IT IS SO ORDERED** this ____ day of _____, 2018. This Stipulated Order does not resolve Plaintiffs' claims for litigation costs under Section 505(d) of the Clean Water Act, which are directed for further proceedings and shall be determined as expeditiously as possible by the Magistrate assigned to this case, The Honorable Anthony E. Porcelli.

_____
JAMES D. WHITTEMORE
United States District Judge

# ATTACHMENT A

# AMENDED CONSENT ORDER

# OGC NO. 16-1280

Exhibit 6

to the

Declaration of Justin Bloom

In Support of

Plaintiffs' Motion for Attorneys'
Fees and Costs

Suncoast Waterkeeper et al. v. City of St.
Petersburg Case No. 8:16-cv-03319-JDW-AEP

CITY OF ST. PETERSBURG

COUNCIL MEETING

AUGUST 9, 2018

(Excerpt of Meeting)

_____

F-1 Settlement Suncoast Waterkeeper, Our Children's Earth
Foundation, and Ecological Rights Foundation vs. City of
St. Petersburg, Case No.:  8:16-cv-3319-JDW-AEP

TRANSCRIBED FROM MP4 AUDIO FILE BY:
Lisa G. Moore, Court Reporter, FPR
12th Judicial Circuit Court Approved
Notary Public, State of Florida at Large

```
 1                    CITY OF ST. PETERSBURG
                         COUNCIL MEETING
 2                        AUGUST 9, 2018
                       (Excerpt of Meeting)
 3

 4

 5  PLACE TAKEN:      Municipal Building
                      175 5th Street North
 6                    Second Floor Council Chamber
                      St. Petersburg, Florida
 7

 8  APPEARANCES:      Steve Kornell, Chairman
                      Charlie Gerdes, Council Member
 9                    Ed Montanari, Council Member
                      Darden Rice, Council Member
10                    Gina Driscoll, Council Member

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CITY OF ST. PETERSBURG
COUNCIL MEETING
AUGUST 9, 2018
(Excerpt of Meeting)

\*    \*    \*    \*    \*

1

2

3

4

5    CHAIRMAN KORNELL:  Okay.  So next, we are going

6    to move to our legal item, F-1, Settlement --

7    potential settlement with Suncoast Waterkeepers, Our

8    Children's Earth Foundation, and the Ecological

9    Rights Foundation.

10    UNIDENTIFIED SPEAKER:  Mr. Vice Chair, we have

11    our outside counsel here -- proceed.

12    CHAIRMAN KORNELL:  Are you ready to go?

13    MR. MANSON:  So I know I've been in front of

14    you-all now, I know it's probably hard to believe,

15    but over a year and a half, so just a brief history.

16    We received a notice from the plaintiffs in this

17    case, which is a citizen suit on the Clean Water Act

18    and Suncoast Waterkeepers and the City, and I call

19    them et. al. because there's other petitioners and

20    plaintiffs as well, but we're coming forward to you

21    with a settlement proposal that I'm going to

22    recommend.

23    But the suit started in December of 2016, if

24    you can believe that, and the consent order we

25    entered into with DEP was executed on July 27th,

1    just about a year ago, of 2017.

2         When we were at our last board -- I'm sorry,

3    city council meeting, we talked about exploring

4    settlement where I attended, and in furtherance of

5    that, there's a deadline in discovery where the

6    plaintiffs had to provide us expert reports, which

7    occurred on June 8th of this year.

8         When we received those expert reports, the

9    engineering report in particular, which was the most

10   substantial of the reports, it was clear that many

11   of the issues raised by them were issues that were

12   already being dealt with by your staff, your utility

13   staff, and so we put together a meeting -- I'm

14   saying we -- city council -- I mean, city attorneys

15   and all of us discussed this, and the engineer sat

16   in together, the experts you have, Claude

17   Tankersley, John Palenchar, and our expert that was

18   hired to help us in litigation, Phil Waller, and sat

19   in with their expert, they had no attorneys, and

20   they discussed the engineering aspects, and found

21   that most of what was in there were things that we

22   were already doing, maybe a slightly different way

23   of being done than was being done, or maybe the time

24   frame would shift a little more from seven years to

25   five years, so it was thought that we have a good

1      framework for settlement.  So at that point we

2      started in earnest to get together and have

3      discussions going forward.

4           I'll also tell you from a case standpoint, on

5      June 8th, you know, we then received their experts.

6      They did have an economist talking about litigation

7      risk.  It was estimating some $17 million economic

8      benefit to the City, and that would translate into

9      some high level of fine, they would allege, so there

10     is that issue going on.

11          And then we also found under the DEP consent

12     order, if you recall, there's an integrated master

13     plan, and that's sort of like the guidance document

14     that's being put together to guide the City into the

15     future for how you're going to do more of your

16     infrastructure.

17          A big part of that, requirements in timelines

18     for things that will be done.  But another big part

19     was research.  Some of the data wasn't there when we

20     entered into the consent order to know where are the

21     priority areas.  I mean, we had an idea, don't get

22     me wrong, but these flow meters and flow tests and

23     modeling show specifically which portions of the

24     system need to be fixed, and we're still developing

25     some of that, but quite a bit of it has already been

1    developed.  Quite a bit of it, I think, has been

2    brought forward to you.

3        And that gave us some more specifics to be able

4    to move forward to say what are things the City is

5    going to do, and we looked, and we found we had more

6    commonality with them and their recommendations than

7    we did differences and we're able to meet those.

8        So we structured this proposed settlement two

9    ways.  We're in the federal court, obviously, so we

10   have to have a stipulated order for the judge.  And

11   then our other provision was attached to that

12   stipulated order to the judge will be an amended --

13   a proposed amended consent order.

14       I say that because these cases are a little

15   different than others that you have where we can

16   just get the parties together and settle the case

17   and it's done.  Well, in this case, obviously, the

18   judge has to approve the settlement.  But in

19   addition to that, because it's a Clean Water Act

20   suit, we have to get the EPA, and this is standard

21   for every one of these cases, to write off on, they

22   have 45 days, and the DOJ, the Department of

23   Justice, to write off on it, and then also because

24   it's an amended consent order with DEP, they'll

25   approve it as well.

1           So what we've done is we've got two formats,

2      and you can interrupt anytime if you have questions.

3      I was just going to walk you through the stipulated

4      order, 30,000 feet, and then walk you real quickly

5      through the amended consent order.

6           On the stipulated order, you know, the first

