UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SUNCOAST WATERKEEPER, *et al.*,

    Plaintiffs,

v.                                             Case No. 8:16-cv-3319-T-27AEP

CITY OF ST. PETERSBURG,

    Defendant.
_____/

**<u>ORDER</u>**

Plaintiffs initiated this action under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.* ("Clean Water Act" or "CWA"), seeking declaratory and injunctive relief and civil penalties against Defendant City of St. Petersburg (the "City"). Following settlement, Plaintiffs move for an award of attorneys' fees and costs under Section 505(d) of the Clean Water Act (Doc. 211), which the City opposes (Doc. 214-19). For the following reasons, Plaintiffs' Motion for Attorneys' Fees and Costs under Section 505(d) of the Clean Water Act (Doc. 211) is granted in part and denied in part.[1]

**I.    Background**

Plaintiffs brought this action under the CWA to address the City's sanitary sewer overflows ("SSOs"), which involve the discharge of raw or inadequately treated sewage (Doc. 4, Amended Complaint); Doc. 211-2, Declaration of Christopher Sproul ("Sproul Decl."), at ¶¶17-19). According to Plaintiffs, since approximately 2011, the SSOs illegally discharged raw or partially treated sewage into Tampa Bay, the Gulf of Mexico, and other water bodies,

---

[1] The parties consented to the undersigned's jurisdiction to determine the issues of attorney's fees and costs (Docs. 182 & 187).

streams, or tributaries located in or adjoining the City (Amended Complaint, at ¶¶14-19). In June 2016, the City notified the Florida Department of Environmental Protection (the "FDEP") of one such bypass beginning on or around June 7, 2016 (Doc. 54, Ex. A). Two days later, the FDEP issued a warning letter to the City regarding an observed pattern of rainfall events and discharge/bypasses and requesting a meeting with the City within seven days to evaluate compliance with the City's permits and to discuss measures which the City had, or needed to have, in place to eliminate the discharges/bypasses that occurred (Doc. 54, Ex. A). Later that month, staff of the FDEP met with representatives of the City to discuss the discharge/bypass issues and the actions taken by the City to address such issues (Doc. 54, Ex. B).

On August 1, 2016, the City's Public Works Administrator Claude Tankersley ("Tankersley") sent a letter to the FDEP describing the Wastewater Overflow Mitigation Program (the "Program") detailing the City's plan to mitigate the discharge/bypass issues (Doc. 54, Ex. C). In that letter, Tankersley stated:

> At the same meeting, the [City Council's Budget, Finance and Taxation Committee] gave us their initial approval of our Wastewater Overflow Mitigation Program. That program, which includes improvements at the water reclamation facilities as well as a significant increase in our sewer rehabilitation efforts, is summarized in the attached table.
>
> Final approval will be given in September when the full Council adopts the proposed rate increases and the proposed budget (operating and capital). Several of the elements of the program have already been funded and are in progress. The other elements will be funded when the FY17 budget is approved. In anticipation of that approval, we have already initiated many of the projects' preliminary activities, such as selecting a consultant. Thus, when funding is available this October, we will be able to immediately start the projects.
>
> Once we have received final approval of the budget, I will send you an updated table with the current status of each of the elements of the program. Going forward, I propose to send you a quarterly updated of our progress.
>
> I want to again reaffirm to you that the City Administration, City Council, City staff and myself take the recent overflow events seriously, and as a team, we are committed to addressing this issue.

2

(Doc. 54, Ex. C). Then, on August 25, 2016, an environmental consultant with the FDEP sent a request for a peer review to the Wastewater Peer Review Committee regarding the four facilities' and the reuse system's noncompliance, the underlying facts, the statutes violated, and the proposed issuance of a consent order and enforcement (Doc. 54, Ex. D). After consideration, the FDEP's Water Compliance Assurance Program Division of Water Resource Management ("DWRM") sent an e-mail concurring with the recommendations of the FDEP staff regarding proceeding with a consent order including penalties and corrective action (Doc. 54, Ex. D). In doing so, the DWRM indicated that the recommended penalty was consistent with the Environmental Litigation Reform Act, Chapter 403.121, Florida Statutes; the FDEP Directive 923, February 14, 2013; and the program-specific settlement guidelines (Doc. 54, Ex. D). Importantly, on September 16, 2016, the FDEP provided the City with the proposed Consent Order OGC File No. 16-1280 (the "Proposed Consent Order"), which addressed the issues associated with wastewater discharges from the collection systems and water reclamation facilities owned and operated by the City (Doc. 54, Ex. E). The Proposed Consent Order set out the monetary penalties, corrective actions to be taken by the City, the timeframes for initiating the corrective actions, and the funding associated with the corrective actions (Doc. 54, Ex. E).