7      issue of it is the court is going to attach, I said,

8      the amended consent order and retain jurisdiction

9      for five years to be there as an arbitrator of

10     compliance.

11          So we included in this stipulated order an

12     extensive dispute resolution process that ends in

13     mediation.  So we do the standard meet and greet,

14     they have to notify us of a problem in writing, and

15     then we have a certain time to get together and meet

16     to try to resolve it that way.  If that doesn't

17     work, then we have to go select mediators, up to

18     five, and then we go into mediation, all of that

19     before they can bring anything back to the judge.

20     We're hoping by that we're going to internalize and

21     get most of these disputes, if there are any,

22     resolved.

23          The consent orders go for ten years.  So we

24     have nine years left on our existing consent order

25     right now.  And so the idea is, this is a five-year

1       stint where they'll be able to check and verify that

2       we've done everything we said we are going to do.

3              Part of that process, if you will, is that

4       we're going to fund, and this is quite common in the

5       federal orders, $15,000 a year for them to pay for a

6       Florida licensed engineer to review compliance with

7       the City.  It's really not -- even this layperson,

8       and attorney -- a lot of these engineering

9       discussions I needed help from Claude and from John

10      to understand the issues, so it really needs to be

11      an engineer that helps them out on that.  So they

12      are going to do that, and we're going to make those

13      payments also for the same five-year time period.

14             Under the stipulation there's a provision that

15      we're going to provide or donate $200,000 to the

16      Tampa Bay Estuary program.  That's sort of in lieu

17      of any kind of a fine or anything, but this is a

18      straight donation, and it's to secure significant

19      environmental benefits to the watersheds and the

20      ocean waters in and adjacent to the city.  So these

21      will be studies or information gathered that will

22      directly benefit the environment in the city and

23      surrounding the city.

24             In the attorney's fees issue, we -- we have

25      deferred that to the court.  When I say "the issue,"

1    what I'm talking about is whether or not there's a

2    right to attorney's fees and costs and the fact of

3    what that amount would be.  So that will be resolved

4    by the court.  It's not resolved by the settlement.

5         And the stipulated order (unintelligible) is

6    five years.  It actually has a termination

7    provision.  It terminates in 2024, December 31st,

8    2024.

9         So as you can see, there's not all that many

10   issues in the stipulated order, so that means most

11   of them are in the amended consent order.

12        So the first thing we started off with, City

13   Staff had been looking at the issues, especially the

14   wet weather, extreme wet weather events, and what

15   can we do to balance out the full capacity of the

16   system.

17        You probably know from your reports -- I wasn't

18   going to repeat a lot, but City Staff and

19   contractors have done a great job, 80 million

20   gallons a day of capacity and injection wells has

21   been created in the last year and a half, on time,

22   and within the confines of the existing consent

23   order.

24        In addition to that, if rain fell universally,

25   you know, over the whole city of St. Petersburg,

1    then things probably wouldn't be as difficult at

2    some of these treatment plans, but, unfortunately,

3    it doesn't. You know, you may be having 4 inches an

4    hour, you know, it's a gully washer, falling in one

5    part of the city and only 2 inches in another.

6    Well, this proposal is to go ahead and build a $7.5

7    million wet weather force main and lift station.

8         And so this is a new thing added in to --

9    they'll be able to balance out these wet weather

10   discharges. If there's more falling in the southern

11   part or the -- I'm sorry, the southwest part, then

12   we can send it up to the northwest plant and vice

13   versa, so that's in addition to the consent order.

14        The second thing was, if you recall from the

15   first consent order, you committed to $14 million

16   per year, and you've exceeded that, for five years

17   to be used for basically the collection system,

18   repair, analyze collection system.

19        What you've done in this consent order is we've

20   bumped it up to 16 million which you had already

21   been -- you're already budgeted to spend that much

22   money or more per year on the collection system, so

23   that was within the budget.

24        Then the rest of these items we're talking

25   about, except for one, are all additions to the

1       integrated master plan, and I would tell you that

2       most of it is details added in.

3               When we first did the provision for the

4       integrated master plan, we didn't have enough

5       information to know many of the details.  We still

6       don't have all of it, but we have a lot more.  So we

7       were able to negotiate a number of different

8       additions to it.  And one of them is called a sewer

9       system asset management plant.  The acronym is SAMP.

10      This is sort of a guidance document for the

11      entire system.  And it was going to be included as

12      part of integrated master plan, so we just now

13      formalized that in the consent order.  And the

14      number of requirements within that sort of

15      characterizing the entire system and the specified

16      time periods when things will be done under the

17      system.

18              There is the FOG program, I love that acronym,

19      that's the Fats, Oils, and Grease program.  That

20      already occurs.  You already have a robust plan.

21      We're going to take that plan and those

22      requirements, add a couple more requirements to

23      them, and that's going to be part of your SAMP.

24              CIP, which was already talked about, integrated

25      master plan, again, more detail in it.  We're going

1    to put in (unintelligible), you know, identify

2    potable projects, reclaimed projects, stormwater

3    projects, and wastewater projects, and ensure that

4    there's fundings for the repairs needed pursuant to

5    the SAMP policies that are set out in that document.

6         Obviously we've been working on evaluation and

7    reduction plans for inflow and infiltration,

8    codified that, put some more detail into those types

9    of testing, and that's contained in the consent

10   order.

11        Then, if you look at -- I want to say it's

12   provision 6-M of that consent order, we're looking

13   at shortening the time frame for the City to come up

14   with an ordinance on private laterals.  So we just

15   took that 2022 to 2020.  From January 31st, 2022 to

16   to June 30th, 2020.

17        And right now the City was working, like, on a