Twelve days later, on September 28, 2016, following sewage spills occurring from June through September 2016, Plaintiffs issued a 60-day statutory Notice of Intent to Sue to the City (Doc. 1-1; Sproul Decl., at ¶¶17-18). Notably, at the time Plaintiffs issued their Notice of Intent to Sue to the City, Plaintiffs admit that they knew of the Proposed Consent Order exchanged between the City and the FDEP (Sproul Decl., at ¶19). Though aware of the Proposed Consent Order, Plaintiffs proceeded with their Notice of Intent to Sue because they believed an FDEP consent order would not adequately address the City's sewage spill problems, as the draft

consent order did not contain firm requirements or deadlines regarding repair of the pipes in the collection system, Plaintiffs were excluded from meaningful participation in the consent-order process before issuance, and the state's consent orders did not otherwise appear effective in addressing other cities with issues relating to sewage spills (Sproul Decl., at ¶19; Doc. 211-6, Declaration of Justin Bloom ("Bloom Decl."), at ¶6).

On December 1, 2016, the FDEP issued an updated version of the Proposed Consent Order, including several remedial measures, the submission of a Water Resources Master Plan update, and civil penalties (Doc. 54, Ex. F). The next day, following issuance of the Notice of Intent to Sue and the updated Proposed Consent Order, Plaintiffs initiated this action on December 2, 2016, setting forth two causes of action for violations of the CWA (Doc. 1). Upon consideration of the allegations set forth in Plaintiffs' Complaint, the Court struck the Complaint as a shotgun pleading and permitted Plaintiffs leave to submit an amended complaint (Doc. 3), which Plaintiffs submitted two days later. Around the same time, Plaintiffs approached the City regarding settlement discussions and the entry of a federal consent decree (Sproul Decl., at ¶20). On December 12, 2016, the parties met to discuss a settlement but proved unsuccessful (Sproul Decl., at ¶20).

After the failed settlement discussions, the City filed a motion seeking to dismiss Plaintiffs' Amended Complaint for lack of subject matter jurisdiction, arguing that Plaintiffs failed to properly allege sufficient facts to establish standing (Doc. 7, Motion to Dismiss). Subsequently, Plaintiffs responded in opposition to the City's Motion to Dismiss (Doc. 15) and also sought leave to submit a second amended complaint (Doc. 14), which the City did not oppose. Upon consideration, the Court granted the request to submit a second amended complaint and denied as moot the City's Motion to Dismiss (Docs. 35 & 36). To that end, Plaintiffs submitted their Second Amended Complaint, alleging two ongoing and continuous

violations of the CWA, namely: (1) discharges of pollutants to waters of the United States without National Pollution Discharge Elimination System ("NPDES") Permit coverage in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a); and (2) violations of the *State of Florida Municipal Separate Storm Sewer System Permit*, NPDES Permit No. FLS000007-004, ("MS4 Permit") (Doc. 87, Second Amended Complaint ("SAC"), at ¶¶6, 65-114). To remedy these violations, Plaintiffs requested the following relief:

> a. Declare St. Petersburg to have violated and to be in violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for its discharges of SSOs to waters of the United States without a NPDES permit;
>
> b. Declare St. Petersburg to have violated and to be in violation of the Clean Water Act for discharging pollutants without complying with the substantive and procedural requirements of the MS4 permit;
>
> d.[2] Enjoin St. Petersburg from discharging SSOs to waters of the United States without a NPDES permit, in violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a);
>
> e. Enjoin St. Petersburg from violating the substantive and procedural requirements of the MS4 permit;
>
> f. Assess civil penalties against St. Petersburg up to $37,500 per day per violation for violations occurring from January 12, 2009, to November 2, 2015 and $51,570 per day per violation for violations occurring after November 2, 2015 and assessed on or after August 1, 2016. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (2016) (Adjustment of Civil Monetary Penalties for Inflation).
>
> g. Award Plaintiffs their reasonable costs of suit, including attorney, witness, and consultant fees, as provided for under [*sic*] by sections 309(d) and 505(a) of the Clean Water Act, 33 U.S.C. §§ 1319(d) and 1365(a); and
>
> h. Any such other relief as the Court deems appropriate.