18   seven-year inspection cycle for its gravity lines,

19   we're going to change that a little bit, we're going

20   to accelerate it to a five-year program, and then

21   we're also going to do it under what's called a CCTV

22   method, and that also provides for rating of the

23   different lines, which helps us then determine which

24   lines need to be fixed first.

25             That along with your wet weather and your flow

1    stuff, we'll be able to all converge together and be

2    integrated into the city's system, the GIS system,

3    for their wastewater system, and say, okay, here's

4    an area we really need to fix first and prioritize

5    those.  So in the first few years of these five

6    years, you're probably going to see a lot of

7    improvement, meaning reduction in inflow and

8    infiltration.

9         We currently test, the City does, a number of

10   water bodies, and we generate a water quality report

11   card for these locations.  One of the things we've

12   noticed is there have been some microbial hits,

13   fecals, so the City is already inspecting those and

14   looking into seeing what it was and doing something

15   called a -- I have to read this, "Microbial source

16   tracking," so that's to determine where is it coming

17   from.  What is it?  First of all, is it animal waste

18   or is it human waste, and then second, you know,

19   where is it coming from?  It identifies those and

20   obviously the idea is to stop that source and

21   improve the water quality.

22        One of the other things that's committed to in

23   the consent order, as part of this integrated master

24   plan is the idea of a desktop analysis of all the

25   force mains within two years, and all the critical

1    force mains will be cleaned within five years.   And

2    then in the consent order, we've actually listed

3    each one of those just to be specific.

4        We're also doing something that will help us

5    really understand how the system functions in

6    realtime, and that's in -- this was being done

7    before the permanent flow meters on pump stations be

8    installed throughout the entire wastewater system.

9    The only thing we did is on very, very small pumps,

10   which aren't very relevant and don't generate much,

11   we're not going to track those, so we have that

12   provision in there.

13       We're also going to continue to do a wet

14   weather flow monitoring program so that we can see

15   what's happening and do some more testing to

16   determine what the condition of the system is in

17   different areas.

18       And, finally, we have a provision we added

19   which is in the public advisory section, and this

20   just goes to we are already doing water quality

21   samples, recreational and background, and then we're

22   combining that with where there's parks located next

23   to those systems that we'll put signs up and be able

24   to tell people at that location, you know, what the

25   water quality was as of the last sample that was

1    taken.  That's just to provide information for the

2    public when they're going into a water body.

3         We also post that same information online, and

4    we'll just add a physical sign at the locations

5    where you have parks and where the water body is

6    (unintelligible) -- you know, located.

7         So at this point we've talked about the type of

8    structure we're going to have.  I mentioned before,

9    you know, how is this going to work?  Well, what

10   happens is, if you approve the settlement, which I

11   recommend you do -- you know, I see the risk of

12   litigation, I know attorneys are expensive, believe

13   me, and right now you obviously are going to end up

14   paying my fees no matter what the disposition of the

15   case is, we hope, and you also probably end up

16   paying the other side's fees only -- and I only say

17   that because many of the cases that are out there

18   for the -- these types of citizen suits it's even if

19   they only caused an acceleration of what you were

20   going to do, sometimes they've said that's enough,

21   typically it's got to be something real and

22   substantive that's changed in what you're doing, and

23   so for me the risk isn't just potentially a fine,

24   which I think is a relatively low risk, but still a

25   risk, then it's attorney's fees, then it's the

1    potential for the court finding a continuing

2    violation of some sort which would then rachet up

3    the fines and the other aspects of the case.  So I

4    highly recommend this settlement.

5        I think it's detailed, which protects you.  I

6    think it also provides for a method to be able to

7    have dispute resolution going forward.  We're going

8    to have more communication instead of having to go

9    to lawsuits or to a judge right away, so I think

10   it's a benefit to the City and it's a benefit to the

11   environment.

12       Once we enter into -- if you approve it, then

13   we do have this process where it will be sent up to

14   the Department of Justice and to EPA, and then we'll

15   also await the DEP's, you know, role in approving

16   the amended consent order.

17       I believe because of the fact that it is

18   increasing environmental requirements on it and

19   incorporating more details, which were derived from

20   the program that DEP put in the original consent

21   order, that they will do that.  Obviously we can't

22   take anything for granted, we have to wait for their

23   approval, EPA's and the DOJ's.

24       CHAIRMAN KORNELL:  Very good.  Thank you.

25       Further comment.

1      UNIDENTIFIED SPEAKER:  I don't think so.  We do

2   have Claude available who's been very -- Claude

3   Tankersley who has been very involved with this.  If

4   you have any questions -- oh, there he is right

5   there.  If you have any questions, I'm sure he would

6   be available and he will answer them, otherwise any

7   questions of the attorneys or a vote on the

8   recommended settlement.

9      CHAIRMAN KORNELL:  Council Member Gerdes.

10      COUNCIL MEMBER GERDES:  Thank you, Mr. Chair.

11      So, Claude, I'm going to ask you the same thing

12   that I asked you in my office, that we're face to

13   face and looking at one another, is there anything

14   in the amended consent order that, absent extra

15   ordinary circumstances, you cannot do?

16      MR. TANKERSLEY:  No, sir.

17      COUNCIL MEMBER GERDES:  Okay.  And I didn't ask

18   you this when we got together, but it occurred to

19   me, I'm presuming that you-all have milestoned out

20   the deadlines in the consent order, you've got

21   critical paths identified, and you know that this

22   event has to happen in order for this event to

23   happen.

24      MR. TANKERSLEY:  Right.

25      COUNCIL MEMBER GERDES:  Where I'm going with

1      that is I -- I -- I'd prefer -- I'm not going to be

2      here for all five years of this, but I'd prefer in

3      the instance that something does happen or something

4      unexpected occurs and we know ahead of time that

5      there is going to be some consequence to the

6      deadline because of an event that happens before the