(Doc. 87, at ¶115).

During the pendency of the litigation, the parties engaged in document production, depositions, expert discovery, and motion practice and attended hearings before the Court (Doc.

---

[2] In the SAC, Plaintiffs omitted a subsection "c." from their requested relief.

211-3, Declaration of Kathryn Schmidt ("Schmidt Decl."), at ¶¶24-64; Bloom Decl., at ¶¶13-15). Notably, in February 2017, the City moved for summary judgment, arguing that the Court lacked subject matter jurisdiction because 33 U.S.C. § 1319(g)(6)(A)(ii) deprived the Court of jurisdiction over CWA "citizen suits when a state, or state agency, has commenced and is diligently prosecuting administrative enforcement actions under a state law 'comparable' to" the CWA (Doc. 54, at 1). Later, in September 2017, Plaintiffs moved for partial summary judgment, setting forth arguments regarding the City's liability for the sewage spills and Plaintiffs' standing to bring this action (Doc. 101). Shortly thereafter, the City moved to stay the proceedings (Doc. 106), which Plaintiffs opposed (Doc. 110) and the Court later denied (Doc. 135). The City never responded to Plaintiffs' Motion for Partial Summary Judgment but rather filed a Motion for Partial Summary Judgment, arguing that the CWA does not provide a cause of action for wholly past discharges nor for discharges that do not discharge pollutants into Waters of the United States (Doc. 114), which Plaintiffs opposed (Doc. 118).

After consideration, in January 2018, the Court denied the City's initial Motion for Summary Judgment, concluding that Florida's enforcement procedures were not sufficiently comparable to those in the CWA, specifically with respect to the public participation provisions, and thus 33 U.S.C. § 1319(g)(6)(A)(ii) did not bar this action by Plaintiffs (Doc. 132). Following expert disclosures in May 2018, the parties engaged in settlement discussions through early July, including submission by Plaintiffs of a fourth settlement letter outlining Plaintiffs' settlement proposal and engagement in a day-long negotiation between the parties (Schmidt Decl., at ¶¶51-54; Bloom Decl., at ¶15). The parties did not settle during that time, but, on July 3, 2018, the parties agreed in principle to a settlement (Schmidt Decl., at ¶¶53-54). Upon advising the Court of the proposed settlement, pending approval of the City Council and

preparation of the settlement documents, the Court dismissed the action without prejudice and administratively closed the case for a period of 60 days (Doc. 168).[3]

On August 9, 2018, the proposed settlement terms were presented to the City Council, and the City Council thereafter approved the settlement (Schmidt Decl., at ¶¶57-58; Bloom Decl., Ex. 5). After that, Plaintiffs waited for the FDEP to issue an amended consent order, as approved by the City, which could then be attached to a stipulated order filed in this action (Schmidt Decl., at ¶59). The FDEP subsequently issued an Amendment to the Consent Order, in an altered format but substantively identical to the settlement negotiated between Plaintiffs and the City (Schmidt Decl., at ¶61). Given the altered format, the City voted again to approve the settlement, and the FDEP then officially issued the First Amendment to the Consent Order on October 12, 2018 (Schmidt Decl., at ¶61; Doc. 182, Attachments A & B). Three days later, Plaintiffs filed with the Court their Notice of Lodging of Stipulated Order of Partial Dismissal and Court's Retention of Jurisdiction, notifying the Court of the partial settlement of this action and retention of jurisdiction (Doc. 174). The matter then went to the Department of Justice for a statutorily provided review period of the settlement (Doc. 174; Schmidt Decl., at ¶61).