7      deadline, I'd like to be out in front of it through

8      a notice of some sort or, you know, instead of

9      waiting to see if they catch it, that kind of thing,

10      I'd rather be proactive about that, that's my

11      suggestion along the way.

12          I'm only going to be here for another year and

13      half of it, but, you know, Murphy, I mean he loves

14      to show up, and I would just prefer that when he

15      does, when he pops his head up and we whack and mow

16      him down, that we also say, hey, we had this event,

17      we're trying to -- we're trying to ameliorate it,

18      we're trying to work around it, but it may be that

19      this deadline has to move and -- instead of waiting

20      for something.

21          MR. TANKERSLEY:  Yes, sir, I concur.

22          COUNCIL MEMBER GERDES:  Okay.  I move approval.

23          UNIDENTIFIED SPEAKER:  Second.

24          CHAIRMAN KORNELL:  Further -- oh, further

25      questions?

1          Council Member Montanari.

2          COUNCIL MEMBER MONTANARI:  Thank you, Mr. Vice

3    Chair.

4          So can -- can you go over, once again for me,

5    the stipulated order.  If there's a question on

6    compliance of that, can you walk through that

7    process again.

8          MR. MANSON:  So first, the notice issue, first

9    of all, everything that we're sending DEP about our

10   compliance with this consent order, every month we

11   have to put together a report with those time

12   frames.  That will also be sent to the plaintiffs in

13   this case.

14         In addition to that, they will probably be

15   using, I'm pretty certain, having the discussion,

16   the Public Records Act, to put a continuing request

17   in for any information and notices that are sent

18   out, so they will be receiving those.

19         The way this would work in a compliance issue

20   is if anything comes up where the plaintiffs believe

21   that there's been some type of violation of the

22   consent order, then they will provide a written

23   notice to us.  And then once we receive that written

24   notice, we have a certain amount of time under the

25   stipulated order, under the dispute resolution

1          provision, to sit down with them and talk about it.

2          I call that the -- I don't mean to be dismissive --

3          but I just call it the meet-and-greet portion of a

4          dispute resolution.

5               You sit down, you have meetings, you try to

6          resolve it.  You get the written notice in so you

7          know what the problem is because they're required to

8          tell you, and then you sit down and talk about it

9          and talk about how you hopefully resolve it in most

10         cases.

11              If you can't resolve it during those meetings,

12         then the next step is the two parties have to submit

13         five names for mediators to one another.  I mean,

14         you can submit one, if they agree, you're fine, but

15         you have to submit five before you can then say we

16         couldn't find a mediator that was acceptable to both

17         sides and then go to the court with it.

18              If you find an acceptable mediator, which I

19         would imagine would be the case, then you'll go to a

20         mediation which has to be held within 30 days.

21         Basically a 60-day process.  At the end of 60 days,

22         if it hasn't been resolved, then you are going to

23         end up being able to take it to the court, and at

24         that time you'll have a resolution from them.

25              I would also say that if it was a violation of

1  the consent order, we would also, obviously, be

2  putting DEP on notice and bringing DEP into those

3  discussions if there's a problem.

4      COUNCIL MEMBER MONTANARI:  Okay.  Thank you.

5      You also mentioned that the EPA, DOJ, and FDEP

6  need to sign off on this.  The -- can you -- when do

7  you -- I take it you expect that to happen, and how

8  long of a process does that take?

9      MR. MANSON:  From the date we send it to them

10 they have 45 days to get us comments back.  And

11 typically the focus of their review is they just

12 want to make sure the environment that's being

13 protected and the people don't use these lawsuits to

14 enrich themselves, meaning the plaintiffs or

15 plaintiffs' counsel.  So typically the review is

16 pretty standard, and they give us comments back, and

17 then we address those before the judge.

18     COUNCIL MEMBER MONTANARI:  Okay.  Thank you.

19     Thank you, Mr. --

20     CHAIRMAN KORNELL:  Council Member Rice.

21     COUNCIL MEMBER RICE:  Thank you.

22     So this amended consent order would go to DOJ

23 and EPA before the DEP?  It seems like DOJ and EPA

24 would maybe be curious to see what DEP has to say

25 first.  I'm just curious about that order of

1    operations.

2         MR. MANSON:  Right.  I missed the beginning of

3    the question.  We are going to be sending the -- the

4    stipulated order will be attached -- I mean, the

5    amended consent order will be attached to the

6    stipulated order.  Both of those are sent to the EPA

7    and the DOJ, and they are used to reviewing these

8    kinds of materials from other proceedings.  So it

9    won't be odd.  So a specific office within DOJ, and

10   then the EPA has got some people assigned to it as

11   well.

12        COUNCIL MEMBER RICE:  Okay.

13        MR. TANKERSLEY:  Council Member Rice, if I may.

14        COUNCIL MEMBER RICE:  Sure.

15        MR. TANKERSLEY:  So we have reviewed these with

16   DEP.

17        COUNCIL MEMBER RICE:  Okay.

18        MR. TANKERSLEY:  And so DEP has seen the

19   proposed amended consent order.  We sat down with

20   them Friday and went over it with them.

21        COUNCIL MEMBER RICE:  Oh, okay, that's helpful.

22        MR. MANSON:  Sorry if I missed that.

23        COUNCIL MEMBER RICE:  So there's no surprises

24   there.

25        UNIDENTIFIED SPEAKER:  No surprises.

1          UNIDENTIFIED SPEAKER:  No.

2          UNIDENTIFIED SPEAKER:  We did give it to DEP,

3    and they're in the process of evaluating them.

4          COUNCIL MEMBER RICE:  Okay.  It's a little hard

5    to track all of the changes since this document

6    isn't a -- there aren't track changes to see what

7    exactly the changes were from the original.  It

8    seems like one of the things that stands out, in

9    particular, was the increase of $14 million a year

10   for INI over the next fives years, that was bumped

11   up to 16 million a year.

12         UNIDENTIFIED SPEAKER:  Correct.

13         COUNCIL MEMBER RICE:  So that's -- so that's --

14   I mean, is that -- so we complete it in a quicker

15   amount of time, or we're just spending another $10

16   million on infrastructure?

17         MR. TANKERSLEY:  So we actually -- this fiscal

18   year we budgeted 18 and a half.  He said 14, we

19   budgeted 18 and a half, and we have been -- and for

20   next year -- we also propose in our budget for next

21   18 and a half, and we carried that out through the

22   remaining years of the consent order.

23         So, therefore, we will be meeting it.  It's