Subsequently, in December 2018, the parties submitted their Stipulated Order of Partial Dismissal and Court's Retention of Jurisdiction (the "Stipulated Order"), including a copy of the Consent Order and the First Amendment to Consent Order (collectively, "Amended Consent Order") (Doc. 182). After consideration, the Court adopted and entered the Stipulated Order (Doc. 187). The Stipulated Order provided that Amended Consent Order OGC No. 16-1280 settled this action; the City's compliance with the Amended Consent Order is enforceable by

---

[3] Among other things, the Court also deferred ruling on Plaintiffs' Motion for Partial Summary Judgment and the City's Motion for Partial Summary Judgment (Doc. 167). Given entry of the Stipulated Order of Partial Dismissal and Court's Retention of Jurisdiction (Doc. 187), no ruling ever issued on those motions.

this Court; the City had to pay $200,000 to the Tampa Bay Estuary Program (the "TBEP"); the City would provide courtesy copies of all reports to the FDEP until the termination date; the City would pay Plaintiffs $15,000 per year for five years to fund compliance monitoring of the City's commitments under the Stipulated Order; the undersigned would determine whether to award reasonable attorneys' fees and costs to Plaintiffs under the CWA; the dispute resolution process between the parties regarding disputes arising under the Stipulated Order; the effective and termination dates; the retention of the Court's jurisdiction to enforce the terms of the Stipulated Order through the termination date; and the dismissal with prejudice of Plaintiffs' claims under the CWA, except as to the request for attorneys' fees and costs (Docs. 182 & 187). Plaintiffs contend that, through the Stipulated Order, they achieved all of the public-interest objectives set out in the SAC, to wit: (1) Court-supervised injunctive relief mandating firm deadlines for fixes to the City's sewage infrastructure and (2) deterrent civil penalties for the City's SSOs (Doc. 211, at 2). According to Plaintiffs, the key additions under the Stipulated Order include a $200,000 payment to the TBEP, gravity sewer line and manhole inspections, compliance monitoring for five years, an additional lift station, and microbial source tracking, plus federal enforcement of the Stipulated Order (Docs. 182 & 187; Schmidt Decl., at ¶78; Bloom Decl., Ex. 5).

By the instant motion, Plaintiffs now seek an award of attorneys' fees for work performed by paralegals and Attorneys Christopher Sproul, Fredric Evenson, Justin Bloom, Kathryn Schmidt, Michael Goodstein, Molly Coyne, and Benjamin Pierce, as well as an award of expert witness fees and costs (Doc. 211). Specifically, Plaintiffs seek an award of attorneys' fees in the amount of $1,331,814 for the litigation of this action and expert witness fees and costs in the amount of $167,095. In response, the City essentially defers to the Court's discretion to award reasonable fees and costs (Doc. 219). In reply, Plaintiffs reiterate their

position and contend that the City fails to meet its burden regarding Plaintiffs' requested hourly rates, hours expended, or costs (Doc. 220). In addition, Plaintiffs request attorneys' fees for preparing the instant motion and reply. Namely, in addition to the attorneys' fees requested for litigating this matter, Plaintiffs request $36,545 in attorneys' fees for 118.45 hours expended preparing the instant motion and reply brief.

After the parties fully briefed the matter, the undersigned conducted a hearing. During the hearing, both parties presented oral argument in furtherance of their positions. Upon consideration of the parties' written and oral presentations, the undersigned concludes that a reduction in the amount of attorneys' fees is warranted, while a full award of expert witness fees and costs is warranted, as detailed more fully below.

**II.    Discussion**

Pursuant to 33 U.S.C. § 1365, a court may award costs of litigation, including reasonable attorney and expert witness fees, to any prevailing or substantially prevailing party, whenever the court deems such award appropriate. 33 U.S.C. § 1365(d). In this instance, Plaintiffs seek (1) an award of attorneys' fees for the litigation of this action; (2) an award of attorneys' fees for the preparation of the instant motion and reply; (3) expert witness fees; and (4) costs.

**A.    Attorneys' Fees**

"In determining the appropriate amount of fees and costs to award under 33 U.S.C. § 1365(d), the Court employs a lodestar analysis." *Sierra Club v. Cripple Creek & Victor Gold Mining Co.*, 509 F. Supp. 2d 943, 951 (D. Colo. 2006). To calculate a reasonable award of attorney's fees, therefore, courts multiply the reasonable hourly rate by the reasonable hours expended. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988). In determining this lodestar figure, a "reasonable hourly rate" consists of "the prevailing market rate in the relevant legal

community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1299 (citations omitted). In this context, "market rate" means the hourly rate charged in the local legal market by an attorney with expertise in the area of law who is willing and able to take the case, if indeed such an attorney exists. *Am. Civil Liberties Union of Ga. v. Barnes*, 168 F.3d 423, 437 (11th Cir. 1999). The fee applicant bears the burden of establishing the requested rates are in line with the prevailing market rates by producing direct evidence of rates charged in similar circumstances or opinion evidence of reasonable rates. *See Norman*, 836 F.2d at 1299. At a minimum, satisfactory evidence consists of more than the affidavit of the attorney performing the work; instead, "satisfactory evidence necessarily must speak to rates actually billed and paid in similar lawsuits." *Id.*