24   already been budgeted.  It's not any additional

25   funds we have to find.

1       I think -- I think it's just a recognition on

2   all parties' side that while the consent order

3   required 14, we've been committed to doing more than

4   14, so let's just go ahead and say we're going to be

5   required to do at least 16, and we'll still meet

6   that and exceed it.

7       COUNCIL MEMBER RICE:  On page 10, section O,

8   refresh my memory, I mean, a lot of this seems to

9   pertain to stormwater runoff.

10      MR. TANKERSLEY:  Yes.

11      COUNCIL MEMBER RICE:  Not sanitary sewer

12  overflow.

13      MR. TANKERSLEY:  Yes.  Very -- very astute, I'm

14  glad you picked up on that because that is where

15  some of this may be -- originate --

16      COUNCIL MEMBER RICE:  If I can interrupt, I

17  mean, not that we should be addressing water quality

18  and stormwater issues, but I just find it odd that

19  that was part of this particular lawsuit.

20      MR. TANKERSLEY:  And --

21      MR. MANSON:  Well, the integrated master plan

22  incorporates as the integrated word potable water,

23  stormwater, and sewer.  And, as you know, many of

24  the difficulties with all sewer systems, including

25  yours, is inflow and infiltration.  Well, if you

1    don't address stormwater, and this was -- if you

2    can't address the inflow and infiltration, so it is

3    a combined issue.  So that was emphasized and added

4    in, but it was part of the integrated master plan

5    originally.

6         COUNCIL MEMBER RICE:  Okay.

7         MR. TANKERSLEY:  And also, Council Member, if

8    you look at the very last line of that item, it says

9    that if we determine that there are -- that

10   (unintelligible) exceed the parameters for microbial

11   presence, then we must follow up with a microbial

12   source tracking --

13        COUNCIL MEMBER RICE:  Uh-huh.

14        MR. TANKERSLEY:  -- that will help us determine

15   whether this is coming from stormwater or

16   wastewater, leaky pipes, or just recreational users.

17   It will help us tie down where these, perhaps, hits

18   are coming from.

19        COUNCIL MEMBER RICE:  Okay.  And then I guess

20   my last comment is -- well, thank you, great work.

21        It was a little distressing that as we went

22   through this process to hear that part of -- part of

23   the sticking point was that one of the group -- one

24   member of the group suing us seemed to be more

25   interested in recouping money for their own

1      organization, putting it in their own pockets

2      instead of really trying to work with us to improve

3      our system, so thank you for your negotiation

4      efforts which made their legal fees more reasonable.

5          But, on the other hand, because of their

6      efforts they did get us to move a little bit forward

7      on strengthening this consent order.  So absent a

8      lawsuit, is there anything else in this consent

9      order that we can look at and figure out can the

10     City of St. Petersburg do better?  What can we do

11     better on our own without a lawsuit nagging us to do

12     it?

13          MR. TANKERSLEY:  That's a really good question.

14          COUNCIL MEMBER RICE:  Or -- or do you feel like

15     this is really solid, what we have here?

16          MR. TANKERSLEY:  I think this is really solid,

17     but I can tell you that I am committed, and John is

18     committed, and most of our staff is committed to do

19     better just because we believe that's the right

20     thing to do.

21          And so I do believe that you have the right

22     leadership and the right staff now that we're going

23     to do a good job regardless of whether we have the

24     consent order or not.

25          COUNCIL MEMBER RICE:  Okay.  One more question.

1    The new 2020 date for an ordinance on private

2    laterals, we shortened that by two years.  Is that

3    something you think that we can meet?

4         MR. TANKERSLEY:  I think that we can meet, but

5    it will be challenging, but I do think we can meet

6    it, yes.

7         COUNCIL MEMBER RICE:  Okay.  What -- why

8    challenging?

9         MR. TANKERSLEY:  I think it's going to be --

10   from a political standpoint I think it will be

11   challenging just because there's going to be so many

12   people who are going to have different opinions on

13   how we provide relief for those who can't afford it,

14   how we do that fairly, whether it's required at a

15   point of sale or whether it's voluntary, those kind

16   of things.  I think those are going to be the issues

17   that are going to be a little bit challenging and is

18   going to take a lot of discussion with the community

19   to work out.

20        But counsel has proved, and I'm also proving to

21   you, I hope, that we're not afraid of that

22   discussion, and so there -- it's going to be

23   challenging, but we'll get it done.

24        COUNCIL MEMBER RICE:  Okay.  I guess my concern

25   is we have two years less to have that public --

1       MR. TANKERSLEY:  Yes.

2       COUNCIL MEMBER RICE:  -- engagement.

3       MR. TANKERSLEY:  Yes, yes.  So I do believe we

4  can get it done in that two-year paired, yes, ma'am.

5       COUNCIL MEMBER RICE:  All right.  Thank you.

6       CHAIRMAN KORNELL:  Thank you.

7       Council Member Gerdes.

8       COUNCIL MEMBER GERDES:  Thank you, Mr. Chair.

9       Isn't the master plan and some of the

10  additional measuring and results tracking

11  requirements that have been added, isn't that going

12  to help us identify how we get better on our own?

13       MR. TANKERSLEY:  Yes, sir.

14       COUNCIL MEMBER GERDES:  You know, a lot of this

15  is going to be learn as you go when we're tracking

16  the flow meter data and we're tracking the water

17  quality data and when we're tracking the FOG content

18  and all of that, that data tracking, database

19  building and all of that is going to give us the

20  information we need to improve and tweak and --

21  isn't that right?

22       MR. TANKERSLEY:  Yes, sir.  That is correct.

23       COUNCIL MEMBER GERDES:  I mean, I guess I

24  thought that was -- to me the whole impetus of

25  this -- the amendment is informational.  That was --

1  to me what struck out was it's really an

2  informational gathering requirement.  You know, CCTV

3  pipes every two years, do this every five years,

4  check this, record that, do -- and I took that to

5  be -- the purpose of all that is we're going to use

6  that to --

7      MR. TANKERSLEY:  Yes, sir.  Yes, sir.

8      COUNCIL MEMBER GERDES:  Okay.

9      MR. TANKERSLEY:  And so it's one thing for me

10  to stand here and say that John and I both are

11  committed to doing better.  But we actually have

12  three mechanisms that -- aside from the consent

13  order three mechanisms that we have to get us there.

14      The first one is the integrated master plan.

15  That -- that is a tool that will get us there.

16      The second one is we're going through am

17  accreditation program.

18      COUNCIL MEMBER GERDES:  Right.

19      MR. TANKERSLEY:  That's the second tool.

20      The third one was the management study that

21  counsel performed last year, and we're taking it