After determining the reasonable hourly rate, courts must then determine the number of hours reasonably expended on the litigation. In submitting a fee petition, counsel must exercise proper billing judgment and thus exclude any hours that are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434; *Norman,* 836 F.2d at 1301. Accordingly, counsel may not bill any hours to their adversary which they would not bill to their client. *Hensley*, 461 U.S. at 434. Where the time or fees claimed appear expanded or lack documentation or testimonial support, a court may make a fee award based on its own experience and knowledge. *Norman,* 836 F.2d at 1303 (citation omitted). When calculating the reasonably hourly rate and the number of compensable hours that are reasonable, courts in the Eleventh Circuit are guided by the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). *Norman*, 836 F.2d at 1299 (noting that the *Johnson* factors may still "be considered in terms of their influence on the lodestar amount"); *see Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008) (*per curiam*) ("In determining what is a 'reasonable' hourly rate and what number of compensable hours is 'reasonable,' the court is to consider the 12 factors enumerated

in *Johnson* . . . ."); *see Loranger v. Stierheim*, 10 F.3d 776, 781 n.6 (11th Cir. 1994) (*per curiam*) (stating that "[a]lthough its balancing test has since been displaced by the lodestar formula, we have expressed our approval of district courts considering the *Johnson* factors in establishing a reasonable hourly rate"); *see also Hensley*, 461 U.S. at 434 n.9 (noting that courts may consider factors identified in *Johnson* but that many of the *Johnson* factors "usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate"). These factors include: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19.

As noted above, Plaintiffs seek attorneys' fees in the amount of $1,331,814 for the litigation of this action and in the amount of $36,545 for the preparation of the instant motion and reply. In doing so, Plaintiffs seek the following rates for attorneys and paralegals, with their corresponding years of experience:

| | |
|---|---|
| Goodstein (34 years) | $490 |
| Sproul (32 years) | $490 |
| Schmidt (27 years) | $440 |
| Evenson (20 years) | $385 |
| Bloom (22 years) | $385 |
| Coyne (2 years) | $295 |
| Pierce (1 year) | $225 |
| Paralegals, attorneys performing paralegal tasks, and Coyne's work prior to Bar admission | $150 |

(Doc. 211, at 22; Schmidt Decl., at ¶67). The City does not dispute that the hourly rates sought by Plaintiffs constitute reasonably hourly rates for complex environmental litigation in the

Middle District of Florida (Doc. 219, at 6 & 17). Indeed, as Plaintiffs thoroughly detailed, these hourly rates comport with the hourly rates awarded in the Middle District of Florida for complex civil litigation and for the level of experience pertinent to each attorney (Schmidt Decl., at ¶¶67-76). Accordingly, Plaintiffs shall be awarded their requested hourly rates.

With respect to the hours expended, however, a reduction is warranted. According to Plaintiffs, counsel billed 5257.34 hours, but, in exercising billing judgment, counsel reduced the total hours by 1338.74 hours, equating to a 25.46% reduction of hours and a 23.52% reduction of the lodestar amount in the amount of $408,550.36, leaving 3918.6 total hours claimed for attorneys' fees and costs (Schmidt Decl., at ¶¶11, 19-23 & Exs. 1-3). Plaintiffs additionally seek attorneys' fees for 118.45 hours expended preparing the instant motion and reply brief, which Plaintiffs assert constitutes a 34% self-reduction for billing judgment (Doc. 220, at 16).