22  seriously and we're working on achieving each of

23  those things.  So those three tools will get us

24  there.

25      And then -- so my opinion is, is that this

1       consent basically codifies that we're going to use

2       those tools, and I have no problem with that.

3            COUNCIL MEMBER GERDES:   Okay.   Okay.   Thank

4       you.

5            CHAIRMAN KORNELL:   Council Member Montanari.

6            COUNCIL MEMBER MONTANARI:   Thank you.

7            Section 6-M, and I may have asked this question

8       before, but it says, "No later than June 30th of

9       2020 responder shall pass an ordinance regarding

10      replacement of private laterals," and it goes on

11      from there.

12           How does -- can -- I'd like to hear from legal,

13      how do -- how does that work?   I mean, so City --

14      how does City Council force to vote to do something?

15           UNIDENTIFIED SPEAKER:   Well, what's required in

16      the consent order is that you pass a ordinance.   It

17      doesn't dictate what the content of the ordinance

18      has to be.   So you -- this is requiring, from a

19      regulatory standpoint, that you pass something, but

20      it's up to you to decide the content of it and how

21      you chose to address it.   The details of it aren't

22      dictated by the consent order.

23           COUNCIL MEMBER MONTANARI:   Okay.   All right.

24      And then -- thank you for that.

25           And then, Claude, in that section it says, "By

1    October 15th of this year, the City will start

2    giving notice to property owners found with

3    defective private laterals in need of repair,

4    replacement, and tracking those properties in its

5    information system."

6        How are we doing with that provision?

7        MR. TANKERSLEY:  So we are already collecting

8    data through our CCTV and smoke testing, and when we

9    find that there is a problem on somebody's private

10   property -- we -- we've already been notifying them.

11       COUNCIL MEMBER MONTANARI:  Okay.

12       MR. TANKERSLEY:  And so this -- this just

13   codifies that we're going to formalize that.

14       And, John, correct me if I'm wrong or come up

15   and join me if you need to, but -- so, for instance,

16   it says that we'll notify them, and we are already

17   doing that.

18       But then it also talks about that we have to

19   track this property in our information system.

20   That's the part that we still need to do a better

21   job of.  And so I definitely think we'll be able to

22   have that in place by October 15th of this year.

23       COUNCIL MEMBER MONTANARI:  Okay.  All right.

24   Thank you.

25       CHAIRMAN KORNELL:  Okay.  I have a few

1      questions.

2           First of all, I'd like to say thank you to

3      Claude and his staff for being so approachable and

4      so open to the public.  I think that's going to

5      serve us well especially as we dig into the thorny

6      issues like the private laterals.  Thank you for

7      that.

8           I have a question.  I think this is more legal,

9      and so Doug and Joe probably for this question.

10          Is there anything in this consent order that

11     would stop us, if we do it by that date in 2020 but

12     we don't do it across the whole city, we phase it

13     in, which I think Claude and I have talked about a

14     lot, is very wise to do because problems will come

15     up and you get them on a small scale and can fix

16     them as you move to the next area of the city -- is

17     there anything that would stop that from being done

18     in that manner?

19          UNIDENTIFIED SPEAKER:  I didn't see anything.

20          UNIDENTIFIED SPEAKER:  Yeah, I agree.  I

21     don't -- I don't -- the language is very broad.  I

22     think -- and I think the intent of the DEP, when

23     this in there originally, was recognizing that this

24     item would require a lot of discussion, there are a

25     lot of factors to weigh, and that that was something

1      that was within counsel's prerogative to decide.

2          So I don't see -- to your specific point I

3      don't see any language in here that would

4      specifically prohibit what you just mentioned.

5          CHAIRMAN KORNELL:  Okay.

6          UNIDENTIFIED SPEAKER:  Other than saying an

7      ordinance has to be passed by that date, the details

8      of it are open-ended.

9          CHAIRMAN KORNELL:  I just want to say again

10     thank you to Claude, and I think it's infinite

11     wisdom on his part to do it that way rather than

12     just roll it out city-wide and just find out -- you

13     know, maybe you'll find out a hundred people have a

14     problem with a certain aspect of it, or there's

15     something that we're doing wrong.

16         If we do it region by region, we may find that

17     out with two problems instead of a hundred, and I

18     think that's -- and then learn as we go and -- and I

19     think that's a really effective and smart way to

20     implement the program, and I appreciate that

21     commitment.  So I'm glad to hear what you just said

22     about that.

23         On the hydraulic model -- and I think this

24     might be a Claude and a Doug question, do you

25     feel -- so maybe start with Doug, do you feel that

1    we -- my understanding with hydraulic models is they

2    don't start a hundred percent perfect, and in the

3    documents we had, that was one of the questions I

4    asked several different engineers is this seems like

5    a broad range to me, do you feel like we're getting

6    a good model, and they said, oh, Steve, that's the

7    way hydraulic models always start, they're never

8    perfect.  You do it, you collect data, you compare

9    real life data to the model and you perfect the

10   model as you go.

11       One, do you agree with that, Doug, as an

12   expert; and, two, do you feel like what's in the

13   consent decree helps, you know, move us down that

14   path?

15       MR. MANSON:  So as an expert modeler once said

16   on the stand to me, there is no unique solution in

17   modeling.  In other words, there can be multiple

18   right answers under a model.  But in reality we know

19   one answer is righter than the other, so.

20       What we see as we get the experience from what

21   Claude is doing with the testing and the actual

22   thing, and then it's an (unintelligible) process.  I

23   think they actually have a better word for it than

24   that, but the model is enhanced by the experiences

25   that we have and by the data we're taking, and the

 1    model will get better and better over time.

 2         And it's a tool.  It doesn't predict what

 3    exactly is going to happen, but in the hands of

 4    Claude and his staff, they get a better

 5    understanding how the system works, and the data

 6    inputting back and the model help them predict what

 7    to do to make sure they don't have any kind of

 8    problems.

 9         And I think the information, and I'm saying

10    with an integrated master plan that you put out on

11    the street, much of this was already being