Notwithstanding Plaintiffs' efforts at self-reduction, an across-the-board reduction of 25% shall be applied. *See, e.g., Am. Canoe Ass'n, Inc. v. City of Louisa*, 683 F. Supp. 2d 480, 493-96 (E.D. Ky. 2010) (concluding that, when considering the totality of the relief obtained versus the amount of time and fees expended in a case involving claims under the CWA, a 25% reduction was appropriate). As addressed more fully during the hearing, although Plaintiffs vigorously pursued their claims and counsel competently represented the interests of their clients, this case did not impose a heavy burden on Plaintiffs to establish liability on behalf of the City. Indeed, as detailed above, prior to the initiation of this action, the City admitted wrongdoing and initiated the process of remedying its infractions (Doc. 54, Exs. C-F). Because of that, the City had already negotiated and agreed to the bulk of the essential settlement terms prior to Plaintiffs' involvement. While Plaintiffs obtained all the results they sought by this action, the additions in the Stipulated Order, though significant, did not substantially change

the outcome for the City. In fact, as the City indicated during the hearing, the additions included in the Stipulated Order did not require *any* changes to the budget. Given the foregoing, therefore, the undersigned deems a reduction of 25% of the attorneys' fees requested for litigation of this matter both reasonable and appropriate. Applying such reduction, the attorneys' fees for litigation of this action are reduced from $1,331,814 to $998,860.50.

With respect to the attorneys' fees for preparation of the instant motion and reply, a 50% reduction is warranted. Though the time expended in preparing and litigating the fee petition may be included in a fee award, such time must be *reasonable*. *See Greenfield Mills, Inc. v. Carter*, 569 F. Supp. 2d 737, 754 (N.D. Ind. 2008) ("Case law supports the general proposition that time expended in preparing and litigating the fee petition may be included in a fee award as long as the time is reasonable. … In deciding what amount of fees to award for litigating the fee issue, a court must consider whether the time expended on the fee petition was reasonable.") (citations omitted); *Am. Canoe Ass'n, Inc. v. U.S. E.P.A.*, 138 F. Supp. 2d 722, 746 (E.D. Va. 2001) ("It is well-settled that reasonable time and expenses spent preparing a fee petition are compensable. … As with a fee application for work performed on the merits of the case, however, a fee award for fee preparation work must be reasonable in the circumstances.") (citations and footnote omitted). As noted, Plaintiffs seeks $36,545 for 118.45 hours expended preparing the instant motion and reply. Essentially, Plaintiffs contend that it took three weeks (or more, if you take into consideration Plaintiffs' 34% self-reductions) to prepare the fee petition and reply. While the fee petition and reply are thorough and comprehensive, the hours expended are simply unreasonable. *See, e.g., Carter*, 569 F. Supp. 2d at 754 (finding that counsel's billing of a combined 127.70 hours on a fee petition, which encompassed six years of litigation, unreasonable and thus reducing the fee petition by 40% in a case involving a claim brought under the CWA). Accordingly, the attorneys' fees for the instant motion and reply are

reduced from $36,545 to $18,272.50. In sum, therefore, Plaintiffs shall be awarded attorneys' fees in the amount of $998,860.50 for litigation of this action and in an amount of $18,272.50 for the instant motion and reply, for a total award of attorneys' fees in the amount of $1,017,133.

### B. Expert Witness Fees and Costs

Plaintiffs additionally seek an award of expert witness fees and costs under 33 U.S.C. § 1365(d). *See also* Fed. R. Civ. P. 54(d). Courts maintain discretion to award or deny costs for citizens' suits under the CWA. *Friends of Everglades v. So. Fla. Water Mgmt. Dist.*, 865 F. Supp. 2d 1159, 1169 (S.D. Fla. 2011). As noted, Plaintiffs seek expert witness fees and costs in the amount of $167,095 (Schmidt Decl., at ¶¶79-82 & Exs. 4 & 6). In its response, the City "does not contend that the expert fees and costs requested by [] Plaintiffs are unreasonable and defers to the discretion of this Court in making award for the repayment of those expenses" (Doc. 219, at 19). During the hearing, however, the City indicated that it maintains no objection to the expert witness fees and costs requested by Plaintiffs. Accordingly, Plaintiffs shall be awarded expert witness fees and costs in the amount of $167,095.

### III. Conclusion

Based on the foregoing, it is hereby

ORDERED:

1. Plaintiffs' Motion for Attorneys' Fees and Costs under Section 505(d) of the Clean Water Act (Doc. 211) is GRANTED IN PART AND DENIED IN PART.

2. Plaintiffs are awarded attorneys' fees in the amount of $1,017,133.

3. Plaintiffs are awarded expert witness fees and costs in the amount of $167,095.

DONE AND ORDERED in Tampa, Florida, on this 30th day of March, 2020.

ANTHONY E. PORCELLI
United States Magistrate Judge

cc: Counsel of Record