12    generated, and your staff's been doing a great job

13    getting those flow meters out there and getting

14    them.

15         So we have been gathering information, learning

16    more and more about the system.  Could there be a

17    hiccup?  Absolutely there could be.  It's a

18    wastewater system, and there's people working there.

19    But are they getting better with every year that

20    they're doing this?  Definitely.

21         I think the consent order will take you -- this

22    amended consent order adds specifics and time frames

23    that weren't there before your staff was still doing

24    the specifics, but now there is a tangible written

25    requirement that that go forward for the next nine

1    years assuming DEP approves the consent order and

2    the court approves the settlement.

3         CHAIRMAN KORNELL:  Great.  Thank you.

4         And, Claude, do you agree that --

5         MR. TANKERSLEY:  Yes, yes, I do.  Actually I

6    did a lot of hydraulic modeling when I was in the

7    private sector so I'm familiar with the whole

8    process.

9         The model only gets better as you compare what

10   the model is going to tell you versus what you

11   actually see in the field.  And as you see in the

12   field something that is different than what the

13   model tells you, then go back in and you figure out

14   why is the model telling you something different.

15   Usually you will find, oh, I should have used this

16   parameter instead of that one or I made a mistake on

17   this pipe or whatever, and so it helps you get the

18   model closer and closer to the real world.

19        CHAIRMAN KORNELL:  Okay.  And I like hearing

20   that we have a process in place and Staff is moving

21   down the path of that continuous improvement of that

22   model.

23        Finally, I'd just like to say I'm happy that

24   we're -- that we have a potential settlement.  I

25   think it's a -- I'm very fine with having a layer of

1    federal oversight, as well as state oversight.  I

2    think doing it -- so then I think the logical

3    question for a member of the public would be then

4    why did you go forward against the lawsuit, but I

5    think you hit it.  Mr. Manson, you hit it right on

6    the -- the nail right on the head.

7         At the time the lawsuit was filed, it was an

8    open-ended question.  We did not have our consent

9    decree with DEP.  We did not have a lot of specifics

10   to say here's what we think is the right thing to

11   do, so under those circumstances I felt it was right

12   to move forward with your services, and under these

13   circumstances I'm very happy -- I -- I welcome a

14   layer of federal oversight of this issue.  I don't

15   have a problem with that.

16        I also want to point out a big thank you, you

17   know, to yourself and our legal team, but also to

18   council and the mayor.  I think the public should

19   know that you have a set of elected officials that

20   are dedicated to solving this problem and spending

21   money.

22        And, you know, one of the examples was -- as

23   Claude just pointed out, we were required to do

24   14 -- we were recommended to do 14 and a half

25   million, and we chose to do $18 and a half million

1      of pipe relining.  That's probably not the typical

2      City's reaction when they're facing environmental

3      fines and so forth like that, and I think that says

4      a lot about this commitment.

5          I think it's important that people know that.

6      I think it's important that we look to do as much as

7      we can for the future.  Because ten years from now

8      the public may feel very differently about this

9      issue as they're having to pay for it, which is

10     unfortunate that they do, but they do.  And the

11     reality is that maybe in the past that other

12     administrations didn't do as much as they could

13     have, so I think that's very important to set up as

14     much as we can set up.

15         And so I think having the layer of federal

16     oversight is a good thing.  I don't see that as

17     anything that is going to scare us.  We were already

18     committed to doing most of the things in there

19     anyways.

20         And finally, I'll just say a thank you also to

21     Suncoast Waterkeepers.  I think they did a good job

22     on caring about this issue.  I know it was sometimes

23     naturally going to be a little bit of conflict

24     between, you know, in the midst of a lawsuit, but

25     I'll just say I think it's good that we have groups

1    out there that care about these kinds of issues and

2    I'll leave it at that.

3         And with that I'll entertain a motion.  I think

4    we have a motion and a second.  Council Member Rice

5    was the second.  Council Member Gerdes made the

6    motion.

7         No, I'm not allowed to as the Chair.

8         UNIDENTIFIED SPEAKER:  Second.

9         CHAIRMAN KORNELL:  So we have a motion and a

10   second.  And seeing no other lights I'll ask the

11   clerk to open the machine for voting.

12        UNIDENTIFIED SPEAKER:  Share the motion to

13   approve agenda item F-1 passes unanimously with

14   Council Members Foster and Gabbard being absent.

15        CHAIRMAN KORNELL:  Very good.  Thank you very

16   much.

17        Thank you for your service to our City.

18        And, Claude, thank you, and, legal, thank you.

19

20              *    *    *    *    *

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3   STATE OF FLORIDA

4   COUNTY OF SARASOTA

5

6           I, LISA G. MOORE, Notary Public of the State of
    Florida, County of Sarasota, Twelfth Judicial Circuit
7   Court-Approved, do hereby certify that the above-captioned
    proceeding took place at the time and place herein set out.

8

            I further certify that the proceedings was
9   recorded stenographically by me from the provided audio
    file, and that this transcript (pages 1 through 39) is a
10  true record of the recorded proceedings to the best of my
    ability.

11

            I further certify that I am not of counsel to any
12  of the parties, nor an employee of counsel, nor related to
    any of the parties, nor in any way interested in the outcome
13  of the action.

14

15          DATED this 5th day of March, 2019.

16

17

18          _____

19

            LISA G. MOORE, FPR
20          Notary Public, State of Florida at Large

21

22

23

24

25

Exhibit 7

to the

Declaration of Justin Bloom

In Support of

Plaintiffs' Motion for Attorneys'
Fees and Costs

Suncoast Waterkeeper et al. v. City of St.
Petersburg Case No. 8:16-cv-03319-JDW-AEP

CITY OF ST. PETERSBURG

COUNCIL MEETING

JANUARY 17, 2019

(Excerpt of Meeting)

---

E-1(c) - Authorizing the Mayor or his designee to execute an Agreement between the City of St. Petersburg, Florida and the University of South Florida Board of Trustees to conduct a study investigating bacteriological sources and impacts to eight identified locations as required in Amended Consent Order 16-1280 at a total cost not to exceed $37,559.00.

TRANSCRIBED FROM MP4 AUDIO FILE BY:
Lisa G. Moore, Court Reporter, FPR
12th Judicial Circuit Court Approved
Notary Public, State of Florida at Large

```
 1                      CITY OF ST. PETERSBURG
                          COUNCIL MEETING
 2                        January 17, 2019
                        (Excerpt of Meeting)
 3

 4

 5   PLACE TAKEN:      Municipal Building
                       175 5th Street North
 6                     Second Floor Council Chamber
                       St. Petersburg, Florida
 7

 8   APPEARANCES:      Charlie Gerdes, Chairman
                       Brandi Gabbard, Council Member
 9                     Gina Driscoll, Council Member
                       Steve Kornell, Chairman
10                     Lisa Wheeler-Bowman, Council Member
                       Ed Montanari, Council Member
11                     Darden Rice, Council Member

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                  CITY OF ST. PETERSBURG
                       COUNCIL MEETING
 2                     JANUARY 17 2019
                     (Excerpt of Meeting)
 3

 4            *      *      *      *      *

 5

 6          CHAIRMAN GERDES:  Mr. Tankersley, E-1(c),

 7      please.

 8          MR. TANKERSLEY:  Thank you, Mr. Chair.

 9          This is a resolution authorizing the Mayor or

10      his designee to execute an Agreement between the

11      City of St. Petersburg and the University of South

12      Florida Board of Trustees to conduct a study

13      investigating bacteriological sources and impacts to

14      eight identified locations as required in the

15      Amended Consent Order No. 16-1280 at a total cost

16      not to exceed $37,559.00.

17          We will be asking for approval for this, but

18      prior to that I wanted to have John Palenchar come

19      up and perhaps give you a little bit of information

20      about what this is.  We believe this is a good news

21      item.  Thank you.

22          UNIDENTIFIED SPEAKER:  Good afternoon,

23      Mr. Palenchar.

24          MR. PALENCHAR:  Hello, Council.  Thank you.  I

25      appreciate the opportunity to come to you and really
```

Page 4

1    speak to this project that we are working on with

2    the University of South Florida.  I am proud to be

3    bring this item to you.

4         This is the second opportunity that we've had

5    to partner with the University of South Florida to

6    identify the sources of bacterial impacts in our

7    water bodies in and around the city of

8    St. Petersburg.

9         This is, as I said, the second time that we've

10   partnered with them.  The first time was a pilot

11   study where -- investigated Salt Creek and Bartlett

12   Park.  That process is continuing.

13        We've developed a framework.  Within that

14   framework we are now applying it in this second

15   series of the agreement with University of South

16   Florida, and we anticipate that this agreement will

17   have annual renewal so that we can continue to

18   investigate the bacterial sources of impacts on the

19   water bodies.

20        CHAIRMAN GERDES:  Entertain a motion -- oh,

21   Council Member Kornell.

22        COUNCIL MEMBER KORNELL:  So this is an

23   impressive partnership, exactly the right kind of

24   moves that we should make as far as working with our

25   marine science community.

1          My question is, and correct me if I'm wrong,

2     but I don't believe -- because, you know, I read it

3     about a week ago, Frenchman's Creek is not on here,

4     and my request is could we consider finding a way to

5     add Frenchman's Creek because what's happening

6     there, you know, we're getting ready to do that

7     project finally with FDOT, everything is falling in

8     place, so we're going to remove invasives and --

9          When we were out there recently, what we

10    noticed was there's about six boats that are clearly

11    using it as a mooring field.  Although what's clear

12    to us is not clear -- under state law it doesn't

13    meet the definition for -- you know, it's very

14    difficult to remove boats.

15         And I know Frenchman's Creek is an impaired

16    water body, and if we go out there and find there's

17    some human sources of that, it's not a very far

18    stretch to think with the number of boats out there

19    that they're just dumping their waste right there,

20    and so I just wanted to put that on the radar.

21         MR. PALENCHAR:  And so I -- and it's fortuitous

22    that you say that, and I don't want to put words

23    into Carlos Frey's mouth, our stormwater manager,

24    but he did reach out just yesterday, or the day

25    before, to Jody Harwood with USF, who is the program

1    manager, the PM, for this project, and we're working

2    out those details right now to include Frenchman's

3    Creek study.

4        So yes, we're on the track, and we're moving

5    forward to investigate the eight and any others that

6    come up that require the identification of the

7    bacteriological source of the impairment as well as

8    the geographic source of the impairment.

9        Our goal is to find out what's causing it to be

10    impaired, identify the cause, and work on a

11    solution.

12        COUNCIL MEMBER KORNELL:  So the only thing left

13    for me to say is thank you.

14        UNIDENTIFIED SPEAKER:  Thank you.

15        COUNCIL MEMBER KORNELL:  So thank you very

16    much, I appreciate that.

17        Thank you, Mr. Chair.

18        CHAIRMAN GERDES:  Sure.

19        Still waiting to hear a motion and a second.

20        UNIDENTIFIED SPEAKER:  Move approval.

21        UNIDENTIFIED SPEAKER:  Second.

22        CHAIRMAN GERDES:  Thank you very much.

23        Mr. Clerk, we have a motion and a second on

24    E-1(c).  You can open the machine for voting.

25        Council Members, if you'd enter your votes.

1          Seeing that all council members have voted,

2     Mr. Clerk, if you would please tally and announce

3     the vote.

4          THE CLERK:  Mr. Chair, the motion to approve

5     agenda item E-1(c) passes unanimously.

6          CHAIRMAN GERDES:  Thank you, Mr. Clerk.

7          Thank you, Mr. Tankersley.

8          MR. TANKERSLEY:  Thank you.

9          CHAIRMAN GERDES:  I believe that winds up your

10    business; is that right?

11          (Excerpt concluded.)

12

13                    *    *    *    *    *

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1                    REPORTER'S CERTIFICATE

2

3   STATE OF FLORIDA

4   COUNTY OF SARASOTA

5

6           I, LISA G. MOORE, Notary Public of the State of
    Florida, County of Sarasota, Twelfth Judicial Circuit
7   Court-Approved, do hereby certify that the above-captioned
    proceeding took place at the time and place herein set out.
8
            I further certify that the proceedings was
9   recorded stenographically by me from the provided audio
    file, and that this transcript (pages 1 through 7) is a true
10  record of the recorded proceedings to the best of my
    ability.
11
            I further certify that I am not of counsel to any
12  of the parties, nor an employee of counsel, nor related to
    any of the parties, nor in any way interested in the outcome
13  of the action.

14

15          DATED this 7th day of March, 2019.

16

17

18          _____

19

20          LISA G. MOORE, FPR
            Notary Public, State of Florida at Large

21

22

23

24

25